# Exhibit B

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

SALIM MUHOOD ADEM,        )
         )
       Petitioner,    )
         )
v.         )     Civil Action No. 05-CV-00723 (RWR)(AK)
         )
GEORGE W. BUSH, *et al*    )
         )
       Respondents.    )
_____)

## <u>MEMORANDUM OPINION</u>

Pending before the Court is Petitioner Adem's Motion to Hold Respondents in Contempt of the Protective Order [23] ("Pet'r Contempt Mot."), the Respondents' Opposition [26] ("Resp'ts Contempt Opp'n")[1] and Petitioner's Reply [28] ("Pet'r Contempt Reply"), as well as Petitioner's Motion to Expedite Petitioner Access to Counsel [31] ("Pet'r Mot. to Exp."),[2] a Supplement to the Motion to Expedite [32] ("Pet'r Supp."),[3] Respondents' Opposition to the

_____

[1]Respondents' Opposition to Petitioner's Motion for Contempt was also filed as a separate Motion for an Order to Show Cause Why the Case Should not Be Dismissed for Lack of Proper Next Friend Standing [27] ("Resp'ts' Show Cause Mot."). The Petitioner filed a Response [28] on Jan. 3, 2006, which was also filed as his Reply in Support of the Motion for Contempt. Respondents filed a Reply [30] ("Resp'ts' Show Cause Reply") on Jan. 13, 2006. The Motion for an Order to Show Cause is not technically pending before this Court. However, because Respondents' opposition and motion are identical, the Court's opinion inevitably addresses some of the issues raised by Respondents' Motion for an Order to Show Cause and the responsive pleadings.

[2]The Motion to Expedite Petitioner Access to Counsel and the Supplement seek substantially the same relief as Petitioner's original Motion to Hold Respondents in Contempt, namely, an order directing that Petitioner be allowed to meet with his counsel.

[3]On November 2, 2005, in recognition of "the need to promote orderly and efficient case management of all *habeas* petitions . . . relating to the rights of [Guantanamo] detainees," Judge

Motion to Expedite and the Supplement [33]/[34] ("Resp'ts Opp'n to Mot. to Exp."), and

Petitioner's Reply in Support of his Motion to Expedite [35] ("Pet'r Exp. Reply").

In his motions, Petitioner claims that Respondents have refused and continue to refuse

counsel access to Petitioner as required by the Protective Order.  The Government insists that

counsel provide written evidence of their authorization to represent the Petitioner before counsel

will be allowed to meet with him.   Upon consideration of the filings submitted by the parties,

and following a conference with counsel for Petitioner and Respondents, the Court finds that a

plain reading of the Protective Order dictates that Petitioner's counsel be allowed to meet with

their client in order to obtain the very authorization of representation that Respondents insist be

provided prior to any visits.  Respondents are ordered to comply with the Protective Order and

allow counsel to visit with Adem.

## Factual and Procedural Background

At their core, the issues presented to this Court are about the right of detainees at

Guantanamo to have access to counsel if they so choose.  At some point in late 2004, well over a

year ago, Petitioner Salim Muhood Adem asked for a lawyer to help him challenge his

potentially indefinite detention without charge by the United States at the Naval Base in

Guantanamo Bay, Cuba.  Al-Rawi Decl. ¶ 5, attached as Exhibit A to Clingman Decl., attached

---

Kessler, acting as Chair of the Calendar and Case Management Committee referred all motions "pertaining to interpretation or construction of any protective order" entered in any of the Guantanamo *habeas* cases to the undersigned for resolution pursuant to LCvR 72.2(a).  A party may seek reconsideration of a ruling by a magistrate judge within 10 days after being served with the magistrate judge's order.  LCvR 72.2(b). Rulings issued by a magistrate judge pursuant to LCvR 72.2 are reviewed by the district court judge, in this case Judge Roberts, on a "clearly erroneous" or "contrary to law" standard. LCvR 72.2(c).

as Exhibit 1 to Pet'r Mot. to Exp.   Adem, who does not speak English, communicated his

request for counsel to a fellow detainee, Mr. Bisher Al-Rawi, while they were housed together in

Camp Delta.  Al-Rawi Decl. ¶ 5.  Adem knew that Al-Rawi, who speaks both English and

Arabic, was represented by counsel and "he specifically requested that [Al Rawi] try to get him

an attorney." *Id.*  Al-Rawi passed Adem's request for counsel to his own lawyer, Brent Mickum,

Esq. *Id.* ¶¶ 2-3.  Mr. Mickum, in turn, found Adem a lawyer through the Center for

Constitutional Rights, whose lawyers are "of counsel" in the majority of Guantanamo *habeas*

cases.

Murray Fogler, Esq. volunteered to represent Adem free of charge and filed a *habeas*

petition on his behalf in April of 2005.  On Nov. 10, 2005, having obtained their security

clearances, counsel for Adem requested permission to meet with their client.  Fogler Decl. ¶ 6,

Dkt. No. 25.  Respondents, however, refused to permit counsel to meet with Adem absent

written evidence either in the form of a "next friend" petition or directly from Adem authorizing

counsel to represent him.  *Id.* ¶¶ 7-9.

On December 9, 2005, Petitioner filed the instant Motion to Hold Respondents in

Contempt for refusing to permit counsel to meet with Adem in violation of the Protective Order.

Respondents filed their Opposition on December 22, 2006.   On December 29, 2005, this Court

met with counsel for Petitioner and Respondents.  Petitioner's counsel agreed that they would

seek additional information from Al-Rawi regarding the circumstances of his relationship with

Adem.  The undersigned deferred ruling on Petitioner's motions pending receipt of the additional

3

information, which counsel submitted in early February.[4]

Adem has now had a lawyer for nearly a year.  However, it is unclear if Adem even knows that his lawyer exists because Respondents refuse to acknowledge counsel's authority to represent him.  Counsel for Adem seek to meet with their client in order to confirm that he does, in fact, want representation.  *See* Pet'r Contempt Mot. at 2.  Respondents insist that before counsel will be allowed to meet with their client, the Protective Order requires that they provide evidence of their authority to represent him.[5]  *See* Resp'ts Contempt Opp'n at 5.  Alternatively, Respondents argue that Adem may convert his direct petition to a "next friend" petition. *Id.* at 11. However, as the pleadings in this and other Guantanamo *habeas* cases demonstrate, Respondents do not consider Al-Rawi to be a proper "next friend."  *Id.* at 11-20.  According to Respondents,

---

[4]*See* Clingman Decl. ¶ 4, attached as Exhibit 1 to Pet'r Mot. to Exp.1; Al-Rawi Decl. ¶¶ 2-8, attached as Ex. A to Clingman Decl.; Gutierrez (Al-Rawi) Decl. ¶¶ 6-29, attached as Exhibit B to Pet'r Supp. to Mot. to Exp.

[5]In response to Petitioner's objection that such evidence is hard to come by without ever seeing their client, Respondents suggested that counsel mail their client a letter.  Notwithstanding their objection that the Protective Order does not limit counsel to obtaining authorization of representation through the mail, counsel for Adem attempted to mail their client a letter, only to find themselves in another catch-22.  Because Respondents do not acknowledge counsel's authority to represent their client, Respondents refused to allow counsel to utilize the procedures put in place for "legal mail" under the Protective Order. Pet'r Mot. to Exp. at 3-4.

The Amended Protective Order and Revised Access Procedures, (collectively "the Protective Order"), govern detainees' access to the outside world. The Protective Order was initially entered by Judge Joyce Hens Green in *In re Guantanamo Detainee Cases*, 344 F. Supp. 2d 174 (D.D.C. 2004).  The Revised Access Procedures are attached as Exhibit A to the Amended Protective Order.  The Protective Order provides for two different mail systems: one for legal mail and one for non-legal mail.  *See* Protective Order, Ex. A § IV.  "Legal mail" includes any "letters written between counsel and a detainee that are related to the counsel's representation of the detainee."  *Id.*, Ex. A § II.E.  Detainees may also send non-legal mail, including letters to family, but non-legal mail is subject to review and censorship by military personnel at Guantanamo and takes much longer to process than legal mail.  *Id.*, Ex. A § IV.

only a family member or a close personal friend has standing to assert the interests of Adem through the "next friend" device.  Otherwise, argue Respondents, how can the Court be assured that Adem really does want to challenge his detention?  *Id.* at 18-19.

