UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                              :
ADIL BIN MUHAMMAD AL WIRGHI,                  :
     Detainee,                              :
     Guantánamo Bay Naval Station           :
     Guantánamo Bay, Cuba,                  :
                                              :
TAWISS BINT HASAN AL WIRGHI,                  :
     as Next Friend of                      :
     Adil bin Muhammad al Wirghi,           :    No.  05-CV-1497 (RCL)
                                              :
     Petitioners,                           :
                                              :
        v.                              :
                                              :
GEORGE W. BUSH, DONALD RUMSFELD,              :
ARMY BRIG. GEN. JAY HOOD, and ARMY            :
COL. MIKE BUMGARNER,                          :
                                              :
     Respondents.                           :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM IN SUPPORT OF EMERGENCY MOTION FOR THIRTY-DAY-NOTICE ORDER, TEMPORARY RESTRAINING ORDER, AND PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....................................................................................... 1

FACTS .......................................................................................................................... 2

A.     Mr. El Ouerghi's Background............................................................... 2
B.     Tunisia Is a Habitual Human Rights Abuser ......................................... 3
C.     The Experience of Similarly Situated Individuals ................................. 5
D.     Mr. El Ouerghi's Probable Torture in Tunisia...................................... 7
E.     Diplomatic Assurances Offered by Tunisia Have Proved Meaningless ................ 8

ARGUMENT ................................................................................................................ 9

I. THIS COURT SHOULD ENTER AN ORDER REQUIRING THE
GOVERNMENT TO GIVE PETITIONER'S COUNSEL THIRTY
DAYS NOTICE OF ANY RELEASE............................................................................ 9

II. THIS COURT SHOULD GRANT A TEMPORARY RESTRAINING
ORDER AND A PRELIMINARY INJUNCTION ENJOINING
RESPONDENT FROM RELEASING PETITIONER TO
THE TUNISIAN GOVERNMENT. ............................................................................ 10

A.     Mr. El Ouerghi Will Be Irreparably Injured if the Temporary Restraining
Order and the Preliminary Injunction Are Not Granted. ..................... 12
B.     Mr. El Ouerghi Has a Reasonable Likelihood for Success on the Merits
of His Habeas Petition. ...................................................................... 14
C.     The Government Is Unharmed by Granting the Temporary Restraining
Order and the Preliminary Injunction. ................................................ 15
D.     Granting Mr. El Ouerghi a Reasonable Chance To Avoid State-Sanctioned
Torture Is in the Public Interest. ........................................................ 16

CONCLUSION............................................................................................................ 20

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Abdah* v. *Bush*,
No. 04-1254, 2005 U.S. Dist. LEXIS 4942 (D.D.C. Mar. 29, 2005) ...................13, 15

*Al-Ghizzawi* v. *Bush*,
No. 05-2378, 2006 U.S. Dist. LEXIS 71252 (D.D.C. Oct. 2, 2006) ...........................2

*Al-Marri* v. *Bush*,
No. 04-2035, 2005 U.S. Dist. LEXIS 6259 (D.D.C. Apr. 4, 2005)...............................9

*Al-Oshan* v. *Bush*,
No. 05-0520, 2005 U.S. Dist. LEXIS 6635 (D.D.C. Mar. 31, 2005) ..........................9

*Al-Shareef* v. *Bush*,
No. 05-2458, 2006 U.S. Dist. LEXIS 88882 (D.D.C. Dec. 8, 2006).......................2, 9

*Alhami* v. *Bush*,
No. 05-359, slip op. (D.D.C. Oct. 2, 2007)......................................................11, 12, 15

*Almurbati* v. *Bush*,
366 F. Supp. 2d 72, 76 (D.D.C. 2005) .......................................................................13

*Alsaaei* v. *Bush*,
No. 05-2369, 2006 U.S. Dist. LEXIS 56599 (D.D.C. July 19, 2006) ..........................9

*Apotex, Inc.* v. *FDA*,
No. 06-0627, 2006 U.S. Dist. LEXIS 20894 (D.D.C. Apr. 19, 2006).................11, 12

*Boumediene* v. *Bush*,
127 S. Ct. 1478 (2007) ..............................................................................................14

*Boumediene* v. *Bush*,
127 S. Ct. 3078 (2007).........................................................................................14, 15

*Boumediene* v. *Bush*,
476 F.3d 981 (D.C. Cir. 2007) ..................................................................................14

*Chaplaincy of Full Gospel Churches* v. *England*,
454 F.3d 290 (D.C. Cir. 2006) ..................................................................................12

*CityFed Fin. Corp.* v. *Office of Thrift Supervision*,
58 F.3d 738 (D.C. Cir. 1995)....................................................................................12

*Cobell* v. *Kempthorne*,
   455 F.3d 301 (D.C. Cir. 2006) ...................................................................................11

*Davenport* v. *Int'l Bhd. of Teamsters*,
   166 F.3d 356 (D.C. Cir. 1999) ...................................................................................12

*Gold ex rel. NLRB* v. *State Plaza, Inc.*,
   435 F. Supp. 2d 110 (D.D.C. 2006) ....................................................................11, 17

*Hamdan* v. *Rumsfeld,*
   126 S. Ct. 2749 (2006) ...............................................................................................19

*Hamoud* v. *Bush*,
   No. 05-1894, 2006 U.S. Dist. LEXIS 48894 (D.D.C. July 5, 2006) ......................2, 9

*Iceland S.S. Co.* v. *U.S. Dep't of the Army*,
   No. 98-2631, 1998 U.S. Dist. LEXIS 17853 (D.D.C. Nov. 10, 1998) ......................16

*Kaktovik* v. *Watt*,
   689 F.2d 222 (D.C. Cir. 1982) ...................................................................................16

*Katz* v. *Georgetown Univ.*,
   246 F.3d 685 (D.C. Cir. 2001) ...................................................................................12

*Khalifh* v. *Gates*,
   No. 07-1215 (D.C. Cir. 2007) ....................................................................................17