For reasons explained in this memorandum opinion, Respondents' arguments are misplaced. The Protective Order manifestly does not require evidence of authority to represent a detainee as a ***prerequisite*** to counsel meeting with a detainee.  Rather, the Protective Order plainly provides that counsel who purportedly represent a particular detainee must provide evidence of their authority to represent that detainee within ***10 days*** of counsel's ***second visit*** with the detainee. *See* Protective Order, Ex. A § III.C.2   Because Adem, through counsel, has filed a direct petition, the Court's Order rests on this holding alone.

However, as is explained in greater detail below, even if counsel had filed Adem's *habeas* petition through Al-Rawi as "next friend," the Protective Order would still grant counsel two visits with Adem directly (plus 10 days) before any challenge to Al-Rawi's standing as next friend would be ripe.  Had Adem's *habeas* petition been filed through Al-Rawi as 'next friend,' upon receiving evidence of counsel's authority to represent Adem directly, the Court would simply convert the "next friend" petition into a direct petition.  If, on the other hand, evidence of counsel's authority to represent Adem is not forthcoming within ten days of counsel's second visit with Adem, then, and only then, would a motion to dismiss for lack of proper "next friend" standing be appropriate.

## Analysis

I.   *History of the Protective Order and the Use of "Next Friends" in Guantanamo Habeas Cases*

It appears to the Court that the dispute between Adem and Respondents is the result of unnecessary confusion over the use of the terms "friend" and "next friend." This confusion is unfortunate, but perhaps understandable given the history of the Guantanamo *habeas* cases. On June 28, 2004, the Supreme Court ruled that the District Court had jurisdiction to consider aliens' "*habeas corpus* challenges to the legality of their [executive] detention at the Guantanamo Bay Naval Base." *Rasul v. Bush*, 542 U.S. 466, 484 (2004).

> Petitioners contend that they are being held in federal custody in violation of the laws of the United States. No party questions the District Court's jurisdiction over petitions' custodians. Section 2241, by its terms, requires nothing more.

*Id.* at 483-84

Prior to *Rasul*, the Government claimed authority to hold detainees at Guantanamo completely incommunicado and without access to counsel. *Id.* at 471-72. Until *Rasul*, therefore, the detainees at Guantanamo had neither access to the attorneys claiming to represent them nor the ability to personally seek relief from the courts reviewing their claims. Thus, *Rasul* and the related *habeas* cases were necessarily filed through other individuals, primarily relatives, acting as "next friends" as that term is traditionally used in the law. *Id.* at 471. A "next friend," as traditionally understood, functions as a guardian *ad litem*, standing in the shoes of the real party in interest throughout the entire litigation when the real party in interest is unable to represent himself or herself.[6]

---

[6]"Next friend" standing is a procedural mechanism by which a lawsuit is prosecuted or defended by someone other than the real party in interest. The practice of a "next friend"

Once *Rasul* rejected the proposition of Guantanamo Bay as a legal black hole, the "next friend" device, at least as the term is traditionally understood in its legal context, became unnecessary to sustain a *habeas* petition because detainees could eventually access counsel directly.  On July 19, 2004, the Court of Appeals for the D.C. Circuit remanded *Rasul* and the related cases back to the District Court for further proceedings in light of the Supreme Court's opinion.  On remand, the Government began drafting proposed procedures that would govern detainees' access to counsel.  *See Rasul v. Bush*, No. 02-299 (D.D.C. July 26, 2004) (Dkt. No. 51) (order instructing parties to file a joint status report and briefing schedule regarding proposed procedures for counsel access to detainees); *Al Odah v. United States*, No. 02-828 (D.D.C. July 23, 2004) (Dkt. No. 38) (order setting briefing schedule on issue of "all proposed procedures with respect to counsel access that the Government intends to apply to the Guantanamo Bay detainees").

On Oct. 20, 2004, Judge Kollar-Kotelly ruled on the merits of the Government's proposed procedures.  *Al Odah v. United States*, 346 F. Supp. 2d 1, 5-14 (D.D.C. 2004).  *Al*

---

standing in the shoes of the real party in interest is an "ancient and fully accepted" practice, *U.S. ex rel Bryant v. Houston*, 273 F. 915, 916 (2d Cir. 1921), deriving from early English statutes, *see Whitmore v. Arkansas*, 495 U.S. 149, 162 (1990) (tracing development of "next friend" doctrine in *habeas* proceedings to English Habeas Corpus Act of 1679).  Traditionally, a "next friend" stands in the shoes of the real party in interest when he or she cannot maintain the suit due to inaccessability, *see Whitmore*, 495 U.S. at 162-63, incapacity, *see Abbott v. Hancock*, 31 S.E. 268, 269 (N.C. 1898) ("next friend" permitted to prosecute tort action on behalf of an "insane" person); *Garnett v. Garnett*, 114 Mass. 379 (1874) ("next friend" permitted to bring divorce action on behalf of "insane" person), or infancy, *Blumenthal v. Craig*, 81 F. 320, 321-22 (3d Cir. 1897).  "A 'next friend' does not himself become a party to the *habeas corpus* [or other] action. . . but simply pursues the cause on behalf of the detained [or incapacitated] person, who remains the real party in interest." *Whitmore*, 495 U.S. at 163.  In that sense, "[a] 'next friend' resembles . . . a guardian ad litem" who prosecutes or defends the case from start to finish on behalf of another. *Morgan v. Potter*, 157 U.S. 195, 198 (1895).

*Odah* set the parameters for the final Amended Protective Order and Revised Access Procedures subsequently approved by Judge Joyce Hens Green in *In re Guantanamo Cases*, 344 F. Supp. 2d 174 (D.D.C. 2004).[7]   In *Al Odah*, petitioners had challenged the government's proposed procedures for counsel access, which contained significant restrictions on attorney-client communications, including real-time monitoring of counsel meetings with detainees.  *Al Odah*, 346 F. Supp. 2d at 3-4.  The Government took the position that detainees' access to counsel existed purely at the pleasure of the Government, with restrictions to be imposed as it saw fit.  *Id.* at 3.  *Al Odah* flatly rejected the Government's position, *id.* at 5-8, and with it certain of the Government's proposed procedures, *id.* at 9-14.  *Al Odah* held that the Guantanamo detainees are entitled to be represented by counsel and that this Court has the authority to "craft the procedures necessary" to enforce that right.  *Id.* at 7. On that basis, *Al Odah* rejected the Government's proposal that it be allowed to monitor counsels' meetings with their clients and conduct a classification review of counsels' notes and mail between counsel and detainees. *Id.* at 9-12.

Instead, Judge Kollar-Kotelly proposed a compromise framework under which counsel would have completely unmonitored access to their clients, but which would permit the government to conduct a classification review of attorney notes and detainee legal mail only if

---

[7]The judges of this District Court transferred the Guantanamo Bay *habeas* cases to Judge Green for coordination and management, including rulings on all common procedural issues, on Sept. 14, 2004, after briefing on the Government's proposed procedures for counsel access in *Al Odah* had been completed and a hearing held before Judge Kollar-Kotelly.  *Al Odah*, 346 F. Supp. 2d at 5 n.5.

the attorney who received the information wished to disclose the information to anyone else, including other counsel. *Id.* at 13-14. This framework subsequently became the basis for the Protective Order that now governs counsel access to detainees held at Guantanamo. *See* Resp'ts' Response on Proposed Procedures for Counsel Access, *Al Odah*, 02-828 (D.D.C. Nov. 4, 2004) (Dkt. No. 135) (acceding to "'closed universe' approach proposed by Judge Kollar-Kotelly").

Following *Rasul* and *Al Odah*, the Government began, on a rolling basis, to notify detainees that they had "the right to challenge the legality of their detention by filing *habeas corpus* petitions in federal court." (Second) Sweigart Decl. ¶¶ 2-5, attached as Exhibit A to Resp'ts' Contempt Opp'n. The "notification"[8] consists of approximately two paragraphs instructing detainees that they may challenge their detention "through a process called *a petition for a writ of habeas corpus*."[9] (Second) Sweigart Decl., Exs. A-C.

The notification tells detainees they may ***either*** file a "petition" themselves ***or*** they "may ask a friend or family member or a lawyer to file such a petition with the

---

[8]The Department of Defense (DoD) issued three different types of notifications to detainees, depending on whether the detainee had been determined 1) an enemy combatant whose status may be reviewed by the Administrative Review Board (ARB), 2) an enemy combatant not eligible for ARB consideration because he is triable by Military Commission, or 3) a non-enemy combatant. (Second) Sweigart Decl. ¶¶ 3-5, Exs. A-C. Although each notification contains slightly different information, all three contain the same two paragraphs informing detainees of their right to seek review of the legality of their detention.