*Khouzam* v. *Hogan*,
   No. 07-0992, 2008 U.S. Dist. LEXIS 2073 (M.D. Pa. Jan. 10, 2008)........................17

*Kurnaz* v. *Bush*,
   No. 04-1135, 2005 U.S. Dist. LEXIS 6560 (D.D.C. Apr. 12, 2005)............................9

*Omar* v. *Harvey*,
   479 F.3d 1 (D.C. Cir. 2007) ......................................................................10, 11, 14

*Omar* v. *Harvey*,
   416 F. Supp. 2d 19 (D.D.C. 2006) .............................................................14, 15, 16

*Serono Lab.* v. *Shalala*,
   158 F.3d 1313 (D.C. Cir. 1998) .................................................................................17

*WWF* v. *Hodel*,
   No. 88-1276, 1988 U.S. Dist. LEXIS 19409 (D.D.C. June 17, 1988)........................16

S<span>TATUTES</span>

8 U.S.C. § 1231 note, 112 Stat. 2681-822 ...................................................1, 17

28 U.S.C. § 1651(a) .................................................................................10

Military Commissions Act of 2006 ("MCA") ...................................................14

O<span>THER</span> A<span>UTHORITIES</span>

136 Cong. Rec. 36, 1984 (1990) ...................................................................18

1951 Convention relating to the Status of Refugees, 189 U.N.T.S. 150,
    *entered into force* April 22, 1954...........................................................18

Amnesty Int'l, Forcible Return/Fear of Torture and Other Ill-Treatment,
    http://www2.amnesty.se/uaonnet.nsf/senastezope/
    9B6B8BBD5C01CAC2C125732800368BB1 (July 23, 2007)......................................6

Bouazza Ben Bouazza, *Ex-Gitmo Detainee Convicted in Tunisia*,
    A<span>SSOCIATED</span> P<span>RESS</span> (Oct. 24, 2007) ...............................................................7

Jennifer Daskal, Editorial, *A Fate Worse Than Guantanamo*,
    W<span>ASH</span>. P<span>OST</span>, Sept. 2, 2007, at B3...........................................................8

H<span>UMAN</span> R<span>IGHTS</span> W<span>ATCH</span>, W<span>ORLD</span> R<span>EPORT</span> 2008 – T<span>UNISIA</span> (Jan. 2008)............................5

H<span>UMAN</span> R<span>IGHTS</span> W<span>ATCH</span>, I<span>LL</span>-F<span>ATED</span> H<span>OMECOMINGS</span>: A T<span>UNISIAN</span> C<span>ASE</span>
    S<span>TUDY OF</span> G<span>UANTÁNAMO</span> R<span>EPATRIATIONS</span> (Sept. 2007) ...............................6, 8, 13, 16

International Covenant on Civil and Political Rights, G.A. res. 2200A (XXI),
    21 U.N. GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316 (1966),
    999 U.N.T.S. 171, art. 7, *entered into force* Mar. 23, 1976.........................19

Protocol Relating to the Status of Refugees, 606 U.N.T.S. 267,
    *entered into force* Oct. 4, 1967 ...........................................................19

Regulations Concerning the Convention Against Torture,
    64 Fed. Reg. 8478 (1999) ...................................................................18

Reuters, Tunisia Confirms Ex-Guantánamo Detainee Jailing (Jan. 8, 2008) ..................7

U.N. Convention Against Torture and Other Forms of Cruel, Inhuman or
    Degrading Treatment or Punishment, opened for signature Dec. 10,
    1984, S. Treaty Doc. 31 No. 100-20 (1988), 1465 U.N.T.S. 85 (CAT) ....................18

U.S. D<span>EP'T OF</span> S<span>TATE</span>, T<span>UNISIA</span>: C<span>OUNTRY</span> R<span>EPORTS ON</span> H<span>UMAN</span> R<span>IGHTS</span>
    P<span>RACTICES</span> – 2004 (Feb. 28, 2005)...........................................................4

U.S. Dep't of State, Tunisia: Country Reports on Human Rights
Practices – 2005 (Mar. 8, 2006) .................................................................................4

U.S. Dep't of State, Tunisia: Country Reports on Human Rights
Practices – 2006 (Mar. 6, 2007) ......................................................................3, 4, 16

Tunisia: Trial Opens for former Guantánamo Inmate,
Associated Press (Oct. 17, 2007) .............................................................................7

Josh White, *Detainee Transfers Concern Senators*,
Wash. Post, July 14, 2007, at A11 .............................................................................6

## PRELIMINARY STATEMENT

In a habeas petition currently pending before this Court, petitioner Adel Ben Mohamed Ben Abess El Ouerghi alleges that he has been wrongly branded an "enemy combatant" and detained—without charge or trial—at the U.S. Naval Station at Guantánamo Bay ("Guantánamo") for almost six years.  The United States government ("the Government") recently approved Mr. El Ouerghi for release from Guantánamo.

As a Tunisian citizen, Mr. El Ouerghi now faces imminent risk of transfer to Tunisia.  Tunisia is a habitual human rights abusing regime that will almost certainly torture and unlawfully detain him.  Additionally, while Mr. El Ouerghi was detained in Guantánamo, a Tunisian military court entered a twenty-year prison sentence against him *in absentia*.  Such *in absentia* convictions are routinely entered against Guantánamo detainees regardless of whether—as in Mr. El Ouerghi's case—they have not set foot in Tunisia in 18 or 19 years.  *See* Declaration of Zachary Katznelson, attached hereto as Exhibit A, at ¶ 3 ("Katznelson Decl.").  For the United States to return Mr. El Ouerghi to Tunisia against his will violates the United States' treaty and statutory obligations under the United Nations Convention Against Torture ("CAT").  *See* 8 U.S.C. § 1231 note, 112 Stat. 2681-822 (incorporating CAT into U.S. law).  The return of Mr. El Ouerghi to face torture in Tunisia—depriving this court of habeas jurisdiction and denying Mr. El Ouerghi the opportunity to meaningfully challenge his detention—must be prevented.