[9]The notification fails to provide any explanation of what a petition for *habeas corpus* is or how a detainee would go about getting one. (Second) Sweigart Decl., Exs. A-C. Some detainees were apparently so confused about what to do with the notice that they "simply mailed the entire [blank] sheet itself back to the court because they did not know what else to do to get legal assistance." Gutierrez (Kabir) Decl. ¶ 12, *Razakah v. Bush*, 05-2370 (D.D.C. Feb. 3, 2006) (Dkt. No. 8).

court."[10]  *Id.*   Once a *habeas* petition is docketed and the Protective Order entered, counsel may meet with their detainee client.  *See* Protective Order, Ex. A § III.C.  Within ten days of their second meeting, counsel must provide DoD with "evidence of his or her authority to represent the detainee." *Id.* § III.C.2.  Thus, after *Rasul* and the creation of the Protective Order, the legal fiction of a "next friend" became largely irrelevant except as a mechanism for identifying those detainees who seek to challenge their detention in the first instance.[11]  In those *habeas* cases initiated since the creation and entry of the Protective Order, the detainees who initiated a *habeas* petition on behalf of a fellow detainee generally do not seek to serve as a "next friend" in the traditional sense, but are simply passing on another detainee's request for help, a fact that can be confirmed once counsel meets directly with the detainee.[12]

Unfortunately, post-*Rasul* and entry of the Protective Order, counsel for both Respondents and Petitioners continued to use the term "next friend," even though the term's

---

[10] The notification instructs detainees to write to the District Court in order to challenge their detention, but provides little in the way of explanation about what detainees should write:

> If you do not have a lawyer or a family member or friend who could file this petition for you, you may file your own petition.  According to prior court rulings, petitions should be sent to:
>
> United States District Court for the District of Columbia
> 333 Constitution Ave., NW
> Washington, DC 20001.

(Second) Sweigart Decl., Exs. A-C.

[11] A "next friend" might still be necessary if, however, a detainee is incapacitated or otherwise unable to personally verify his intent to challenge his detention.

[12] *See* Gutierrez (Kabir) Decl. ¶¶ 19-20; Gutierrez (Al-Rawi) Decl. ¶¶ 14-22; Al-Rawi Decl. ¶¶ 2-9.

10

traditional legal context no longer applied. This led the District Court in several instances to understandably assume that the so called "next friends" were in fact seeking to stand in the shoes of named detainees in the traditional sense, throughout the course of the *habeas* litigation.

In *Hamily v. Bush*, Judge Bates *sua sponte* issued an order to show cause why the case should not be dismissed for lack of "next friend" standing. *Hamily*, No. 05-763 (D.D.C. Oct. 3, 2005) (Dkt. No. 16) (Order to Show Cause). In *Hamily*, the detainee had filed a *habeas* petition through a fellow detainee, Shaker Aamer, as 'next friend' on April 15, 2005. Judge Bates issued the order to show cause because there was insufficient information in the record to determine whether Aamer could maintain "next friend" standing. *Id.* at 2. In fact, when the 'show cause' order was issued, counsel had already met directly with Hamily and obtained authorization of representation. However, counsel had failed to notify the Court of that fact. Smith Decl. ¶¶ 3-14, *Hamily v. Bush*, No. 05-763 (Oct. 31, 2005) (Dkt. No. 20). Upon learning that Hamily had personally requested counsel to challenge his detention, Judge Bates converted the case into a direct petition and substituted Hamily as the sole petitioner. *Hamily*, No. 05-763 (Oct. 31, 2005) (Dkt. No. 19).

From the time the Protective Order was first entered until approximately mid-summer 2005, the Government raised no objection to the practice of detainees initiating a *habeas* petition through a fellow detainee who was a friend because once the detainee confirmed his request for counsel, the question of 'next friend' standing was moot.[13] *See* Resp'ts' Response at 1-2, *Ahmed v. Bush*, No. 05-665 (June 23, 2005) (Dkt. No. 14) (taking no position on issue of "next friend"

---

[13]The issue of 'next friend' standing appears to have been raised for the first time *sua sponte* in *Ahmed v. Bush*, No. 05-665 (May 24, 2005) (Dkt. No. 12) .

standing other than to argue that the fellow detainee should only be permitted to serve as a "next friend" until such time as counsel could meet with Ahmed directly); *see also* Tarver Decl. ¶¶ 2-6, attached as Ex. 2 to Pet'r Mot. to Exp. (noting that counsel was permitted to meet directly with detainees who had filed *habeas* petitions through fellow detainees); *Sliti v. Bush*, No. 05-429 (D.D.C. 2005) (*habeas* petitions of seventeen detainees brought by three fellow detainees as 'next friends' without challenge).

After *Hamily* and *Ahmed*, however, Respondents began challenging the standing of fellow detainees to serve as "next friends."   At the same time, Respondents also refused to allow counsel to meet with the detainee who was the real party in interest, thereby placing counsel in a Sisyphean quagmire by preventing counsel from obtaining the authorization necessary to convert the case to a direct petition.  As a result, the cases in which Respondents are challenging the standing of fellow detainees to initiate a petition as a "next friend" have been at a standstill since approximately October of 2005.[14]

---

[14]In Oct. of 2005, a number of pending motions challenging "next friend" standing in Guantanamo *habeas* cases were transferred to Judge Oberdorfer pursuant to LCvR 40.6.  *See Ahmed Doe v. Bush*, No. 05-1458 (Oct. 13, 2005) (Dkt. No. 8); *Nabil v. Bush*, No. 05-1504 (Oct. 25, 2005) (Dkt. No. 8); *Al Hawary v. Bush*, No. 05-1505 (Oct. 25, 2005) (Dkt. No. 10); *Shafiiq v. Bush*, No. 05-1506 (Oct. 25, 2005) (Dkt. No. 10); *Idris v. Bush*, 05-1555 (Oct. 21, 2005) (Dkt. No. 6); *Al Razak v. Bush*, 05-1601 (Minute Order dated Nov. 14, 2005); *Kabir v. Bush*, 05-1704 (Nov. 1, 2005) (Dkt. No. 18); *Qasim v. Bush*, 05-1779 (Oct. 31, 2005) (Dkt. No. 4); *Zakirjan v. Bush*, 05-2053 (Oct. 21, 2005) (Dkt. No. 17); *Muhammed v. Bush*, 05-2087 (Nov. 11, 2005) (Dkt. No. 11). In response to Petitioners' allegations that Respondents were preventing counsel from obtaining direct authorizations from their detainee-clients, Judge Oberdorfer ordered Petitioners and Respondents to confer with this Court to determine "how counsel for Petitioners may obtain access to the detainees who allegedly seek to be represented by next friends to determine if the detainees will authorize counsel to represent them directly."  *See* Order of Oberdorfer, J., dated Nov. 4, 2005.

Pursuant to Judge Oberdorfer's Order, this Court held a conference with counsel for the Petitioners and Respondents in those cases in which a 'next friend' challenge had been raised. The Court instructed Petitioners' counsel to meet with as many of the "next friends" as possible

II. *Existing Procedures for Providing Detainees with Meaningful Access to Counsel and the Court*

The DoD "notifications" instruct detainees that they may either file a petition themselves or they "may ask a friend or family member or a lawyer to file such a petition with the court." (Second) Sweigart Decl., Exs. A-C. The District Court received approximately 56 "*pro se* petitions"[15] in response to the DoD notifications.[16] Respondents point to these *pro se* petitions as

---

to seek additional information about the circumstances of their relationships with the detainees who are the real parties in interest. Gitanjali Gutierrez, who is of counsel in many of the Guantanamo *habeas* cases, met with Mr. Al-Rawi, Mr. Kiyemba and Mr. Kabir. These meetings shed some light on the ways detainees may have understood their legal rights and the process for challenging their detention in federal court. *See* Gutierrez (Al-Rawi Decl.); Gutierrez (Kabir) Decl. Respondents have since transferred Jamal Kiyemba to the custody of the government of Uganda. *See* Respondents' Notice of Transfer, *Deghayes v. Bush*, 04-2215 (Feb. 9, 2006) (Dkt. No. 39). Kiyemba, who speaks English, had relayed the requests of three other detainees for a lawyer to his lawyer. *See Nabil v. Bush*, No. 05-1504; *Shafiq v. Bush*, No. 05-1506; *Muhammed v. Bush*, No. 05-2087.

Adem's petition is presently filed as a direct petition, and was therefore not one of the cases referred to Judge Oberdorfer. Rather, the motions currently before the Court were referred directly to the undersigned by Judge Roberts. However, because Respondents argue that Adem's petition should have been filed as a 'next friend,' many of the issues are identical.