Accordingly, petitioner Adel El Ouerghi moves this court for (1) an order requiring the Government to give Mr. El Ouerghi's counsel thirty days notice before transferring him out of Guantánamo, (2) a temporary restraining order ("TRO")

preventing the Government from transferring Mr. El Ouerghi to Tunisia, and (3)

conversion of that TRO to a preliminary injunction at the appropriate time.[1]

## FACTS

### A.    Mr. El Ouerghi's Background

Mr. El Ouerghi was born and raised in Tunisia.  Upon information and

belief, Mr. El Ouerghi left Tunisia in 1989 to live and work in Italy, where he resided

until 1997.  Upon further information and belief, Mr. El Ouerghi later lived in Pakistan,

where he was married, subsequently moving to Afghanistan in late 2001.  Mistakenly

branded an "enemy combatant," Mr. El Ouerghi was taken successively to prisons in

Jalalabad, Kabul, Bagram, and Kandahar, and was finally brought to Guantánamo on

May 1, 2002.  He has remained imprisoned in Guantánamo ever since.  Counsel has

learned that a twenty-year *in absentia* conviction by a Tunisian military court was entered

against Mr. El Ouerghi during his time in Guantánamo.[2]

---

[1] The Court has issued an order staying this case pending the outcome of the appeals in *In re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443 (D.D.C. 2005), *Khalid* v. *Bush*, 355 F. Supp. 2d 311 (D.D.C. 2005), and *Boumediene* v. *Bush*, 355 F. Supp. 2d 311 (D.D.C. 2005).  That stay does not preclude consideration of this motion.  Another court in this District, operating under a nearly identical stay, considered a detainee's motion for access to medical records that did not go to the merits of his habeas petition.  *See Al-Ghizzawi* v. *Bush*, No. 05-2378, 2006 U.S. Dist. LEXIS 71252 (D.D.C. Oct. 2, 2006) (Bates, J.).  Indeed, the very purpose of this motion is to request the injunctive relief necessary to effectuate the purpose of the stay by preventing the case from being mooted.  *Cf. Hamoud* v. *Bush*, No. 05-1894, 2006 U.S. Dist. LEXIS 48894, at *2 (D.D.C. July 5, 2006) (Roberts, J.) ("A primary purpose of a stay pending resolution of issues on appeal is to preserve the status quo among the parties.").

While Petitioner does not believe the stay order applies to this motion, to the extent the Court finds that it does, Petitioner requests that the stay be lifted for resolution of this motion or, at a minimum, that the stay be conditioned on the thirty days notice requested herein.  *See Al-Shareef* v. *Bush*, No. 05-2458, 2006 U.S. Dist. LEXIS 88882, at *2 (D.D.C. Dec. 8, 2006) (Roberts, J.) (conditioning a stay similar to the one in this case on "requiring thirty days' notice of any intended or planned transfer of the detainees").

[2] Counsel was informed of this *in absentia* conviction by Samir Ben Amor, a Tunisian lawyer who has worked with other Guantánamo detainees.  Due to the lack of transparency in the

On February 7, 2008, counsel for Mr. El Ouerghi received notice from the Department of Defense that Mr. El Ouerghi had "been approved to leave Guantánamo, subject to the process of making appropriate diplomatic arrangements for his departure." *See* Email of Commander Bree Ermentrout, attached hereto as Exhibit B.  If the United States is permitted to return him to Tunisia, there is a substantial risk that Mr. El Ouerghi will be tortured, persecuted, and unlawfully imprisoned.  Returning the petitioner despite knowledge of these substantial risks would violate United States law.

**B.      Tunisia Is a Habitual Human Rights Abuser**

The Tunisian government's use of torture has been widely documented by the U.S. Department of State, as well as in news reports and findings by leading human rights non-governmental organizations ("NGOs").  The most recent Department of State Country Report on Human Rights Practices concluded that "[m]embers of the [Tunisian] security forces tortured and physically abused prisoners and detainees."[3]  That report elaborates:

> The forms of torture and other abuse included: sleep deprivation; electric shock; submersion of the head in water; beatings with hands, sticks, and police batons; suspension, sometimes manacled, from cell doors and rods resulting in loss of consciousness; and cigarette burns.  According to Amnesty International (AI), police and prison officials used sexual assault and threats of sexual assault against the wives of Islamist prisoners to extract information, intimidate, and punish.[4]

---

Tunisian military justice system, counsel has been unable to obtain documentation beyond the charging document, which is attached hereto as Exhibit C.

[3] U.S. DEP'T OF STATE, TUNISIA: COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES – 2006 (Mar. 6, 2007) [hereinafter 2006 TUNISIA REPORT], *available at* http://www.state.gov/g/drl/rls/hrrpt/2006/78864.htm, and attached hereto as Exhibit D.

[4] *Id.*

Such findings that the government of Tunisia engages in torture are not new developments; year after year the State Department has found that the government of Tunisia engages in widespread and brutal torture of prisoners, detainees, and perceived political opponents.[5] The Tunisian government reserves its harshest and most brutal treatment for those who have been labeled—wrongly in the case of Mr. El Ouerghi—as Islamic radicals and opponents of the country's regime. Since 2005, Tunisian officials have imprisoned more than 500 persons on terrorism-related charges with little or no evidence that they had committed or planned to commit terrorist acts. These prisoners are reported to have been tortured in government facilities.[6] According to the Department of State, victims of torture are often denied access to medical care by Tunisian authorities. Tunisian officials routinely refuse to register complaints of torture or investigate allegations of torture.[7]

Reports by numerous human rights organizations, including Human Rights Watch and Amnesty International, echo the findings of the State Department. Human Rights Watch recently reported that "sentenced prisoners . . . face deliberate ill-treatment" and elaborated that detainees suffer a range of methods of torture including threats of rape, beatings on the soles of the feet, and sleep deprivation. No Tunisian

---

[5] *See*, *e.g.*, U.S. DEP'T OF STATE, TUNISIA: COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES – 2005 (Mar. 8, 2006), *available at* http://www.state.gov/g/drl/rls/hrrpt/2005/61700.htm, and attached hereto as Exhibit E; U.S. DEP'T OF STATE, TUNISIA: COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES – 2004 (Feb. 28, 2005), *available at* http://www.state.gov/g/drl/rls/hrrpt/2004/41733.htm, and attached hereto as Exhibit F.