[15]The term "*pro se* petition" is something of a euphemism in this context. Because the notifications provided no explanation about the meaning of "*habeas corpus*" or what steps a detainee should take to challenge his detention, the responses received by the District Court varied widely. The Court received lengthy letters of several pages as well as letters that consisted of little more than a few sentences asking for an explanation for their detention. The Court treated these inquiries as *pro se* petitions.

[16]*See* Resp'ts' Contempt Opp'n at 13 n. 9 (listing *Khiali-Gul v. Bush*, No. 05-877; *Rahmattulah v. Bush*, No. 05-878; *Mohammad v. Bush*, No. 05-879; *Nasrat v. Bush*, No. 05-880; *Slahi v. Bush*, No. 05-881; *Rahman v. Bush*, No. 05-882; *Bostan v. Bush*, No. 05-883; *Muhibullah v. Bush*, No. 05-884; *Mohammad v. Bush*, No. 05-885; *Wahab v. Bush*, No. 05-886; *Chaman v. Bush*, No. 05-887; *Gul v. Bush*, No. 05-888; *Basardh v. Bush*, No. 05-889; *Khan v. Bush*, No. 05-890; *Nasrullah v. Bush*, No. 05-891; *Shaaban v. Bush*, No. 05-892; *Sohail v. Bush*, No. 05-993; *Tohirjanovich v. Bush*, No. 05-994; *Slahi v. Bush*, No. 05-995; *Mohammad v. Bush*, No. 05-996; *Khudaidad v. Bush*, No. 05-997; *Al Karim v. Bush*, No. 05-998; *Al-Khalaqi v. Bush*, No. 05-999; *Sarajuddin v. Bush*, No. 05-1000; *Kahn v. Bush*, No. 05-1001; *Mohammed v. Bush*,

evidence that detainees are able to challenge their detention without seeking the assistance of a

fellow detainee, arguing in effect that Adem must not want to challenge his detention because he

did not submit a *pro se* petition directly to the Court. Resp'ts' Contempt Opp'n at 13-15.   The

evidence suggests, however, that DoD's attempts to notify detainees of their right to challenge

their detention have been marginally effective at best.

First, it appears that there was significant confusion among detainees about what the DoD

notifications were and what the detainees should do with them.  *See* Gutierrez (Al-Rawi) Decl. ¶¶

6-12.   As noted previously, the DoD notice informed detainees that they could "ask a civilian

judge to look at the lawfulness of your detention through a process called a *petition for a writ of*

*habeas corpus*" without providing any further explanation. *See* (Second) Sweigart Decl., Exs. A-

C.   According to Al-Rawi, "[n]o U.S. personnel are available at the base to answer any

detainee's questions about how to obtain a lawyer or what a *habeas* petition is."  Gutierrez (Al-

Rawi) Decl. ¶ 12; *see also* Gutierrez (Kabir) Decl. ¶ 18 (noting that the Military Police "were

prohibited from helping the detainees with any legal or other questions about the notification").

Petitioner asserts that detainees who tried to ask their "personal representative" for an

---

No. 05-1002; *Mangut v. Bush*, No. 05-1008; *Hamad v. Bush*, No. 05-1009; *Khan v. Bush*, No.
05-1010; *Zuhoor v. Bush*, No. 05-1011; *Ali Shah v. Bush*, No. 05-1012; *Salaam v. Bush*, No. 05-
1013; *Mammar v. Bush*, No. 05-1233; *Ahmed v. Bush*, No. 05-1234; *Baqi v. Bush*, No. 05-1235;
*Abdulzaher v. Bush*, No. 05-1236; *Aminullah v. Bush*, No. 05-1237; *Ghalib v. Bush*, No. 05-
1238; *Al Khaiy v. Bush*, No. 05-1239; *Altaiy v. Bush*, No. 05-1240; *Bukhari v. Bush*, No. 05-
1241; *Pirzai v. Bush*, No. 05-1242; *Peerzai v. Bush*, No. 05-1243; *Alsawam v. Bush*, No. 05-
1244; *Mohammadi v. Bush*, No. 05-1246; *Al Ginco v. Bush*, No. 05-1310; *Ullah v. Bush*, No. 05-
1311; *Al Bihani v. Bush*, No. 05-1312; *Sadkhan v. Bush*, No. 05-1487; *Faizullah v. Bush*, No. 05-
1489; *Faraj v. Bush*, No. 05-1490; *Khan v. Bush*, No. 05-1491; *Ahmad v. Bush*, No. 05-1492;
*Amon v. Bush*, No. 05-1493; *Idris v. Bush*, No. 05-1555; *Jamolivich v. Bush*, No. 05-2112).

explanation of a *habeas* petition "received no response."[17]  *See* Gutierrez (Al-Rawi) Decl. ¶ 12.

As one detainee complained in his letter directly to the Court:

> Here we are, sending you the so-called petition, Writ of habeas corpus. And I don't know any details about it.  I have asked the camp administration for a lawyer about four to six months ago and there was no attention given to the matter. Please, send a lawyer with either a verbal or written message [in response] to this letter so that I can be understand that [sic] the petition is and what this court is all about.

*Al Bihani v. Bush*, 05-1312 (June 30, 2005) (Dkt. No. 1).

Language issues appear to have compounded the confusion. The DoD notice was translated into Arabic and several other languages, but, according to one detainee who speaks both Arabic and English, the Arabic version was much more difficult to understand.  Gutierrez (Kabir) Decl. ¶ 18.   This same detainee did not understand what a *habeas corpus* petition was until he spoke to his own lawyer. *Id.*  Additionally, those detainees who are illiterate in their own language had "to ask another detainee to read the notification to him, if he was in a camp where this was even possible."  *Id.*

According to Al-Rawi, after receiving the DoD notice, a group of Afghani detainees decided to try to write to the Court because they thought they had nothing to lose.  *Id.* ¶ 8. However, Al-Rawi believed that the only reason the Afghani detainees were able to send letters to the Court is because one of the Afghani detainees spoke some English and because these particular detainees were held in a group setting. *Id.* ¶ 9.   According to Al-Rawi, the Afghani detainees discussed the DoD notice and wrote their letters to the Court as a group. *Id.*  However, this kind of collective action "cannot happen in other blocks because the prisoners cannot easily

---

[17]The Court assumes that the "personal representative" referred to in the Declaration is the same personal representative assigned to assist the detainee in the Combatant Status Review Tribunal.

speak as a group to discuss their options for challenging their detention."[18] *Id.*

Petitioner alleges, however that most detainees did not trust that "writing a simple letter would do anything" Gutierrez (Al-Rawi) Decl. ¶¶ 6-7. According to Al-Rawi, "the authorities at Guantanamo have deceived the prisoners so consistently and so often" the detainees simply do not trust anything they are told by their captors. *Id.* ¶ 6. Rather, "most detainees only trusted contacting other detainees who had actual *habeas* lawyers as a means of securing legal representation." *Id.*, ¶ 14. According to Al-Rawi, "[t]his was because the other prisoners had had time to get to know their lawyers, and learn whether they could be trusted." *Id.* Al-Rawi

---

[18]The circumstances under which the District Court received the 56 *pro se* petitions lends credence to Al-Rawi's allegations. All but one of the *pro se* petitions were submitted by detainees between mid-February and late May. At least 34 were submitted by detainees during the month of March, (some are undated), although it appears to have taken anywhere from two to four months before they were delivered to the Court. *See Khiali-Gul v. Bush*, No. 05-877; *Rahmattulah v. Bush*, No. 05-878; *Mohammad v. Bush*, No. 05-879; *Nasrat v. Bush*, No. 05-880; *Slahi v. Bush*, No. 05-881; *Rahman v. Bush*, No. 05-882; *Bostan v. Bush*, No. 05-883; *Muhibullah v. Bush*, No. 05-884; *Mohammad v. Bush*, No. 05-885; *Wahab v. Bush*, No. 05-886; *Chaman v. Bush*, No. 05-887; *Basardh v. Bush*, No. 05-889; *Khan v. Bush*, No. 05-890; *Nasrullah v. Bush*, No. 05-891; *Shaaban v. Bush*, No. 05-892; *Sohail v. Bush*, No. 05-993; *Tohirjanovich v. Bush*, No. 05-994; *Mohammad v. Bush*, No. 05-996; *Khudaidad v. Bush*, No. 05-997; *Al Karim v. Bush*, No. 05-998; *Al-Khalaqi v. Bush*, No. 05-999; *Sarajuddin v. Bush*, No. 05-1000; *Kahn v. Bush*, No. 05-1001; *Mohammed v. Bush*, No. 05-1002; *Mangut v. Bush*, No. 05-1008; *Hamad v. Bush*, No. 05-1009; *Khan v. Bush*, No. 05-1010; *Zuhoor v. Bush*, No. 05-1011; *Ali Shah v. Bush*, No. 05-1012; *Salaam v. Bush*, No. 05-1013; *Ghalib v. Bush*, No. 05-1238; *Peerzai v. Bush*, No. 05-1243; *Alsawam v. Bush*, No. 05-1244; *Mohammadi v. Bush*, No. 05-1246.