[6] 2006 TUNISIA REPORT, *supra* note 3.

[7] *Id.*

official has been held to account for the torture of persons held for politically motivated offenses.[8]

Additionally, the Tunisian judiciary lacks independence and regularly violates or ignores outright fundamental due process rights.  Defendants are convicted solely on the basis of coerced confessions or on the testimony of witnesses the defendant has no opportunity to confront.  Judges accept as evidence confessions that are extracted through torture.  Judges and prosecutors routinely ignore allegations of torture.  Many of those convicted under Tunisia's 2003 anti-terror law have been denied any access to the civilian courts.  Instead, they are tried and convicted before military tribunals, which violate numerous fair trial guarantees, including the right to a full appeal by a higher tribunal.[9]

## C.    The Experience of Similarly Situated Individuals

Evidence has recently emerged demonstrating that the two former Guantánamo detainees who have been repatriated to Tunisia have been brutally tortured and unlawfully detained by the Tunisian government.  On June 17, 2007, the United States repatriated to Tunisia Abdellah Ben Omar al Hajji and Lufti Ben Swei Lagha.  Since their return, both have been sentenced to long prison terms in trials that flouted even the most basic of due process rights.  Both men have been repeatedly subjected to torture.  Katznelson Decl. ¶¶ 5–7, 9.

---

[8] HUMAN RIGHTS WATCH, WORLD REPORT 2008 – TUNISIA 1–3 (Jan. 2008), *available at* http://www.hrw.org/wr2k8/pdfs/tunisia.pdf, and attached hereto as Exhibit G.

[9] *Id.* at 2–3.

Upon their arrival in Tunisia, both Mr. Al Hajji and Mr. Lagha were immediately detained by the Ministry of the Interior. The Tunisian authorities subjected them to harsh and lengthy interrogations. Both men were threatened with torture, and government officials repeatedly beat Mr. Al Hajji and threatened him with rape and the rape of his wife and family members. Katznelson Decl. ¶ 5.[10] Both men were detained for prolonged periods in solitary confinement, deprived of access to any daylight, and kept in severe isolation without any contact with other people, in violation of Tunisian law. Both men's access to counsel was denied or greatly limited.[11]

In addition to their brutal mistreatment and torture, both men have been denied fundamental fair trial rights. Mr. Al Hajji was convicted *in absentia* by a military tribunal. He attempted to challenge this *in absentia* conviction, but this attempt was met with little more than a show trial. Katznelson Decl. ¶ 7. Mr. Lagha was brought before a military tribunal without his lawyer ever being been granted the opportunity to review the dossier of charges against him. After objections, the trial was briefly delayed, but Mr. Al Hajji's *in absentia* conviction was subsequently upheld by a Tunisian military court on November 14, 2007. Similarly, Mr. Lagha, while not subject to an *in absentia* conviction like Mr. El Ouerghi and Mr. Al Hajji, was charged with terrorism-related offences on his arrival in Tunisia. A Tunisian court abruptly began a trial against him on October 17,

---

[10] *See also* Amnesty Int'l, Forcible Return/Fear of Torture and Other Ill-Treatment, http://www2.amnesty.se/uaonnet.nsf/senastezope/9B6B8BBD5C01CAC2C125732800368BB1 (July 23, 2007); Josh White, *Detainee Transfers Concern Senators*, WASH. POST, July 14, 2007, at A11; HUMAN RIGHTS WATCH, ILL-FATED HOMECOMINGS: A TUNISIAN CASE STUDY OF GUANTÁNAMO REPATRIATIONS 8 (Sept. 2007) [hereinafter "ILL-FATED HOMECOMINGS"], *available at* http://www.hrw.org/reports/2007/tunisia0907, and attached hereto as Exhibit H.

[11] *See* Sworn Statement of Samir Ben Amor, Attorney, *in* ILL-FATED HOMECOMINGS, *supra* note 10, at 34-35; ILL-FATED HOMECOMINGS, *supra* note 10, at 8.

giving minimal notice to his lawyer and international observers.[12]  That court convicted
Mr. Lagha of association with a terrorist group intending to cause harm to Tunisia—
although the court failed to name either the group with which he was associated or the
harm intended.  The trial reportedly took no more than two or three hours.  No evidence
against Mr. Lagha was presented.  Katznelson Decl. ¶ 9.  On the basis of this sham trial,
Mr. Lagha was sentenced to three years imprisonment.[13]  The sentence imposed by this
sham trial was upheld by a Tunisian appeals court on January 8, 2008.[14]

**D.    Mr. El Ouerghi's Probable Torture in Tunisia**

The widespread torture and abuse of prisoners by Tunisian authorities
bodes ill for Mr. El Ouerghi if he is repatriated.  Counsel has been informed by a
Tunisian lawyer that in 2006 a Tunisian military court tried and convicted Mr. El
Ouerghi, *in absentia* and without notice, for allegedly being a member of al Qaida and
encouraging participation in al Qaida—charges that Mr. El Ouerghi emphatically denies.
Mr. El Ouerghi has been sentenced to a term of imprisonment of 20 years and fears the
prospect of not only being confined for a lengthy period after a trial violating
international norms but also being physically abused during that confinement.  That fear
is concrete and imminent.

---

[12] Tunisia: Trial Opens for former Guantánamo Inmate, ASSOCIATED PRESS (Oct. 17, 2007).

[13] Bouazza Ben Bouazza, *Ex-Gitmo Detainee Convicted in Tunisia*, ASSOCIATED PRESS (Oct. 24, 2007).