Of these 34 petitions, nearly half were written over a period of four days (March 1 to March 4), appear to be written by Afghani detainees and are strikingly similar in style and content. *See Khiali-Gul v. Bush*, No. 05-877; *Rahmattulah v. Bush*, No. 05-0878; *Mohammad v. Bush*, No. 05-879; *Nasrat v. Bush*, No. 05-880; *Rahman v. Bush*, No. 05-882; *Bostan v. Bush*, No. 05-883; *Muhibullah v. Bush*, No. 05-884; *Mohammad v. Bush*, No. 05-885; *Wahab v. Bush*, No. 05-886; *Chaman v. Bush*, No. 05-887; *Basardh v. Bush*, No. 05-889; *Khan v. Bush*, No. 05-890; *Nasrullah v. Bush*, No. 05-891; *Sohail v. Bush*, No. 05-993; *Ghalib v. Bush*, No. 05-1238. Significantly, one of these fifteen petitions was written in English by an Afghani detainee. *Sohail v. Bush*, No. 05-993.

also stated that he knew, based on conversations with Adem directly, that Adem does not trust

his military captors and would therefore view anything from the military with suspicion. *See* Al-

Rawi Decl. ¶ 8.

Additionally, the DoD notices told detainees to write to a "court," whereas the detainees

"were seeking an 'attorney' to help them."[19] Gutierrez (Kabir) Decl. ¶ 9. Detainees have no way

of knowing what kind of institution the United States District Court for the District of Columbia

is and whether it is associated with the military. *Id.* ¶ 8. According to Al-Rawi, the view of most

detainees that it was useless to try to write the Court has been confirmed by the fact that, as of

yet, no detainee who sent a letter to the Court has been able to meet with a lawyer.[20] Gutierrez

---

[19]In September 2005, DoD began to notify some detainees that they could obtain a lawyer by sending a form to the American Bar Association (ABA). (Second) Sweigart Decl. ¶ 7. The ABA notice uses so much legal and technical language that the Court doubts it would mean much of anything to an individual not already familiar with the United States legal system. *Id.*, Ex. E. More importantly, however, it is unclear whether any detainees have received the notice, other than the 56 detainees who already sent *pro se* petitions to the District Court. *Id.* ¶ 7. Respondents assert that they have delivered the notice "to all *pro se* petitioners who are not already represented by counsel." *Id.* Since the District Court appointed Federal Public Defenders to serve as counsel to the unrepresented *pro se* petitioners within a month of DoD mailing the ABA notice, it is unclear what relevance the notice has for those detainees. Additionally, Respondents state that they "will continue to deliver" the ABA notice to all "other detainees who request the assistance of counsel." *Id.* Respondents do not claim that the ABA notice has yet been sent to any detainee other than those detainees who have already communicated with the Court. Perhaps this is merely an oversight, but Respondents also fail to explain how delivery of the ABA notice is triggered. Does a request to another detainee count? If so, how does DoD learn about the request? What about a statement to a guard or the detainee's "personal representative"? Is the detainee obliged to make some sort of formal request for counsel in writing? Given Respondents' insistence on the niceties of form, these are hardly empty questions.

[20]The Court received the majority of the 56 *pro se* petitions in May of 2005. In October of 2005, the Court appointed Federal Public Defender Offices to represent the *pro se* detainees. Although the District Court mailed an acknowledgment to each detainee who had personally submitted some sort of request for assistance, it appears that the notices, written in English, may never have been translated. Gutierrez (Al-Rawi) Decl. ¶ 10. As a result, those detainees who

(Al-Rawi) Decl. ¶¶ 10-11.

Al-Rawi, who speaks English, and who is himself represented by counsel, offered to help other detainees file a *habeas* petition because the DoD notice "specifically said that he could." *Id.* ¶¶ 16-20. Al-Rawi claims that he knows Adem personally because they lived together for some period of time in Camp Delta. Al-Rawi Decl. ¶ 5. Adem specifically asked Al-Rawi to help him get a lawyer.[21] *Id.* ¶¶ 3-6. Several other detainees did the same. *See* Gutierrez (Al-Rawi) Decl. ¶¶ 14-21. Al-Rawi sent a letter to Mr. Mickum, his own lawyer, listing the names of the detainees who had come to him asking for help in getting a lawyer. Resp'ts' Show Cause Reply, Ex. A ¶ 10. Al-Rawi listed Adem's name, his ISDN number and his home country (Sudan). *Id.* He also noted that Adem had attempted to write directly to Mr. Mickum, but the letter apparently never arrived.

According to Al-Rawi, when he "gave his attorney authorizations from other detainees, he was conveying 'their words, their wishes.'" Gutierrez (Al-Rawi) Decl. ¶ 18. Adem and other detainees sought help from Al-Rawi because he had a lawyer whom he trusted and also because he spoke English and could help translate detainees' requests for a lawyer. *Id.* ¶¶ 18-19.

---

received a letter from the Court may have no idea that the Court is presently reviewing the legality of their detention. After waiting several months for security clearances, several appointed counsel are scheduled to meet with clients for the first time in early March 2006. It is the Court's understanding, however, that as of mid-February, nearly a year after the *pro se* petitions were written by the detainees, not a single detainee represented by appointed Federal Public Defender counsel had met or spoken with his lawyer.

[21]Al-Rawi also filed as a 'next friend' in *Idris v. Bush,* No. 05-1555, consolidated with *Edries v. Bush*, No. 05-1725. Respondents initially challenged Al-Rawi's standing to act as a 'next friend' in that case as well, but the case was converted to a direct petition after determining that the petitioner had written a letter directly to the Court. Idris' letter to the Court took six months to arrive.

According to Al-Rawi, the detainees who sought his help "held out some hope that their

translated requests would reach a lawyer who could help them if Al-Rawi gave the request

directly to his lawyer, rather than sending the letter in an abyss by mailing it through the military

mail system.[22] *Id.* ¶ 19.   The detainees whose requests Al-Rawi forwarded to his counsel

"continue to ask him if he has heard back from his lawyer." *Id.* ¶ 21.   They "want to know what

is happening with their request for a lawyer" and "are starting to believe that it is the habeas

lawyers' fault for not meeting them." *Id.*

Careful review of the pleadings and the Amended Protective Order and Revised

Procedures for Counsel Access convinces this Court that Respondents' arguments are without

---

[22]Respondents and Petitioner make widely divergent claims about the reliability of the
non-legal mail system in Guantanamo.  Respondents attest that detainees have "the opportunity
to send and receive mail" and that "[d]etainees cannot lose mail privileges for any reason,
including as part of disciplinary action or interrogation." (Second) Sweigart Decl., Ex. D.
According to Respondents, the non-legal mail system works smoothly and non-legal mail is
generally processed within 14 days on average. *Id.*  Petitioner, on the other hand, notes that
"there is anecdotal evidence that it takes months for regular correspondence to reach a detainee."
Pet'r Mot. to Exp. at 3-4.

It appears from evidence in other *habeas* cases that Petitioner's concerns may not be
entirely misplaced. Although most of the *pro se* petitions received by the Court took
approximately two months to be delivered, several *pro se* petitions did not arrive until 3 to 6
months after detainees sent them. *See Idris v. Bush*, No. 05-1555 (Aug. 2, 2005) (written on Feb.
12; received on Aug. 2); *Mammar v. Bush*, 05-1233 (June 22, 2005) (written on Jan. 30; received
on June 22); *Aminullah v. Bush*, 05-1237 (June 22, 2005) (written on Feb. 22; received on June
22); *Ghalib v. Bush*, 05-1238 (June 22, 2005) (written on March 3; received on June 22);
*Mohammadi v. Bush*, No. 05-1246 (June 22, 2005) (written on March 23; received on June 22);
*Peerzai v. Bush*, No. 05-1243 (June 22, 2005) (same); *Alsawam v. Bush*, No. 05-1244 (June 22,
2005) (written on March 14; received on June 22).   *See also* Pet'rs Mot. for an Order Amending
Protective Order for Non-Enemy Combatants at 7 n.7, *Qassim v. Bush*, 05-497 (Dkt. No.42)
(detainee's letter to his lawyer informing him that CSRT had exonerated him arrived exactly 100
days after it was mailed from Guantanamo); Gutierrez (Kabir) Decl. ¶ 13 (detainee "has not
received one letter from his attorney in six months, even though his attorney has written to him
several times"); Smith Decl. ¶ 80, attached as Exhibit 2 to Pet'r Response to Order to Show
Cause, *Nabil v. Bush*, 05-1504 (Nov. 18, 2005) (Dkt. No. 17) (noting routine delay of six months
for detainee-client letters to arrive).

merit. Adem, who has been detained *incommunicado* without charge by the United States, who does not speak English, who has no access to family or friends, has indicated to a fellow detainee who is represented by counsel that he wishes to challenge his potentially indefinite detention without charge. *Rasul* and *Al Odah* give him the right to have counsel. The Protective Order provides the mechanisms by which detainees may access the counsel to which they are entitled. Petitioner Adem's counsel have fully complied with the procedures necessary to meet with Adem. Nothing more is necessary.