[14] Reuters, Tunisia Confirms Ex-Guantánamo Detainee Jailing (Jan. 8, 2008), *available at* http://africa.reuters.com/wire/news/usnOUN863066.html.

**E.      Diplomatic Assurances Offered by Tunisia Have Proved Meaningless**

            The notification that Mr. El Ouerghi had been "cleared" to leave

Guantánamo stated his departure was subject to the Government making "diplomatic

arrangements."  Experience has shown that "arrangements" for Guantánamo detainees

based upon diplomatic assurances by Tunisia are meaningless.  *See* Katznelson Decl.

¶¶ 8, 10–11.  Even if Tunisia were to offer assurances that Mr. El Ouerghi would not be

tortured and his due process rights would be respected, events of the last few months have

made it clear that the risk of torture Mr. El Ouerghi would face is unacceptably high.

            The United States reportedly returned Mr. Al Hajji and Mr. Lagha to

Tunisia after receiving promises of humane treatment from the government of Tunisia.[15]

The U.S. Ambassador to Tunisia reportedly stated that "specific and credible assurances"

were received from the Tunisian government that the two detainees would not be

abused.[16]  Yet the treatment of these two former Guantánamo detainees since their

repatriation makes it clear that such diplomatic assurances, when made by a habitual

human rights abuser like Tunisia, simply cannot be relied upon.  The bad faith of the

Tunisian government has been made amply clear; no assurances offered at this time could

serve to assure the safety or fair treatment of Mr. El Ouerghi.

            Recognizing that any diplomatic assurances offered by Tunisia are hollow

and will invariably be flouted by the Tunisian government, counsel for Mr. El Ouerghi

stands ready to work with the Government to secure a suitable third country for the

resettlement of Mr. El Ouerghi.  Mr. El Ouerghi is willing to be settled in any one of a

---

[15] ILL-FATED HOMECOMINGS, *supra* note 10, at 3.

[16] Jennifer Daskal, Editorial, *A Fate Worse Than Guantanamo*, WASH. POST, Sept. 2, 2007, at B3.

host of countries where he will be spared the brutal torture that awaits him in Tunisia and

where he will be granted basic rights and due process guarantees.  Counsel has made, and

continues to make, independent inquiries into possible countries to which Mr. El Ouerghi

could be settled, and will offer any assistance possible to the Government in their efforts

to secure such settlement.

## ARGUMENT

### I.    This Court Should Enter An Order Requiring The Government To Give Petitioner's Counsel Thirty Days Notice Of Any Release.

Mr. El Ouerghi requests that this Court order the Government to give his

counsel thirty days notice before any release from Guantánamo.  This notice is necessary

to allow his counsel to represent effectively and fully his interests by attempting to find a

country where he may safely resettle.  A number of courts in this District have entered

thirty-day-notice orders identical to the one Mr. El Ouerghi seeks.  *E.g.*, *Al-Shareef* v.

*Bush*, No. 05-2458, 2006 U.S. Dist. LEXIS 88882, at *2 (D.D.C. Dec. 8, 2006) (Roberts,

J.); *Alsaaei* v. *Bush*, No. 05-2369, 2006 U.S. Dist. LEXIS 56599, at *9 (D.D.C. July 19,

2006) (Roberts, J.); *Hamoud* v. *Bush*, No. 05-1894, 2006 U.S. Dist. LEXIS 48894, at *8

(D.D.C. July 5, 2006) (Roberts, J.); *Kurnaz* v. *Bush*, No, 04-1135, 2005 U.S. Dist. LEXIS

6560, at *9 (D.D.C. Apr. 12, 2005) (Huvelle, J.); *Al-Marri* v. *Bush*, No. 04-2035, 2005

U.S. Dist. LEXIS 6259, at *21–22 (D.D.C. Apr. 4, 2005) (Kessler, J.); *Al-Oshan* v. *Bush*,

No. 05-0520, 2005 U.S. Dist. LEXIS 6635, at *4 (D.D.C. Mar. 31, 2005) (Urbina, J.).  In

this case, the Government informed Mr. El Ouerghi's counsel on February 7, 2008 that

the ARB proceedings have concluded and that the Government could release Mr. El

Ouerghi at any time.  Although counsel has not yet received a firm commitment from

another country to accept Mr. El Ouerghi, counsel is actively attempting to find such a

country.  Entering an order requiring the Government to give Mr. El Ouerghi's counsel thirty days notice before sending him to Tunisia would give counsel a reasonable opportunity to respond on his behalf.  Absent a thirty-day-notice order, the Government could send Mr. El Ouerghi to Tunisia without his counsel learning of his rendition until he is already in a Tunisian prison and unreachable by U.S. lawyers.

Furthermore, as discussed in more detail below, the release of Mr. El Ouerghi into detention by a foreign government would moot the case by removing Mr. El Ouerghi—the "corpus"—from the jurisdiction of this Court without affording him the relief he might obtain on the merits of his habeas petition.  The D.C. Circuit recently held that releasing a habeas petitioner from U.S. custody to that of a foreign government "would not afford [him] all the relief he could obtain through a writ of habeas corpus." *Omar* v. *Harvey*, 479 F.3d 1, 15 (D.C. Cir.), *cert. granted sub nom.*, *Geren* v. *Omar*, 128 S. Ct. 741 (2007).