III.    *Counsel Access to Detainees Under the Protective Order*

The "Amended Protective Order and Procedures for Counsel Access at the United States Naval Based in Guantanamo Bay, Cuba" ("Protective Order") and the "Revised Procedures for Counsel Access to Detainees at the United States Naval Base in Guantanamo Bay, Cuba ("Revised Access Procedures"), attached to the Protective Order as Exhibit A, govern the procedures by which counsel for Guantanamo detainees may meet and communicate with their clients. The Protective Order and Revised Access Procedures were initially entered by Judge Joyce Hens Green in November 2004 in *In re Guantanamo Detainee Cases*, 344 F. Supp. 2d 174 (D.D.C. 2004), and have since been entered in the vast majority of Guantanamo *habeas* cases currently pending in the District Court. The Protective Order and Revised Access Procedures were entered in Adem's case on June 3, 2006. *See* Dkt. No. 12. On June 6, 2005, Judge Roberts stayed Adem's case pending resolution of the appeals in *In re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443 (D.D.C. 2005), but provided that Petitioner could seek relief as necessary under the Protective Order. *See* Dkt. No. 13. The Protective Order and Revised Access Procedures

20

remain in effect in Adem's case.

As an initial matter, the Court respectfully declines Respondents' invitation to defer ruling on Adem's motion pending resolution of the jurisdictional and retroactivity questions raised by the Detainee Treatment Act of 2005 (the "DTA").[23]   The issues raised by Adem's motion seeking access to counsel pursuant to the Amended Protective Order do not implicate any of the jurisdictional questions currently pending in the D.C. Circuit and the Supreme Court.

Respondents concede, as they must, that the Protective Order remains in effect in Adem's case and in each of the Guantanamo *habeas* cases in which it was entered.  Counsel for other detainees continue to visit their clients according to its terms. Indeed, under no circumstances would DoD permit counsel to visit detainees in Guantanamo Bay without counsel's signed agreement to abide by the Protective Order.  When an attorney wishes to share information learned from a detainee with other co-counsel, members of the DoD Privilege Review Team continue to conduct classification reviews of detainee mail and attorneys' notes as required by the Protective Order.  The acknowledgments signed by *habeas* counsel agreeing to abide by the terms of the Protective Order remain in effect, *see* Protective Order, Ex. C, "Acknowledgment," and counsel remains subject to this District Court's contempt power, *see Armstrong v. Executive Office of the President*, 1 F.3d 1274, 1289 (D.C. Cir. 1993).  Were the situation reversed, and were counsel for a detainee alleged to have violated the Protective Order, the Court has no doubt that Respondents would seek relief immediately.

_____

[23]On December 30, 3005, President Bush signed into law the Detainee Treatment Act of 2005, Pub. L. No. 109-148, Tit. X, 119 Stat. 2680 (the "DTA"). Respondents argue that the DTA divests the District Court of jurisdiction over the Guantanamo *habeas* petitions, including those already filed prior to the DTA's passage.

21

"[A] protective order, like any ongoing injunction, is always subject to the inherent power of the district court." *Poliquin v. Garden Way, Inc.*, 989 F.2d 527, 535 (1st Cir. 1993); *see also Armstrong*, 1 F.3d at 1289 (recognizing courts' "inherent power to enforce compliance with their lawful orders"); *Broderick v. Donaldson*, __ F.3d __, 2006 WL 305505 at *6 (D.C. Cir. Feb. 10, 2006) (same); *cf. Gambale v. Deutsche Bank, AG*, 377 F.3d 133, 140-41 (2d Cir. 2004) (recognizing court's jurisdiction to modify protective orders that remain in effect, even after dismissal of the underlying litigation); *United Nuclear Corp. v. Cranford Ins. Co.*, 905 F.2d 1424, 1427 (10th Cir. 1990) (same), *cert. denied, American Special Risk Ins. Co. v. Rohm & Haas Co.*, 498 U.S. 1073 (1991).   It would be untenable for the District Court to be put in a position where it is powerless to enforce its own protective order, presently in effect and over which it has continuing control.[24]

The question of when, and under what circumstances the existing Protective Order permits Adem to meet with his lawyer has no bearing on the question of which Court has jurisdiction to review the merits of Petitioner's challenge to his detention.[25]   It has been over a year since Adem first tried to get a lawyer to help him challenge his detention.  It is simply

_____

[24]Respondents appear to concede this point, as they do not argue that this Court lacks jurisdiction to resolve disputes involving construction of the Protective Order.  Rather, Respondents suggest that it would be more "appropriate" to stay Petitioner's motion pending a further guidance by the D.C. Circuit or the Supreme Court regarding the effect of the DTA. Resp'ts' Reply at 1 n.1.; Resp'ts' Opp'n to Mot. to Exp. at 2.

[25]Presumably, counsel for Adem would also represent him in any proceedings before the D.C. Circuit.  Thus, the need to resolve questions regarding the logistics of counsel access will remain an issue, even if the D.C. Circuit and the Supreme Court determine that the DTA applies to those *habeas* cases currently pending in the District Court.  Moreover, it will undoubtedly take months for the courts to grapple with the jurisdiction and retroactivity questions presented by the DTA.  Forcing Adem to wait until all such proceedings and appeals are concluded before permitting him to speak with his lawyer renders his right to counsel meaningless.

unacceptable to wait any longer.

The Protective Order and the Revised Access Procedures govern in-person meetings with detainees, procedures for sending and receiving legal mail, handling of classified information and any other access and communications issues involving Guantanamo detainees who are seeking *habeas* relief in this District Court. The requirements for in-person access to detainees by their counsel are laid out in Section III of the Revised Procedures. Protective Order, Ex. A § III.

Under Section III of the Protective Order, *habeas* counsel must verify that they represent the detainee in question.[26] *Id.*, Ex. A § III.C. The Protective Order divides the verification process into two steps: 1) notification of representation[27] and 2) evidence of authority to represent the detainee. *Id.* Respondents argue that counsel must comply with both steps of the verification process before being allowed to visit with their client. Resp'ts Contempt Opp'n at 5. According to Respondents, the Protective Order "provides that '[p]rior to being permitted access to the detainee,' counsel must 'provide evidence of his or her authority to represent the detainee.'" Resp'ts Contempt Opp'n at 5.

Respondents quote the Protective Order in such a way that the phrase "prior to being permitted access to the detainee" appears linked to the phrase "evidence of authority to represent the detainee." *Id.* In fact, the phrase "prior to being permitted access to the detainee" only

---

[26]In addition to providing DoD with verification of representation, Counsel must also hold a valid security clearance at the Secret level or higher, *see* Protective Order, Ex. A § III.A, and must sign an affirmation acknowledging that they agree to "fully comply with the[] procedures" in the Protective Order, *id.* § III.B.1

[27]The Notification of Representation must include "counsel's licensing information, business and email addresses and phone numbers, as well as the name of the detainee being represented." *Id.*, Ex. A § III.C.1.

modifies the "notification of representation" requirement. Protective Order, Ex. A § III.C.1. By selectively combining two sentences into one, Respondents transform the meaning of the Protective Order.

Paragraph (1) of Section III.C of the Revised Procedures lists two requirements for verification: "notification of representation" and "evidence of [counsel's] authority to represent the detainee." However, while paragraph (1) makes the "notification of representation" a prerequisite to counsel's access to a detainee, it imposes no time frame for the evidence of authority to represent the detainee.

> Prior to being permitted access to the detainee, counsel must provide DoD with a *Notification of Representation*. This Notification must include the counsel's licensing information, business and email addresses and phone number, as well as the name of the detainee being represented by the counsel. Additionally, counsel shall provide evidence of his or her authority to represent the detainee.