II.    **This Court Should Grant A Temporary Restraining Order And A Preliminary Injunction Enjoining Respondent From Releasing Petitioner To The Tunisian Government.**

Petitioner seeks a TRO and a preliminary injunction preventing the Government from releasing him to the Tunisian government after his anticipated release from Guantánamo.  This court has jurisdiction to enter an injunction under the All Writs Act, which allows federal courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions."  28 U.S.C. § 1651(a); *see Omar* v. *Harvey*, 479 F.3d 1 (D.C. Cir.), *cert. granted sub nom.*, *Geren* v. *Omar*, 128 S. Ct. 741 (2007).  In *Omar*, the D.C. Circuit upheld a preliminary injunction preventing the transfer of a habeas petitioner in United States custody in Iraq to Iraqi authorities.  *Omar*, 479 F.3d at 11–15.  The Court

- 10 -

distinguished between "transferring Omar to Iraqi authorities and releasing him to walk free from his current detention," *id*. at 12, and found that transfer would not render the habeas petition moot, but rather would "preserve[] the district court's jurisdiction to review the lawfulness of that transfer." *Id.* at 13. Similarly, transferring Mr. El Ouerghi to Tunisia where he would be imprisoned "would not afford [him] all the relief he could obtain through a writ of habeas corpus." *Id.* at 15. Additionally, a recent decision from this district relied on the All Writs Act for jurisdiction when enjoining the Government from returning a Guantánamo detainee to Tunisia. *See Alhami* v. *Bush*, No. 05-359, slip op. at 5 (D.D.C. Oct. 2, 2007). Thus, under the All Writs Act as interpreted by *Omar*, this Court has jurisdiction to enter a temporary restraining order and a preliminary injunction barring Respondent from releasing Mr. El Ouerghi to the Tunisian government.

Having jurisdiction to provide the requested relief, the Court should then turn to the merits of the proposed TRO and preliminary injunction. The purpose of preliminary injunctive relief is "to preserve the status quo pending the outcome of litigation." *Cobell* v. *Kempthorne*, 455 F.3d 301, 314 (D.C. Cir. 2006) (quoting *Dist. 50, UMW* v. *Int'l Union, UMW*, 412 F.2d 165, 168 (D.C. Cir. 1969)); *see also Gold ex rel. NLRB* v. *State Plaza, Inc.*, 435 F. Supp. 2d 110, 118 (D.D.C. 2006). When considering an application for a TRO or a preliminary injunction, the court must consider four factors: "(1) the prospective irreparable injury to the movant in the event that the requested relief is denied; (2) the possibility of harm to other parties in the event that the relief is granted; (3) the likelihood that the movant will prevail on the merits; and (4) the public interest." *Apotex, Inc.* v. *FDA*, No. 06-0627, 2006 U.S. Dist. LEXIS 20894, at *21

- 11 -

(D.D.C. Apr. 19, 2006); *see also*, *e.g.*, *Chaplaincy of Full Gospel Churches* v. *England*, 454 F.3d 290, 297 (D.C. Cir. 2006); *Katz* v. *Georgetown Univ.*, 246 F.3d 685, 687–88 (D.C. Cir. 2001).

These factors must be viewed as a sliding scale:  the greater the potential injury to the petitioner, the less certain the petitioner must be of success in order to warrant the grant of the TRO or the preliminary injunction.  *See*, *e.g.*, *Davenport* v. *Int'l Bhd. of Teamsters*, 166 F.3d 356, 361 (D.C. Cir. 1999); *CityFed Fin. Corp.* v. *Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995); *Apotex*, 2006 U.S. Dist. LEXIS 20894, at *22.  Mr. El Ouerghi's likely torture and prolonged unlawful detention at the hands of the Tunisian authorities if he is released to them, coupled with the removal of this case from the jurisdiction of this Court before consideration on the merits, is a grave and irreparable injury that justifies the entry of a preliminary injunction.

**A.  Mr. El Ouerghi Will Be Irreparably Injured if the Temporary Restraining Order and the Preliminary Injunction Are Not Granted.**

Mr. El Ouerghi faces two distinct types of irreparable injury if he is released to the Tunisian government.  Each such injury is both "certain and great," without the availability of "compensatory or other corrective relief . . . at a later date." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (quotation omitted).  First, there is a strong likelihood that upon his return to Tunisia he will be tortured while in prison for years based on a conviction obtained *in absentia*.  Second, releasing him to the Tunisian government will deprive him of his right to adjudicate the legality of his detention for the previous five years without being charged with a crime.

In *Alhami*, the District Court concluded that a Tunisian detainee's "allegations of the indiscriminate use of torture in Tunisian prisons [in part] demonstrate

- 12 -

the devastating and irreparable harm he is likely to face if transferred." No. 05-359, slip

op. at 3. Mr. El Ouerghi will almost certainly be forced to endure torture at the hands of

the Tunisian authorities if he is released to them. He has specific and credible evidence

that two similarly situated individuals—Mr. Al Hajji and Mr. Lagha—were held in

Guantánamo as enemy combatants, convicted by sham trials in Tunisia, and subjected to

torture and inhumane treatment upon their return to Tunisia. *See* pp. 6–8, *supra*; *see also*

ILL-FATED HOMECOMINGS, *supra* note 10, at 8, 34–35. The injuries that Mr. Al Hajji and

Mr. Lagha have suffered and continue to suffer are irreparable and grave, and there is no

reason to suspect that Mr. El Ouerghi's strikingly similar situation will result in different

treatment.[17] Additionally, Mr. Al Hajji had a pending habeas petition before a court in

this district, and yet he was rendered back to Tunisia without any notice whatsoever

given to his counsel, and without any opportunity to seek an alternative country for

resettlement. Katznelson Decl. ¶¶ 2, 4.

   Furthermore, releasing Mr. El Ouerghi to the authorities in Tunisia, where

he will still remain in custody but beyond the jurisdiction of United States courts, will

deprive him of the right to challenge his detention in this Court. Courts in this District

have held that such an injury warrants the grant of an injunction. In *Abdah* v. *Bush*, the

Court held that the Government "may not act to deprive this court of its jurisdiction over

the very 'corpus' of this case; indeed, the 'federal courts may and should take such action

as will defeat attempts to wrongfully deprive parties entitled to sue in the Federal courts

for the protection of their rights in those tribunals.'" No. 04-1254, 2005 U.S. Dist.

---

[17] These concrete examples distinguish this case from *Almurbati* v. *Bush*, 366 F. Supp. 2d 72, 76 (D.D.C. 2005), which rejected allegations based solely on speculative news reports in *The New York Times*.