*Id.*, Ex. A, § C.1

If paragraph C.1 contained the only reference to any time frame for submitting "evidence of authority," Respondents' interpretation might well be correct. The reference to "evidence of authority" in C.1 simply states "additionally," but provides no time by when counsel must provide the evidence to DoD. Standing alone, it might be reasonable to assume that the phrase "[p]rior to being permitted access to the detainee" was intended to apply to the "evidence of authority" requirement as well as the "notification of representation" requirement. The problem with Respondents' argument, however, is that the very next paragraph establishes a different deadline for providing the very "evidence of authority" referred to in paragraph C.1.

Paragraph C.1 ends with a sentence that imposes a requirement on counsel to submit evidence of their authority to represent the detainee to DoD. Paragraph C.2 begins by

24

establishing the deadline for counsel to fulfil this requirement:

> Counsel shall provide evidence of his or her authority to represent the detainee as soon as practicable and in any event no later than ten (10) days after the conclusion of a second visit with the detainee.

*Id.*, Ex. A § C.2.   By its plain terms, therefore, the Protective Order and Revised Procedures allow counsel a maximum of two visits with a detainee, plus ten days, before counsel must submit evidence of his or her authority to represent the detainee. *See Armstrong v. Executive Office of the President*, 830 F. Supp. 19, 22 (D.D.C. 1993) (construing protective order's "plain language").   To accept Respondents' interpretation of Paragraph C.1 would render Paragraph C.2 completely redundant.

The Court's reading is supported by the most basic cannons of construction.  It is a settled principle of contract[28] and statutory interpretation, for example, that when a word or phrase is used generally, and then later defined more narrowly, the narrow, more specific definition applies. *See, e.g.,* 5 Corbin on Contracts § 24.23 (Margaret N. Kniffin & Joseph M. Perilla eds., 1998); *Ki See Lee v. Ashcroft*, 368 F.3d 218, 223 (3d Cir. 2004) (noting "'commonplace [rule] of statutory construction' [] that the 'specific governs the general'").

Moreover, the Protective Order explains the basis for imposing separate time frames for submission of the "notification of representation" and the "evidence of authority."  The Protective Order grants counsel at least two visits with the detainee before counsel must submit evidence of their authority to represent the detainee in view of the logistical difficulties of meeting with Guantanamo detainees, most of whom do not speak English, and may have reason

---

[28]*Cf. Geller v. Branic Intern. Realty Corp.*, 212 F.3d 734, 737 (2d Cir. 2000) (applying contract law principles to interpretation of protective order).

25

to distrust American visitors. Protective Order, Ex. A § C.2 ("The Court recognizes that counsel may not be in a position to present such evidence after the initial meeting with a detainee); *see also* Tarver Decl. ¶¶ 2-13 (alleging that detainees were reluctant to sign "any piece of paper" due to abuse and deception by the military).

Respondents attempt to avoid the plain language of Paragraph C.2 by arguing that Paragraphs C.1 and C.2 refer to two different types of evidence of authority to represent a detainee. Resp'ts Contempt Opp'n at 5. According to Respondents, the Protective Order envisions a "two-layer requirement regarding counsel's authority to bring and then maintain the lawsuit." *Id.* at 5 n.2. According to Respondents, the phrase "evidence of authority to represent the detainee" referred to in Paragraph C.1 means either evidence from the "next friend," if the case has been initiated by a "next friend,"or, in the case of a direct petition, the *pro se* petition and evidence of appointment of counsel. *Id.* at 5. Respondents argue that the phrase "evidence of authority to represent the detainee" referred to in Paragraph C.2, by contrast, is a "second, subsequent type of authorization, directly from the detainee" that is only required when a *habeas* petition is initiated by a "next friend."[29] *Id.*

In order to credit Respondents' "two-layer" theory, the Court would have to believe that the Protective Order uses the exact same phrase in immediately successive paragraphs to refer to

---

[29] Facing the obvious problem that the Protective Order provides for only one system of verification, not a two-step process for "next friend" petitions and a one-step process for direct petitions, Respondents invite the Court to infer a "two-layer[ed] requirement" solely for 'next friend' petitions because "the Guantanamo habeas cases pending at the time the access procedures were negotiated and established were uniformly 'next friend' cases." Resp'ts Contempt Opp'n at 5 n.2. This argument is hard to take seriously, since, at the same time the Protective Order was being negotiated, DoD was in the process of notifying all the detainees of their right to file a *habeas* petition directly with the Court. (Second) Sweigart Decl. ¶¶ 3-5.

two distinctly different requirements despite the lack of any language indicating that such was its intent.  The Court simply cannot fathom that such a carefully crafted Protective Order, painstakingly negotiated by both Petitioners and Respondents and approved by the Court to balance national security concerns with detainees' right to counsel as articulated in *Rasul v. Bush* and *Al Odah v. United States*, would have been so careless in its use of language.  *Cf. C.I.R. v. Lundy*, 516 U.S. 235, 250 (1996) ("interrelationship and close proximity of these provisions of the statute 'presents a classic case for application of the normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning'") (*quoting Sullivan v. Stroop*, 496 U.S. 478, 484 (1990)).

Respondents' argument is also belied by the fact that a proper "next friend" petition under *Whitmore v. Arkansas*, 495 U.S. 149, 161-66 (1990) would not need to be converted into a direct petition in order to be prosecuted in District Court.  Thus, a "proper next friend petition" is, standing alone, sufficient evidence of authority to represent the detainee under Paragraph C.2.  No additional evidence from the detainee himself would be necessary.

The phrase "evidence of authority to represent the detainee," on its face and by its plain terms, refers to a single requirement.  The Protective Order contains no reference to multiple "layers" or "a second [and] subsequent type of authorization" by the detainee who is the "real party in interest." Resp'ts Contempt Opp'n at 5.  If the Protective Order meant to require two entirely separate sets of "evidence of authority" from two different individuals - first the next friend and second the detainee himself - it would have said so.  The Court cannot infer a "two-layer requirement" out of thin air.

Thus, this Court finds that the Protective Order entitles counsel to two visits plus ten days before they must submit evidence of their authority to represent the detainee in question. The only information that counsel must submit to DoD before being permitted to meet with a detainee is the "Notification of Representation." Counsel for Adem have submitted the "Notification of Representation. No further evidence is required at this stage.

IV.    *Petitioner's Right to Counsel*

Respondents insist that absent written authorization directly from the Petitioner, counsel must proceed through a "proper next friend" petition before they may be granted access to their client. Resp'ts' Contempt Opp'n at 11. Whether Petitioner's *habeas* petition has been properly filed is an issue for Judge Roberts, and is not before this Court. Adem's petition for *habeas* relief has proceeded as a direct petition since April of 2005. Until otherwise notified by the Trial Court, the undersigned will continue to treat it as a direct petition.

However, even if Adem's petition had been filed through Al-Rawi as a "next friend," the Protective Order would still require that counsel be permitted to meet with Adem in order to confirm his desire for representation. First, as explained above, the Protective Order does not distinguish between direct and "next friend" petitions in its provisions for counsel access. The two-step process by which counsel provide evidence of their authority to represent a detainee applies to all counsel, including counsel for detainees who initially filed through a "next friend." All *habeas* counsel must "provide evidence of his or her authority to represent the detainee as soon as practicable and in any event no later than ten (10) days after the conclusion of second visit with the detainee." Protective Order, Ex. A § III.C.2.

28

Second, as Respondents themselves concede, "[i]f counsel are able to secure direct authorization from Adem, then the next friend standing issue will become moot."[30] Resp'ts Opp'n to Mot. to Exp. at 6.  Once counsel meet with the detainee directly, and obtain authorization of representation, the case is converted into a direct petition.[31]  The Government uses the term "next friend" but in reality, Al-Rawi is simply a "friend" who, at the explicit invitation of the Department of Defense, communicated Adem's direct request for counsel to help him challenge his detention to his lawyer.  Once Adem confirms his desire for counsel to his own lawyers, Al-Rawi will play no further role in the case.  Alternatively, if Adem is unwilling or unable to authorize counsel to represent him, then Respondents' "next friend" challenge will be ripe.[32]

Respondents, however, insist that the only acceptable way to confirm Adem's desire for counsel directly is to require Adem to sign a form and send it through the "non-legal mail" channels at Guantanamo.  Thus, the issue, at this point in the case is not whether Al- Rawi's

---

[30]The Court expresses no opinion on the question of whether Al-Rawi has a significant enough relationship with Adem to maintain 'next friend' standing.