LEXIS 4942, at *14 (D.D.C. Mar. 29, 2005) (Kennedy, J.) (quoting *Abu Ali* v. *Ashcroft*, 350 F. Supp. 2d 28, 54 (D.D.C. 2004)). And in *Omar* v. *Harvey*, the Court held that "[d]ivesting the court of jurisdiction, either as a matter of law or de facto, would abuse the process now put in place for the purpose of adjudicating matters on their merits." 416 F. Supp. 2d 19, 28 (D.D.C. 2006) (citing *Rasul* v. *Bush*, 542 U.S. 466, 467 (2004)), *aff'd*, 479 F.3d 1 (D.C. Cir. 2007). Similarly, sending Mr. El Ouerghi into Tunisian custody— not the complete remedy to which the Court of Appeals in this Circuit has referred, *see Omar*, 479 F.3d at 15—would cause him irreparable harm by preventing him from litigating his habeas corpus petition in this Court. This factor weighs heavily in favor of granting the TRO and the preliminary injunction.

**B.    Mr. El Ouerghi Has a Reasonable Likelihood for Success on the Merits of His Habeas Petition.**

The status of Mr. El Ouerghi's petition for a writ of habeas corpus, currently pending before this Court, will depend in large part on the Supreme Court's forthcoming decision in *Boumediene* v. *Bush*, No. 06-1195. In *Boumediene*, the D.C. Circuit held that the Military Commissions Act of 2006 ("MCA") stripped Guantánamo detainees of their ability to initiate any action against the Government or its officials. *Boumediene* v. *Bush*, 476 F.3d 981, 985–86 (D.C. Cir. 2007). The D.C. Circuit also held that detainees, as aliens outside the territory of the United States, did not have a constitutional right to petition for habeas relief. *Id*. at 990–91. That decision was issued on February 20, 2007, and the Supreme Court denied certiorari on April 2, 2007. *Boumediene* v. *Bush*, 127 S. Ct. 1478 (2007). On June 29, 2007, the Supreme Court vacated its April decision on rehearing and granted the detainees' petition for certiorari on two questions: (1) whether the MCA stripped jurisdiction over the detainees' habeas

petitions, and (2) whether the detainees' petitions warrant habeas relief or a hearing on the merits. *Boumediene* v. *Bush*, 127 S. Ct. 3078 (2007).

The D.C. Circuit thereafter recalled the mandate, rendering the D.C. Circuit's initial opinion not yet final. *See* Fed. R. App. P. 41(c), Advisory Committee Notes, 1998 amendment ("A court of appeals' judgment or order is not final until issuance of the mandate; at that time the parties' obligations become fixed."). The *Alhami* court relied in part on the unusual posture of *Boumediene* and the unsettled state of the law, which made it "imperative that the Court protect its jurisdiction until the Supreme Court issues a definitive ruling in *Boumediene*." *Alhami*, No. 05-359, slip op. at 5–6. This Court should similarly protect its jurisdiction and ensure that the Supreme Court is given time to make its ruling, so as to not allow the Government, in its haste, to deprive Mr. El Ouerghi of relief to which he may be entitled.

## C.    The Government Is Unharmed by Granting the Temporary Restraining Order and the Preliminary Injunction.

Mr. El Ouerghi has been detained at Guantánamo since May 1, 2002—nearly six years. He recognizes that the Government has an interest in the orderly process of resolving the fate of the detainees by either charging them or releasing them. But, as the *Abdah* court stated, whereas an injunction "might restrict or delay Respondents with respect to one aspect of managing Petitioners' detention, such a consequence does not outweigh the imminent threat facing Petitioners with respect to the *entirety* of their claims before the court." 2005 U.S. Dist. LEXIS 4942, at *20. When "balancing the hardships to the parties," the *Omar* district court concluded "that the threat of tangible harm to the petitioner resulting from the court's failure to act outweighs any potential harm to the Executive's exercise of its war powers" and noted "that it is in the

- 15 -

public's interest to have a judiciary that does not shirk its obligations, particularly where the Great Writ is concerned." *Omar*, 416 F. Supp. 2d at 29–30 (citations omitted). The slight harm, if any, the Government may claim to face in detaining Mr. El Ouerghi a little longer pales in comparison to the grave harms facing Mr. El Ouerghi if he is released into Tunisian custody.

Furthermore, Mr. Al Hajji and Mr. Lagha were tortured after the United States received specific assurances from the Tunisian government that they would not be. *See* ILL-FATED HOMECOMINGS, *supra* note 10, at 3. It is certainly not in the interest of the United States to act on assurances made to it that are then flouted. U.S. DEP'T OF STATE, TUNISIA REPORT, *supra* note 3 (noting that the Tunisian government tortures its prisoners despite United States policy not to release prisoners to governments that torture them).

**D.    Granting Mr. El Ouerghi a Reasonable Chance To Avoid State-Sanctioned Torture Is in the Public Interest.**

As demonstrated above and in light of the treatment of other Guantánamo detainees since their return, there is a strong likelihood—in fact, a near certainty—that Mr. El Ouerghi will be wrongfully detained and subject to torture if he is returned to Tunisia. To render an individual held in U.S. custody into the hands of a regime that will torture him violates the public interest embodied in United States law and public policy. *See WWF* v. *Hodel*, No. 88-1276, 1988 U.S. Dist. LEXIS 19409, at *14 (D.D.C. June 17, 1988) ("If the treaty has been violated, then the public interest will suffer."); *Iceland S.S. Co.* v. *U.S. Dep't of the Army*, No. 98-2631, 1998 U.S. Dist. LEXIS 17853, at *7 (D.D.C. Nov. 10, 1998), *rev'd on other grounds*, 201 F.3d 451 (D.C. Cir. 2000) ("It is in the public interest to accord the Treaty its intended meaning."); *see also Kaktovik* v. *Watt*, 689 F.2d 222, 228 (D.C. Cir. 1982) ("We must assume that the statute is in [the public]

- 16 -

interest."); *Serono Lab.* v. *Shalala*, 158 F.3d 1313, 1326 (D.C. Cir. 1998) (looking to the statute to define the public interest); *Gold ex rel. NLRB*, 435 F. Supp. 2d at 119 (same).