[31]*See Hamily v. Bush*, No. 05-763 (Oct. 31, 2005) (Dkt. No. 19) (Order of J. Bates dismissing Shaker Aamer as next friend and substituting Adel Hamily as sole petitioner)*; Zakirjan v. Bush*, No. 05-2053 (Dec. 12, 2005) (Dkt. No. 24) (Order of Oberdorfer, J. dismissing as moot government's "Motion to Show Cause Why Case Should Not Be Dismissed for Lack of Proper 'Next Friend' Standing" because detainee who was real party in interest authorized counsel to represent him directly); *Muhammed v. Bush*, No. 05-2087 (Dec. 16, 2005) (Dkt. No. 17) (same); *Idris v. Bush*, No. 05-1555 (Nov. 1, 2005) (Dkt. No. 8) (same).

[32]At this point, nothing is known about Adem's physical or mental condition. If he has been participating in a hunger strike, or if he is mentally unstable as a result of long periods in isolation or other conditions, he may not be in a position to authorize counsel to represent him. *See, e.g.,* Eric Schmidt and Tim Golden, *Force Feeding at Guantanamo Now Acknowledged*, NY Times, Feb. 22, 2006, at A6.

relationship with Adem would be sufficiently close to maintain traditional "next friend" standing. Rather, the issue is whether the District Court's authority to "craft [the] procedures necessary" to allow Adem to "present the facts surrounding [his] confinement to the Court," is somehow inherently limited to relying on the mail.  *See Al Odah*, 346 F. Supp. 2d at 7.  The Court can think of no principled reason why this should be so.

Respondents seem to be arguing that if Adem really wanted to challenge his detention, he would have written directly to the Court.  First, Respondents cannot be heard to insist on a written *pro se* petition as the sole procedural mechanism by which a detainee may communicate his request for counsel or seek to challenge his potentially indefinite detention without charge, when DoD has already informed Adem in writing that he may challenge his detention **either** by writing directly to the Court **or** by asking a "friend" or a "lawyer" to file a petition for him, and when Respondents have previously permitted detainees to meet directly with counsel to confirm their oral request.[33]

Second, the evidence submitted by Adem casts doubt on Respondents' claim that "DoD has taken affirmative steps to facilitate legal representation for detainees who have indicated a desire to challenge the legality of their detention," at least in any meaningful way.[34]  *See* Resp'ts

---

[33]Respondents urge the Court to ignore the inconsistencies in its approach to counsel access under the Protective Order, but are unable to articulate any principled basis for the disparity.  *See* Resp'ts Opp'n to Mot. to Exp. at 5 n.4.  Respondents essentially argue that because their "treatment of defective 'next friend' cases" has been consistent recently, the Court should ignore the fact that Respondents' previously allowed counsel to meet with directly with the detainees who were the real parties in interest. *Id.*

[34]In two cases in which Respondents raised a 'next friend' challenge, counsel was able to meet with the detainees in person and confirm their desire for representation purely by accident. *See Zakirjan v. Bush*, No. 05-2053; *Muhammed v. Bush*, 05-2087.  Zakirjan, who is being held

Contempt Opp'n at 13-14.   Serious questions exist regarding the extent to which detainees

received and understood the DoD notice.  The Court doubts that most Americans would

understand the meaning of the phrase "petition for a writ of *habeas corpus*."  To expect Adem,

who does not speak English and who "almost certainly lack[s] a working knowledge of the

American legal system" to intuit the meaning of an ancient, Latin, legal term of art is simply

---

as a non-enemy combatant (NEC), filed a *habeas* petition through another NEC detainee, Abu
Qassim. Susan Baker Manning, who is counsel for Qassim and other clients, was in Guantanamo
meeting with her clients on November 14 and November 16.  *See* Decl. of Susan Baker Manning
¶ 5, *Zakirjan*, No. 05-2053, Dkt. No. 20.  During a break between meetings with her clients,
Zakirjan approached Ms. Manning to ask for help obtaining a lawyer.  *Id.* ¶ 6. Although
Respondents had refused to allow any attorney to meet directly with Zakirjan, the guards allowed
the conversations to take place. *Id.*

    Zakirjan informed Ms. Manning that he had been "trying to obtain a lawyer for a very
long time." *Id.* ¶ 9.  "He ha[d] been sending his name, ISN number and request for counsel with
other inmates who were taken to Camp Echo to meet with their lawyers, including Mr. Qassim."
*Id.*  During the same visit, Ms. Manning was also approached by Fethi Boucetta (a/k/a Dr. Abu
Muhammed), who also asked her for help finding a lawyer. *See* Decl. of Susan Baker Manning,
*attached as* Exhibit A to Pet.'s Mem. in Opp'n to Mot. for an Order to Show Cause, *Muhammed
v. Bush*, No. 05-2087 (Dec. 2, 2005) (Dkt. No. 14).  Upon learning that Zakirjan and Boucetta
had personally requested counsel, Judge Oberdorfer dismissed the 'next friends' and converted
the cases into direct petitions. *See Zakirjan,* No. 05-2053 (Dec. 12, 2005) (Dkt. No. 24);
*Muhammed*, No. 05-2087 (Dec. 16, 2005) (Dkt. No. 17).

    Ms. Baker Manning was able to speak directly with these two particular detainees
because they both speak passable English and because they are NECs being held in Camp Iguana,
a fortuity virtually guaranteed not to repeat itself.  In August of 2005, Respondents began
housing non-enemy combatants detainees in a separate detention facility called "Camp Iguana."
Brigadier General Jay W. Hood Decl. ¶ 5, attached as Ex. 1 to Resp'ts Mem., *Qassim v. Bush*,
05-497 (Aug. 8, 2005) (Dkt. No. 27).  Camp Iguana is a "communal living facility." *Id.*  NEC
detainees housed in Camp Iguana have significantly greater freedom of movement than detainees
held as enemy combatants.  They have a common bunk room, a recreation room and a recreation
yard.  *Id.* ¶¶ 5-6. There is a fence around the facility and guards posted, but detainees in Camp
Iguana are otherwise free to move about the grounds within the confines of the Camp. *Id.*
Because of their location in Camp Iguana, Zakirjan and Foucetta were able to walk up to Ms.
Baker Manning and personally ask her for help getting a lawyer, something detainees in other
parts of Guantanamo could never do.  With the exception of NEC detainees, who are allowed to
meet with their lawyers in Camp Iguana, counsel meetings with detainees in Guantanamo take
place in Camp Echo, a solitary confinement facility.

absurd.  *See Al Odah*, 346 F. Supp. 2d at 8 (explaining detainees' need for the assistance of counsel in presenting their claims to the District Court).

For those who did understand it, questions remain about detainees' ability to send and receive non-legal mail and their willingness to trust information provided by the military. Gutierrez (Al-Rawi) Decl. ¶¶ 6-15.  In fact, Petitioner has submitted evidence indicating that Adem wrote directly to Al-Rawi's lawyer asking to be represented, but that the letter never arrived.  Considering that the 56 *pro se* detainees who did write to the Court have already waited a year without seeing a lawyer, this Court can hardly fault Adem for being skeptical.

Adem did what Respondents invited him to do in the first instance; he asked "a friend" that he trusted to help him challenge his detention.  (Second) Sweigart Decl., Exs. A-C.  Al-Rawi did as he was asked and counsel filed a petition on Adem's behalf. Yet, Respondents insist that, absent Adem's signature on a form, Al-Rawi's lack of "proper next friend standing" precludes this Court from further inquiring into the truth of Adem's request.  It is inconceivable that the Court's authority to investigate Adem's request would be so constrained.  Adem is "entitled to present the facts surrounding [his] confinement to the Court.  It is equally clear that the Court is authorized to craft the procedures necessary to make this possible, in order that the Court might fully consider Petitioners' challenge to their detention." *Al Odah*, 346 F. Supp. 2d at 7.

It appears that attempts to inform detainees of their rights in writing have been, at best, fraught with diffculty.  Furthermore, the Protective Order clearly provides that counsel for Adem may meet with him twice before they are obliged to provide evidence of authority to represent

him. Considering the lack of any possible prejudice to the Government from allowing Adem to confirm his desire for representation in person rather than in writing, and weighing the importance of Adem's right to counsel, which he has been attempting to exercise for over a year, Respondents are ordered to comply with the Protective Order and allow Adem's counsel to meet with him in person as soon as possible.

The Petitioner's request that the Government be sanctioned by contempt is denied as not warranted. *See Armstrong*, 1 F.3d at 1289.


Dated: March 14th, 2006                                    _____/s/_____
                                                           ALAN KAY
                                                           UNITED STATES MAGISTRATE JUDGE