        The United States has not only signed the United Nations Convention Against Torture ("CAT"), but also implemented those provisions by statute. The United States' strong policy against torture extends to ensuring that persons in the custody of, or otherwise under the power of, the United States shall not be returned to a country where they will face torture. Enjoining Mr. El Ouerghi's repatriation to torture in Tunisia would further United States public policy, which is clearly stated in the Foreign Affairs Reform and Restructuring Act of 1998: "It shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States." 8 U.S.C. § 1231 note, 112 Stat. 2681-822; *see also* Declaration of Clint Williamson, United States Ambassador-at-Large for War Crimes Issues, *attached to* Opposition to Petitioner's Emergency Motion for Order Prohibiting Transfer, *Khalifh* v. *Gates*, No. 07-1215 (D.C. Cir. 2007) (citing "longstanding policy of the United States not to transfer a person to a country if it determines that it is more likely than not that the person will be tortured"). Transferring individuals to states where they are at substantial risk of torture and prohibited ill-treatment, based on an unreliable diplomatic assurance, flies in the face of this principle. *See Khouzam* v. *Hogan*, No. 07-0992, 2008 U.S. Dist. LEXIS 2073 (M.D. Pa. Jan. 10, 2008) (enforcing obligations under United States law to prevent the return of a prisoner who faced substantial risk of torture in his home country

when that country made unreliable diplomatic assurances). Yet Mr. El Ouerghi faces just such a substantial risk.

It is substantially more likely than not that Mr. El Ouerghi will be brutalized and tortured upon his arrival in Tunisia. As discussed above (pp. 5–7, *supra*), the two Guantánamo detainees previously returned to Tunisia were immediately taken into custody on their return, and subject to the harshest kind of torture and abuse, as well as unlawful detention and the deprivation of any due process of law. *See* ILL-FATED HOMECOMINGS, *supra*; Katznelson Decl. ¶ 5–9. Therefore, Respondents' return of Mr. El Ouerghi would violate the Convention Against Torture. Additionally, the prohibition on sending a person to torture is reflected in two other international conventions to which the United States is a signatory. The 1951 United Nations Refugee Convention requires that no state "shall expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened," and the International Covenant on Civil and Political Rights provides that no one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment." *See* U.N. Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment, opened for signature Dec. 10, 1984, S. Treaty Doc. 31 No. 100-20 (1988), 1465 U.N.T.S. 85 (CAT);[18] 1951 Convention relating to the Status of Refugees, 189 U.N.T.S. 150, *entered into force* April 22, 1954, article 33; Protocol

---

[18] The United States became a party to CAT in 1994, and promulgated its first regulations implementing Article 3 in 1999. *See* Regulations Concerning the Convention Against Torture, 64 Fed. Reg. 8478 (1999). The standard under CAT is that a person must not be returned if the person has "substantial grounds for believing" he faces torture if returned. When the U.S. Senate ratified CAT, it did so with the understanding that its "more likely than not" standard would be used. *See* 136 Cong. Rec. 36, 1984 (1990). Mr. El Ouerghi's transfer to Tunisia would violate the CAT under either standard.

Relating to the Status of Refugees, 606 U.N.T.S. 267, *entered into force* Oct. 4, 1967;[19]

International Covenant on Civil and Political Rights, G.A. res. 2200A (XXI), 21 U.N.

GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316 (1966), 999 U.N.T.S. 171, art. 7, *entered*

*into force* Mar. 23, 1976.

      Furthermore, Common Article 3 of the Geneva Conventions, not only

signed by the United States but also found by the Supreme Court in *Hamdan* v. *Rumsfeld,*

126 S. Ct. 2749 (2006), to apply to Guantánamo Bay prisoners, protects detained

civilians in internal conflict and prohibits cruel treatment, torture, and "outrages against

personal dignity, in particular humiliating or degrading treatment . . . in all circumstances

. . . [and] at any time and in any place whatsoever." *Id.*  It is thus not in the public interest

for the Government to engage in affirmative acts that will directly result in subjecting Mr.

El Ouerghi to torture and imprisonment without due process of law.

---

[19] Mr. El Ouerghi qualifies for refugee status due to his well-founded fear of persecution on the basis of political opinion, a recognized ground of protection under U.S. and international law. The Tunisian government will impute Islamist political beliefs to him solely by reason of his detention at Guantánamo, and evidence has shown that they are likely to persecute him on that basis.

## CONCLUSION

No interest is served by transferring Mr. El Ouerghi to a country that will almost certainly torture him, nor is any interest served by transferring Mr. El Ouerghi without giving his counsel notice and the opportunity to respond.  Giving Mr. El Ouerghi's counsel reasonable notice of any transfer and enjoining the Government from releasing Mr. El Ouerghi to Tunisia will greatly assist efforts underway to ensure that irreparable harm does not befall him.  Petitioner Adel El Ouerghi respectfully requests that his motion be granted in full.


Dated:  March 3, 2008                    Respectfully submitted,

                                         ___/s/ Michael A. Cooper_____
                                         Michael A. Cooper
                                         Suhana S. Han
                                         125 Broad Street
                                         New York, New York  10004
                                         Tel. (212) 558-4000
                                         Fax: (212) 558-3588

                                         *Counsel for Petitioners Adil bin Muhammad
                                         al Wirghi and Tawiss bint Hasan al Wirghi*

                                         Of Counsel
                                         Barbara Olshansky
                                         CENTER FOR CONSTITUTIONAL RIGHTS
                                         666 Broadway, 7th Floor
                                         New York, New York  10012
                                         Tel: (212) 614-6439
                                         Fax: (212) 614-6499

- 20 -