# Exhibit D



# Tunisia

## Country Reports on Human Rights Practices - 2006
Released by the Bureau of Democracy, Human Rights, and Labor
March 6, 2007

Tunisia is a constitutionally based republic with a population of approximately 10 million, dominated by a single political party, the Democratic Constitutional Rally (RCD). Zine El-Abidine Ben Ali has been the president since 1987. In the 2004 presidential election, President Ben Ali ran against three opposition candidates and was declared the winner with approximately 94 percent of the popular vote. Official turnout was higher than 90 percent, although observers regarded these figures as substantially inflated. In concurrent parliamentary elections, the RCD gained 152 of the 189 seats. A second legislative body, the Chamber of Advisors, was created in a 2002 referendum amending the constitution. In July 2005 indirect elections for the Chamber of Advisors resulted in a heavily pro-RCD body. The civilian authorities generally maintained effective control of the security forces.

The government continued to commit serious human rights abuses. There were significant limitations on citizens' right to change their government. Members of the security forces tortured and physically abused prisoners and detainees. Security forces arbitrarily arrested and detained individuals. Authorities did not charge any police or security force official with abuse during the year. Lengthy pretrial and incommunicado detention remained a serious problem. The government infringed on citizens' privacy rights, continued to impose severe restrictions on freedom of speech and of the press, and restricted freedom of assembly and association. The government remained intolerant of public criticism and used intimidation, criminal investigations, the court system, arbitrary arrests, residential restrictions, and travel controls (including denial of passports), to discourage criticism by human rights and opposition activists. Corruption was a problem.

**RESPECT FOR HUMAN RIGHTS**

Section 1 Respect for the Integrity of the Person, Including Freedom From:

a. Arbitrary or Unlawful Deprivation of Life

The government or its agents did not commit any politically motivated killings; however, on March 11, according to the World Organization Against Torture (OMCT), Bechir Rahali, chief of police of Cité Ennour, El Ouradia IV, Tunis, killed 24-year-old Tarek Ayari. According to an OMCT communiqué, following a police raid, Ayari fled on foot and a police vehicle pursued him. Rahali reportedly exited the vehicle and hit Ayari on the head with the handle of a pickaxe. Ayari reportedly collapsed and was left on the scene without assistance. According to information collected by OMCT, Ayari's brother subsequently drove him to the hospital where sources say he had injuries on his shoulder, knee, hand, and foot in addition to a head injury. Ayari died on March 11, and he was buried on March 13, reportedly under heavy police surveillance. OMCT and the Tunisian Human Rights League (LTDH) called for an independent inquiry into the death of Ayari and restitution for the family; however, there were no further developments by year's end.

There were no developments in the case of Moncef Ben Ahmed Ouahichi, a Jendouba resident, who died in June 2005 of a cerebral hemorrhage at La Rabta Hospital in Tunis following his arrest and detention at police facilities in Jendouba. Human rights organizations alleged that Ouahichi died as a result of being beaten in custody by security officials.

b. Disappearance

There were no reports of politically motivated disappearances.

c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

The law prohibits such practices; however, according to human rights organizations, security forces tortured detainees to elicit confessions and discourage resistance. The forms of torture and other abuse included: sleep deprivation; electric shock; submersion of the head in water; beatings with hands, sticks, and police batons; suspension, sometimes manacled, from cell doors and rods resulting in loss of consciousness; and cigarette burns. According to Amnesty International (AI), police and prison officials used sexual assault and threats of sexual assault against the wives of Islamist prisoners to extract information, intimidate, and punish.

Charges of torture in specific cases were difficult to prove. Authorities often allegedly denied victims of torture access to medical care until evidence of abuse disappeared. The government maintained that it investigated all complaints of torture and mistreatment filed with the prosecutor's office and noted that alleged victims sometimes accused police of torture without filing a complaint, which is a prerequisite for an investigation.

According to defense attorneys and local and international human rights groups, police routinely refused to register complaints of torture. In addition, judges dismissed complaints without investigation and accepted as evidence confessions allegedly extracted through torture. The government has the ability to open an administrative investigation of allegations of torture or mistreatment of prisoners without a formal complaint; however, in those cases the results have not been made public or available to the lawyers of affected prisoners.

Consistent with an effort to extract information or coerce confessions, reports of torture were more frequently associated with the initial phases of interrogation/investigation and pretrial detention centers more than prisons. Human rights activists, citing prisoner accounts, identified facilities at the Ministry of Interior as the most common location for torture. Political prisoners, Islamists, and persons detained on terrorism-related charges allegedly received harsher treatment than other prisoners and detainees.

Several domestic nongovernmental organizations (NGOs), including the National Council for Liberties in Tunisia (CNLT) and the Association for the Fight Against Torture in Tunisia (ALTT), reported multiple torture cases throughout the year.

On June 1, the LTDH Section in Bizerte reported that on May 4, Aymen Ben Belgacem Dridi, detained on terrorism-related charges, was reportedly beaten, kicked, and subjected to *falka* (beatings on the soles of the feet) in the Borj er-Roumi prison. Dridi's lawyer reportedly registered a complaint of torture and other crimes and requested an inquiry. According to the LTDH communiqué, on May 17, the request was registered at a Bizerte court, and on May 20, a government prosecutor conducted an interview of Dridi. Security forces allegedly assaulted Dridi again. There were no further developments in the inquiry at year's end.

There were no further developments in the case of Zied Ghodhbane, who reportedly appeared in court in June 2005 in a state of physical and psychological distress, showing marks of abuse. He reportedly testified that after his extradition from Algeria, officials at the Ministry of Interior tortured him by beatings, electrocution, and holding his head under water. Defense lawyers for the accused requested that the judge recommend a medical examination, but the judge reportedly ruled that such a request should come from the general prosecutor.

There were no further developments in the case of the "Bizerte Group," 11 defendants arrested in 2004 and charged with various terrorism-related crimes, who were sentenced in 2005 to prison terms ranging from 10 to 30 years. In July 2005 the court acquitted five of the defendants, while the remaining six received sentence reductions. The Committee of the Defense of Victims of the Law on Terrorism released multiple communiqués in 2005 charging that authorities used torture to obtain confessions from the group.

Police assaulted human rights and opposition activists throughout the year.

On March 11, according to the LTDH, police agents beat former political prisoner Abdeljabbar Maddouri, who reportedly lost consciousness and was hospitalized due to the attack.

On May 11, according to multiple witnesses and human rights groups, police assaulted lawyers staging a three-week sit-in to protest a new law that created a training institute for lawyers (see section 1.e.). Police allegedly attacked several lawyers over the course of the three-week sit-in, including Ayachi Hammami, Raouf Ayadi, and Abderrazak Kilani, all of whom were hospitalized, according to a communiqué released by CNLT.

There were no further developments on reports that three individuals, allegedly members of the security forces, assaulted journalist Sihem Ben Sedrine in 2004 (see section 2.a.), or on reports in 2004 of an assault on former political prisoner Hamma Hammami, whose political party urged the boycott of the 2004 presidential elections.

In 2004 the president ordered the Higher Commission on Human Rights and Basic Freedoms (a state-appointed body) to

conduct an inquiry into the case of Nabil El Ouaer, whom a military tribunal had sentenced to 15 years in prison in 1992. In 2004 the senior official of Borj er-Roumi Prison allegedly beat Ouaer and placed him in solitary confinement. While in solitary confinement, four other prisoners allegedly raped him. Based on its timing and location, human rights activists believed prison officials sanctioned the incident. Authorities did not publish the commission's findings, if any, by year's end.

Authorities did not charge any police or security force official with abuse during the year.

Prison and Detention Center Conditions

Prison conditions ranged from spartan to poor and generally did not meet international standards. Although overcrowding and limited medical care posed a significant threat to prisoners' health, new prison facilities at Mornaguia and greater access to healthcare improved the situation.

According to human rights organizations, prison conditions in the country continued to fall short of minimum adequate standards. Hygiene was extremely poor, and prisoners rarely had access to showers and washing facilities. Sources reported that 40 to 50 prisoners were typically confined to a single 194 square foot cell, and up to 140 prisoners shared a 323 square foot cell. Most prisoners were forced to share beds or sleep on the floor. Current and former prisoners reported that inmates were forced to share a single water and toilet facility with more than 100 cellmates, creating serious sanitation problems. Contagious diseases, particularly scabies, were widespread, and prisoners did not have access to adequate medical care. Additional discriminatory and arbitrary measures such as restrictions on family visits worsened the conditions of detention, particularly when prisoners sought redress for grievances about treatment and conditions.

On September 9, the government closed the "9 Avril" prison in Tunis and moved prisoners to a new facility at Mornaguia, a suburb of Tunis. The capacity of the new prison was reportedly 5,000 prisoners and designed to remedy serious problems of overcrowding in the 9 Avril prison. Prisoners had previously complained of very poor conditions in 9 Avril, including overcrowding, sanitation problems, and limited access to medical care.

A 2004 LTDH report on the country's prisons entitled "The Walls of Silence" estimated that there were approximately 26,000 prisoners in 29 prisons and seven juvenile detention centers. The report described a number of abuses, alleging that torture and humiliating treatment of prisoners were widespread.

In an April 2005 report, Human Rights Watch (HRW) described the government practice of holding political prisoners in prolonged solitary confinement. During a press conference held in Tunis in April 2005, HRW announced that the government promised not to place prisoners in solitary confinement for more than 10 days, the maximum time allowed for punishment according to the law. Shortly thereafter, the government confirmed that it had eliminated long-term solitary confinement. However, HRW reported that the government continued to keep some political prisoners, most of whom were outlawed Islamist party An-Nahdha leaders, in small-group isolation.

According to prisoner and detainee testimony, prison conditions for women were generally better than those for men. Conditions for detainees and convicts were reportedly the same.

International and local NGOs reported that political prisoners regularly were moved among jails throughout the country, thereby making it more difficult for their families to deliver food to them and to discourage their supporters or the press from inquiring about them (see section 1.b.). The CNLT reported that other inmates were instructed to stay away from political prisoners and were punished severely for making contact with them.

In April 2005 the government reportedly approved access for HRW to make prison visits. Following this verbal agreement, however, HRW submitted a formal request for prison access, but despite multiple communications from HRW, by year's end the government had not responded to HRW's request. In June 2005 the ICRC began conducting prison and detention center visits, following more than a year of negotiations with the government. The International Committee of the Red Cross (ICRC) reported that prison authorities had respected their mission and allowed them to conduct visits without obstacle. According to ICRC the government began to put measures in place to improve conditions, including improved hygienic conditions and access to medical care. In February the ICRC submitted its first intermediary report to the government. The government did not permit media to inspect or monitor prison conditions.

d. Arbitrary Arrest or Detention

The law prohibits arbitrary arrest and detention, but, in practice, they occurred.

The International Association for the Support of Political Prisoners (AISPP) reported that hundreds of persons were arrested from 2003 until presentfor visiting terrorism-related Web sites and were detained without proper legal procedures

or sufficient evidence of commission of a crime (see section 1.d.).

According to AI and domestic human rights organizations, scores of people were arrested by police beginning in late December, following exchanges of gun fire between security forces and members of a Salafist armed group that had among its targets foreign embassies and personnel. Families made enquiries about the individuals, but the authorities allegedly have given them no information. AI expressed concern that they may have been held in incommunicado detention at the State Security Department of the Ministry of Interior in Tunis, where they would be at risk of torture and other ill-treatment. There were no developments on this caseload at year's end.

Role of the Police and Security Apparatus

The Ministry of the Interior controls several law enforcement organizations including: the police, who have primary responsibility within the major cities; the National Guard, which has responsibility in smaller cities and the countryside; and state security forces, which monitor groups and individuals the government considers to be a threat, such as opposition parties and leaders, the media, Islamists, and human rights activists.

In general law enforcement groups were disciplined, organized, and effective; however, there were episodes involving petty corruption and police brutality. Law enforcement organizations operated with impunity, and sanctioned by high officials, the police attacked dissidents and oppositionists.

The Ministry of Interior's Higher Institute of Internal Security Forces and Customs has oversight of law enforcement officers in the ministries of interior and customs. The organization's stated mission was to reinforce human rights and improve law enforcement; however, no information was available about its operations, and no information was available about any punishment of police and prison guards.

Arrest and Detention

The law provides that the police must have a warrant to arrest a suspect, unless the crime committed is a felony or is in progress; however, arbitrary arrests and detentions occurred. The penal code permits the detention of suspects for up to six days prior to arraignment, during which time the government may hold suspects incommunicado. Arresting officers are required to inform detainees of their rights, immediately inform detainees' families of the arrest, and make a complete record of the times and dates of such notifications, but those rules were sometimes ignored. Detainees were allowed access to family members when they were not being held incommunicado, although the government did not always facilitate the efforts of family members to identify the whereabouts of their detained relatives.

Detainees have the right to know the grounds of their arrest before questioning, and may request a medical examination. They do not have a right to legal representation during the pre-arraignment detention. Attorneys, human rights monitors, and former detainees maintained that authorities illegally extended detainment by falsifying arrest dates. Police reportedly extorted money from families of innocent detainees in exchange for dropping charges against them.

The law permits the release of accused persons on bail, and detainees have the right to be represented by counsel during arraignment. The government provides legal representation for indigents. At arraignment the examining magistrate may decide to release the accused or remand him to pretrial detention.

The government denied detaining anyone for political crimes. The lack of public information on prisoners and detainees made it impossible to estimate the number of political detainees. However, it was likely that the number of those held without charge was low because criminal convictions of dissidents and Islamists were easy to secure under laws prohibiting membership in outlawed organizations and "spreading false information aimed at disturbing of the public order."

In cases involving crimes for which the sentence may exceed five years or that involve national security, pretrial detention may last an initial period of six months and may be extended by court order for two additional four-month periods. For crimes in which the sentence may not exceed five years, the court may extend the initial six-month pretrial detention by an additional three months only. During this pretrial stage, the court conducts an investigation, hears arguments, and accepts evidence and motions from both parties. Complaints of prolonged pretrial detention were common.

Amnesty

Judges and the government exercised their authority to release prisoners or suspend their sentences, often on conditional parole (see section 1.e.).

On February 26, President Ben Ali released 1,298 prisoners from prison and granted "conditional freedom" to 359 others. Among those released were 87 members of the banned Islamist party An-Nahdha, including Hamadi Jebali, the former editor of An-Nahdha's now defunct newspaper al-Fajr, as well as other Islamists. Also among those released were six detainees, known as the Zarzis group, who had been arrested in 2003 for allegedly preparing to commit terrorist attacks. International and domestic human rights NGOs, who have long called for the release of political prisoners, had been particularly vocal about Jebali and the Zarzis group. After release Jebali and members of the Zarzis group complained of subsequentgovernment harassment and excessive restrictions on personal movement due to their administrative control status (see section 2.d.).

On November 4, President Ben Ali released an unannounced number of prisoners in advance of the November 7 national holiday commemorating the President's accession to power in 1987. An-Nahdha later reported on its Web site that 55 of its former members that had been imprisoned in the early 1990s were among those released. Several of those released had been sentenced to life in prison.

e. Denial of Fair Public Trial

The law provides for an independent judiciary; however, the executive branch and the president strongly influenced judicial procedures, particularly in political cases. The executive branch exercised indirect authority over the judiciary through the appointment, assignment, tenure, and transfer of judges, rendering the system susceptible to pressure. In addition, the president was head of the Supreme Council of Judges, composed primarily of presidential appointees.

The law provides citizens legal recourse to an administrative tribunal to address grievances against government ministries, although government officials rarely respected the tribunal's nonbinding decisions. Throughout the year the government permitted observers from diplomatic missions and foreign journalists to monitor trials. The government did not permit observers to attend sessions of military tribunals.

In June 2005 as it had in the previous year, the Association of Tunisian Judges (AMT), a 1,700-member professional organization, released a communiqué calling for reform of the recruitment, transfer, and promotion system for judges and proposing elections of judges to the Supreme Council of Judges, the governing body for the judiciary (see section 2.b.). Although the government did not officially respond to the association's communiqué, in July 2005 human rights organizations stated that the government removed AMT leadership due to its demonstrated independence and transferred independent judges to regional cities as punishment(see section 2.b.).

On May 9, the Tunisian Bar Association led a sit-in at the association's headquarters in Tunis protesting a draft law announced the same day that created a training institute for lawyers. Lawyers alleged that by controlling admission to the Institute, the government would effectively control admittance to the bar. Although the bar association had previously supported the creation of a training institute to standardize qualifications for becoming a lawyer, bar association leaders complained that the association was not consulted on the new draft law and that the proposed institution would not be independent. Lawyers alleged that police abused several lawyers who participated in the sit-in and related demonstrations outside of court buildings in Tunis (see section 1.c.). On May 12, despite the objections of the bar association, the president signed the law.

The civil court system is a four-tiered hierarchy. At the first level, there are 51 district courts, in which a single judge hears each case. At the second level are 24 courts of first instance, which serve as the appellate courts for the district courts, but which also have original jurisdiction for more serious cases. The Court of Cassation (or Supreme Court) serves as the final court of appeals. The Supreme Court only considers arguments pertaining to points of law. The organization of the criminal court system is similar to that of the civil court system. In most cases the presiding judge or panel of judges dominate a trial, and attorneys have little opportunity to participate substantively.

Military courts fall under the Ministry of Defense. Military tribunals have the authority to try cases involving military personnel and civilians accused of national security crimes. Defendants may appeal the military tribunal's verdict to the civilian Supreme Court.

On April 18, according to newspapers, Slah Mosbah, a well-known singer, was arrested on charges of "attacking the dignity of the army" and physical assault due to an altercation with two military officials following a car accident involving Mosbah's vehicle and a military bus. Authorities tried Mosbah in April and May in a military tribunal and sentenced him to two years and eight months in prison. Authorities released Mosbah on parole after two months on June 23.

There is also an administrative tribunal, which hears administrative cases between citizens and the government.

Trial Procedures

The law extends the same trial procedure rights to all citizens, and it provides for the right to a fair trial; however, according to international and domestic NGOs this did not always occur in practice.

Trials in the regular courts of first instance and in the courts of appeal are open to the public. By law the accused has the right to be present at trial, to be represented by counsel, and to question witnesses; however, judges do not always observe these rights in practice. The law permits the trial in absentia of fugitives from the law. Both the accused and the prosecutor may appeal decisions of the lower courts.

The law provides that defendants are presumed innocent until proven guilty "following a procedure offering essential defense guarantees." However, that presumption was sometimes ignored in practice, especially in politically sensitive cases. Defendants may request a different judge if they believe the assigned one is not impartial; however, judges are not required to recuse themselves.

Lengthy trial delays remained a problem (see section 1.d.). Defendants do not have the right to a speedy trial, nor is there any limit to how much time a case can take. Defense lawyers claimed that judges sometimes refused to let them call witnesses on their clients' behalf or to question key government witnesses. Defense lawyers contended that the courts often failed to grant them adequate notice of trial dates, or to allow them time to prepare their cases. Some reported that judges restricted access to evidence and court records, and in some cases, required all the lawyers working on a case to examine documents together on a single date in judges' chambers, without allowing them to copy relevant documents.

Lawyers and human rights organizations reported that courts routinely failed to investigate allegations of torture and mistreatment and accepted as evidence confessions extracted through torture (see section 1.c.). They noted that the summary nature of court sessions sometimes prevented reasoned deliberation. They also stated that erratic court schedules and procedures were designed to deter observers of political trials.

Although family and inheritance law is codified, civil law judges were known to apply Shari'a (Islamic law) in family cases if the two systems conflicted (see section 5). For example, codified laws provided women with the legal right to custody over minor children; however, judges sometimes refused to grant women permission to leave the country with them, holding that Shari'a appoints the father as the head of the family and the one who must grant children permission to travel. Some families avoided the application of Shari'a inheritance rules by executing sales contracts between parents and children to ensure that daughters received shares of property equal to that of sons.

Political Prisoners and Detainees

The government denied that it held any political prisoners, and there was no definitive information regarding the number, if any, of such prisoners. Human rights organizations alleged that the government had arrested and imprisoned more than 500 persons since 2005 on charges related to a 2003 antiterrorism law, without sufficient evidence that they had committed or planned to commit terrorist acts. Human rights activists and lawyers alleged that many of these detainees were tortured in Ministry of Interior facilities and were forced to sign confessions.

The AISPP claimed that approximately 150 political prisoners remained from the caseload of Islamists arrested in the late 1980s and early 1990s. Very few of the prisoners were convicted for acts of violence. Most of those who were identified by international human rights groups as political prisoners or prisoners of conscience were arrested for violating laws that prohibit membership in illegal organizations and spreading false information aimed at undermining public order. Many were arrested for disseminating information produced by organizations such as An-Nahdha. Former political prisoners stated their identity papers were marked in a way that resulted in their receiving harsher treatment.

The ICRC and the governmental body Higher Committee on Human Rights had access to visit prisons and detention facilities.

In June 2005 the government released Lotfi Amoudi, who the AISPP stated was a political prisoner. He had served 14 years in prison and was released in poor health after a 26-day hunger strike.

Civil Judicial Procedures and Remedies

While a court system existed through which a human rights complaint could be made, the judiciary was not independent and impartial in cases involving human rights violations when the government was involved. Administrative remedies were available through the Office of the Ombudsman at the Presidency and administrative court. However, decisions taken by these institutions were not binding and were often ignored by other government departments and agencies.

f. Arbitrary Interference with Privacy, Family, Home, or Correspondence

The law prohibits such actions "except in exceptional cases defined by law"; however, the government generally did not respect these prohibitions in practice. Police sometimes ignored the requirement to have a warrant before conducting searches if authorities considered state security to be involved. AISPP officials reported that throughout the year members of the security forces broke into AISPP offices at night and searched without warrant.

Authorities may invoke state security to justify telephone surveillance. According to numerous reports by NGOs, the news media, and diplomatic representatives, the government intercepted faxes and e-mails. The law does not explicitly authorize these activities, but the government stated that the code of criminal procedure implicitly gives investigating magistrates such authority. Many opposition political activists experienced frequent and sometimes extended interruptions of service to home and business telephones, faxes, and the Internet. Human rights activists accused the government of using the postal code, with its broad but undefined prohibition against mail that threatens the public order, to interfere with their correspondence and interrupt the delivery of foreign publications. Security forces routinely monitored the activities, telephone, and Internet exchanges of opposition, Islamist, human rights activists, as well as journalists, and also placed some under surveillance (see section 2.a.).

The government barred membership in political parties organized by religion, race, or region of origin. On these grounds, the government considered that members of the Islamist movement An-Nahdha belonged to an illegal organization (see section 3).

Human rights activists claimed that the government punished family members of Islamist activists for crimes allegedly committed by the activists. Family members were reportedly denied jobs, educational opportunities, business licenses, and the right to travel due to their relatives' activism. They also alleged that relatives of Islamist activists, in jail or living abroad, were subjected to police surveillance and questioning about their activist relatives.

Human rights activists reported that upon release from prison, detainees suspected of An-Nahdha membership were harassed and restricted in their employment. Former An-Nahdha prisoners reported that government officials instructed prospective employers not to hire them or their families. Former political prisoners were not able to obtain a document from the Ministry of Interior stating that they had no criminal records. Such statements were necessary for employment. Even if they had not been jailed, authorities confiscated the identity cards of some activists and Islamists. For example, AISPP member Lasaad Johri has been deprived of an identity card since 1999. An individual must have an identity card to receive healthcare, sign a lease, buy or drive a car, access bank accounts and pensions, and even to join a sports club. Police may stop anyone at any time and ask for his or her identity card. If individuals are unable to produce their cards, police may detain them until their identity can be established by a central fingerprint database.

Section 2 Respect for Civil Liberties, Including:

a. Freedom of Speech and Press

The constitution provides for freedom of speech and of the press "exercised within the conditions defined by the law"; however, the government generally did not respect these rights in practice. It limited press freedom and intimidated journalists, editors, and publishers into practicing self-censorship. Security forces closely monitored press activity.

Journalist accreditation for domestic press is obtained from the Ministry of Communication. The journalist must have a university degree and be employed by a newspaper. The journalist's employing newspaper must submit a request for accreditation. If approved, the journalist received a trainee card for the first year, followed by a professional card. Not all working journalists have accreditation, which provides access to official events.

Under the law, print media need not be licensed. In practice, however, print media are rigidly controlled by the authorization to the printer, not the publisher. Print media must request a copyright (*patente*) registration from the Ministry of Interior. Applications are submitted to the Ministry of the Interior, which then delivers a receipt (*récépissé*) good for one year constituting the official permit to publish. The Press Code requires that the printer request the receipt before printing, effectively prohibiting any unlicensed publications. The code also requires the publisher to inform the Ministry of Interior of any change of printer.

Printers and publishers violating these rules are subject to substantial, per copy, personal fines under the Press Code.

In a similar way, broadcast media are controlled by the granting or denial of a frequency by the Tunisian Frequencies Agency, which is part of the Ministry of Communications and Technologies. These licenses, or acceptance of the application, are tightly restricted.

The law prohibits citizens from discussing national politics on foreign radio or television channels during the two weeks

prior to national elections.

Security forces often questioned citizens seen talking with foreign visitors or residents, particularly visiting international human rights monitors and journalists. The government attempted to prevent private meetings with foreign diplomats and to influence public meetings by surrounding meeting places with scores of plainclothes policemen (see section 2.b.). For example, on May 3, World Press Freedom Day, plainclothes policemen lined the street leading to the headquarters of the government offices of Tunisian Radio and Television, blocking a planned demonstration on press freedom.

The government stated that there were 950 foreign publications and newspapers distributed in the country and that 90 percent of the newspapers were "privately owned and editorially independent." However, of the eight mainstream dailies, two were government owned, two were owned by the ruling party, and two, although nominally private, took editorial direction from senior government officials. All media were subject to significant governmental pressure over subject matter.

There were three opposition party newspapers with small circulations and editorial independence from the government. Nevertheless, two of them, *Ettariq El Jadid* and *Al-Wahda*, received government subsidies under a law that provides government financing to papers representing opposition parties with seats in parliament. The third, *Al-Mawqif*, did not receive the subsidy since its party was not represented in parliament.

While the government permitted public criticism in opposition newspapers, it impeded similar criticism in the mainstream press. Individuals and certain groups faced reprisal for statements critical of the government. For example, in April 2005 a court found Mohamed Abbou, a lawyer, guilty of publishing statements "likely to disturb the public order" in which he compared the fate of Iraqi prisoners in Abu Ghraib to that of citizen prisoners. He was arrested following the online publication of another article in which he unfavorably compared the country's president to then-Israeli Prime Minister Ariel Sharon. Mohamed Abbou's wife, Samia Abbou, and family were harassed and subjects of surveillance. In March Mohamed Abbou went on a hunger strike to protest his detention conditions, which he alleged deteriorated following a demonstration by supporters outside the El Kef Prison where he was detained. On October 16, Samia Abbou went on a one-day hunger strike with other wives of political prisoners to protest their husbands' continued detention. Following the hunger strike, police harassment and surveillance of Samia Abbou and her family increased.

On May 27, authorities sentenced opposition political activist Neila Hachicha's husband, Khaled Hachicha, to six months in prison for a zoning violation after Neila Hachicha published critical articles online and in international newspapers and appeared on Al-Jazeera. Human rights activists alleged that Hachicha's husband's sentence was a result of her activism. On November 16, authorities released Hachicha.

On October 21, authorities charged opposition political leader Moncef Marzouki with "threatening to disturb the public order," following appearances on Al-Jazeera earlier in October in which he criticized the government and called for civil disobedience.

Unlike in the previous year, there were no reports of journalists being arrested solely because of their work as journalists; however, some journalists who were active in opposition activities, such as Al-Jazeera correspondent Lotfi Hajji, were detained. Other journalists were detained and interrogated without being formally arrested. Throughout the year, Abdullah Zouari, a journalist who once worked for *Al-Fajr*, the weekly newspaper of the An-Nahdha party, remained under administrative control and in internal exile. During the year Zouari undertook a number of hunger strikes to bring attention to his situation. In February authorities released Hamadi Jebali, a former editor of *Al-Fajr*, after having served most of a 16 year sentence for insurrection and "membership in an illegal organization." He reported that he remained under administrative control and was unable to travel outside of the governorate of Sousse.

On August 16, according to Reporters Without Borders (RWB), police beat two journalists, Slim Boukhdir and Taoufik Al-Ayachi, in Tunis following their visit to the home of Samia Abbou. According to RWB, approximately a dozen policemen accosted and beat them, and Ayachi's camera was confiscated.

According to RWB and other human rights and press freedom organizations, authorities frequently harassed Boukhdir after he posted articles on the Internet critical of the government. In November 2005 Arabic-language daily newspaper *Ash-Shourouq* stopped publishing his articles and froze his salary in February. In April and May he was one of two *Ash-Shourouq* journalists who went on hunger strike in protest of their treatment by *Ash-Shourouq* management. Government authorities reportedly refused to give Boukhdir a press card and confiscated his passport.

There were no further developments in the case of Christophe Boltanksi, a journalist for the French newspaper *Liberation*, who was attacked and robbed in November 2005. Boltanski had been reporting on demonstrations in support of the Movement of 18 October hunger strikers (see section 2.b.). Following the attack international and local civil society organizations accused the security forces of organizing the assault. The government claimed it had arrested two suspects in the attack, but there was no information on any subsequent trial of the alleged perpetrators at year's end.

There was no further information on the alleged assault of Jean Jacques Mathy in November 2005. According to international media and NGO reports, plainclothes policemen pulled Mathy, of the Belgian television station RBF, from his car and seized his video camera and cassette. The camera was subsequently returned without the cassette (see section 2.b.).

On January 11, the president signed a law abolishing *dépôt légal*, which had required that the government approve all printed material prior to publication or distribution. The lifting of *depot legal* applied to newspapers and magazines but not books. The lifting of *dépôt légal* means that newspapers and magazines no longer must deposit a copy of their latest issue at the Ministry of Interior before going to print. Lifting of *dépôt légal* ended formal, overt censorship of the print media but did not end self-censorship and obvious government interference, such as the simultaneous appearance in three different Arabic-language newspapers of similar editorials lambasting civil society activists who frequent foreign embassies. All books and foreign publications continued to be subject to restrictions, as evidenced by the refusal of permission to distribute or print certain books. Book fairs had to deposit a copy of each title, or at least a list of titles, in advance. In a February 2005 report, the Tunisia Monitoring Group of the NGO International Exchange on Freedom of Expression provided a list of 21 books or academic works by domestic authors that have been censored in the country from initial publication until present.

On January 18, the GOT seized all of the copies of two domestic newspapers (mainstream weekly *Akhbar al Joumhouriya* and opposition weekly *Al Mawqif*), reportedly because of their articles on a rumored upcoming rise in bread prices. Press contacts claimed that the government considered the articles provocative. The government provided no legal justification for the removal of the newspapers.

The government also seized and banned distribution of the July 14 issue of *Al Mawqif*. Press observers claimed that the cause was its reprinting of an editorial by the chief editor of Pan-Arab newspaper *Al Quds Al Arabi*, threatening not to distribute the newspaper in the country due to press censorship. However, the article was published in a subsequent issue of *Al Mawqif*.

The law stipulates that the publication, introduction, and circulation of foreign works may be restricted. Authorities restricted the timely purchase of foreign publications that included articles deemed critical of the country or that the government determined could prompt a security threat. For example, on February 7, according to the NGO Observatory for the Freedom of Press, Publishing, and Creation in Tunisia (OLPEC), authorities banned the circulation of issue 257 of *Al Maraa Al Youm* magazine, edited in Dubai, allegedly due to an article referring to a rumored illness of President Ben Ali.

Authorities prevented the distribution of the September 19 edition of the *International Herald Tribune* and *Le Figaro* due to an editorial by Robert Redeker that claimed Islam incited hatred and violence.

The law authorizes sentences up to five years in prison for offensive statements against the president and up to three years in prison for defamation of constitutional bodies, including the Chamber of Deputies, Chamber of Advisors, constitutional councils, the administration, government members or deputies. In 2004 charges for defamation were brought against the editor of *Al Mawqif* for a 2004 article calling for an investigation into the railroad system. Nejib Chebbi, then-PDP secretary general and *Al Mawqif* publisher, appeared before the public prosecutor in April 2005.The case remained pending at year's end.

Directors and owners of existing private media, as well as journalists at the government and ruling party-owned press, practiced a high degree of self-censorship. Journalists in the mainstream press regularly refrained from investigative reporting on national issues. Only the small opposition press reported regularly on controversial national issues.

In May 2005 three independent members of the board of the Tunisian Journalists Association published a report in the name of the association that reported "rampant violations, including censorship and harassment of journalists." In May 2005 one of the members, Neji Bghouri, was held in police headquarters, but no formal charges were brought against him.

On May 3, the Association of Tunisian Journalists (AJT) released a report that summarized financial and administrative hardships of journalists, noted that no new newspapers were licensed, and mentioned the near absence of investigative reporting or editorial comment on local issues. While the report criticized government-owned television programming and also referred to "censorship, abusive licensing practices, and refusal of coverage of some events," the authors avoided any direct criticism of the government.

Also on May 3, World Press Freedom Day, Lotfi Hajji, president of the unrecognized Tunisian Journalists Union (SJT), released a report that directly criticized the government's harassment of journalists and its control over nominally private media outlets. On May 12, authorities called Hajji to police headquarters and interrogated him for four hours about an "illegal" meeting of "civil society representatives" at his home in Bizerte. The list of representatives presented to him by the police included the names of his wife and brother. Hajji's detention also followed two articles he wrote and published on the

Internet on a confrontation between the government and the Tunisian Bar Association over the creation of the new lawyer's institute (see section 1.e.).

Government regulations required foreign correspondents to obtain written approval before video recording in public. The government also controlled the satellite transmissions of local correspondents reporting for foreign television stations by refusing to license correspondents and insisting all correspondents use government-owned facilities for satellite uplinks.

The government often pressured newspapers to carry the government wire service's version of an event, even when their own journalists were present. According to the May 3 SJT report, authorities told journalists not to report a post office employees' strike on January 4 and a high school teachers' strike on April 19. Some government-owned newspapers accused the union of incitement and a lack of patriotism. Following a 2005 press conference held by the Tunisian Bar Association on the Mohamed Abbou case, officials told journalists present not to write about the event.

The government continued to exercise tight control over the licensing of new newspapers. Although there were at least 11 existing applications, the government authorized the creation of only one new newspaper, *Mouwatinoun*, which was to be published by the legal opposition party Democratic Forum for Labor and Liberties (FDTL). According to party leaders, only weeks after refusing FDTL the necessary paperwork to begin the process of authorization, in December the Ministry of Interior approved the publication, according to party leaders.

CLNT produced the newspaper-magazine *Kalima* without a license, but it was not available for public consumption. In September 2005 officials at the Ministry of Interior prevented Sihem Ben Sedrine, a journalist, publisher, and one of the founders of the CNLT, from registering her newspaper *Kalima*, whose Web site remained blocked within the country (see section 2.b.). It was Ben Sedrine's fourth attempt to register the publication. Ben Sedrine and international human rights NGOs alleged that the government refused registration of *Kalima* due to its commentary critical of the government. During the year police seized copies of the newspaper from CNLT officials outside of CNLT headquarters in Tunis.

The government maintained tight control of the broadcast media. Although the private broadcast media made some inroads in social and sports commentary, both private and government-owned radio stations confined broadcast news to international and noncontroversial national issues.

In observance of a stipulation of its 2005 license, the Hannibal private television station did not broadcast news. The granting of the licenses for the three existing private broadcast media was not transparent, and several requests for licenses, some pending for years, remained in limbo. The government did not restrict the widespread possession of satellite dishes.

On October 3, Hannibal TV stopped broadcasting *Sans Préavis,* a show reporting poor families preparing the traditional Ramadan iftar meal. Although no official reason was given for the cancellation, some media sources suggested that it was due to government pressure since the show presented an unfavorable picture of government efforts to eradicate poverty.

The government permitted the establishment of a pan-Maghreb satellite television channel, based in Tunis but broadcasting from Paris, by Karoui&Karoui World.

The government continued to withhold press credentials from, and delayed granting passports to, journalists, such as Slim Boukhdir, who in 2004 posed a question in a press conference implying that relatives of the president had pressured the judiciary to influence a legal case. The government did not grant government press cards to other experienced journalists, including Lotfi Hajji, Abdelatif Fourati, Slaheddine Jourchi, and Mohamed Fourati. Such press cards were needed for official accreditation as a journalist and were reviewed annually. Accreditation allowed journalists to attend official press conferences.

According to many journalists and non-journalist sources, senior government officials routinely called news directors and editors to inform them which issues they were forbidden to cover or publish and to direct editorial content and news coverage. The Tunisian Agency for External Communications enforced this policy and other informal censorship mechanisms by favoring certain publications for placement of government advertising. In addition, private companies were unwilling to advertise in newspapers no longer receiving government advertisements in order to avoid the appearance of siding with the media organization being punished by the government.

Internet Freedom

According to the government, no content is blocked or censored, except for obscene material or content threatening public order, defined as "incitement to hate, violence, terrorism, and all forms of discrimination and bigoted behavior which violate the integrity and dignity of the human person, and/or are prejudicial to children and adolescents." However, the

government blocked access to a number of Internet Web sites for their criticism of the government. The government blocked nearly all sites belonging to domestic human rights, opposition, and Islamist groups. Some foreign Web sites remained blocked, including that of AI, RWB and the local section of the HRW Web site. Opposition news sites and Internet discussion sites were also blocked.

In November 2005 the OpenNet Initiative, a collaborative of universities in several nations studying government attempts to control Internet information, reported that the government had blocked 10 percent of the 2,000 Web sites it tested and targeted and blocked substantial online material on political opposition, human rights, methods of bypassing filtering, and pornography. A November 2005 HRW report on online censorship noted that the government cited counterterrorism and the need to curb incitement to hatred and violence among its justifications for censoring information online. The same report noted, however, that tests on 41 radical Islamist Web sites found only four blocked.

In April 2005 a court found Mohamed Abbou, a lawyer, guilty of publishing statements "likely to disturb the public order" in which he condemnedtorture in the country's prisons andcompared the fate of Iraqi prisoners in Abu Ghraib to that of citizen prisoners (see section 1.c.).

Two 1997 decrees cover in part Internet and telecommunications services. All Internet service providers (ISPs) must obtain a license from the Ministry of Communications and Technologies. The Commission on Telecommunications Services, including representatives from the ministries of defense and interior, as well as officials holding posts related to communications, information, and computer sciences, reviews each application.

According to the HRW report on online censorship, each ISP must designate a director who "assumes responsibility...for the content of pages and Web pages and sites that the ISP is requested to host on its servers." Internet users and those who maintain Web sites and servers are also responsible for infractions of the law. Each ISP must submit, monthly, a list of its Internet subscribers to the quasi-governmental Tunisian Internet Agency (ATI). If an ISP stops services, it must "without delay" furnish the ATI with a complete set of its archives. The director of the ISP must maintain "constant oversight" of the content on the ISP's servers to insure that no information remains on the system that is contrary to "public order and good morals."

There were approximately 300 Internet cafés. The cafés are privately-owned but operate under the authority of the Ministry of Communications. Among other legal requirements, Internet cafe owners must maintain a database of their customers and inform customers of their obligations and their responsibility for any infringements of the legal provisions relating to Internet use.

Academic Freedom and Cultural Events

The government limited academic freedom and fostered a culture of self-censorship in universities. The government closely monitored administrators, teachers, and students to identify any political activity. Police on university campuses, both uniformed and in plainclothes, discouraged students from openly expressing dissent.

On October 13, authorities fined Abdelhamid Sghaïer, a post-graduate student, for demonstrating for the right of female students at a Tunis university to wear hijab (see section 2.c.). Sgaier went on a 20-day-hunger strike to protest the court's decision and to demand the renewal of his passport. The government allegedly refused to issue him a new passport for six months due to his political activities.

In March 2005 police assaulted students during campus demonstrations against the government's invitation to then-Israeli Prime Minister Ariel Sharon to attend a UN summit hosted by the country. Police arrested one faculty member and several students, who were released the following day (see section 2.b.).

Authorities subjected academic publications to government approval before publication, and university libraries did not purchase foreign books or subscribe to foreign magazines deemed critical of the government. Close government control over academic research funds prevented university administrators from authorizing or applying for grants on research topics that they believed the government would find objectionable. Professors avoided teaching classes on subjects considered sensitive, such as legal courses on political systems or classes on civil liberties. University professors often avoided discussion of subjects deemed sensitive enough to interest the government, and faculty members reported that they were hesitant to gather outside the classroom.

b. Freedom of Peaceful Assembly and Association

The law provides for freedom of assembly and association, but the government severely restricted this right in practice.

Freedom of Assembly

The law requires groups wishing to hold a public meeting, rally, or march to obtain a permit from the Ministry of Interior no later than three days before the proposed event and to submit a list of participants; authorities routinely approved such permits for groups that supported the government and generally refused permission for dissenting groups. As in previous years, NGO leaders reported difficulty in renting space to hold large meetings. They maintained that police pressured venue managers to prevent them from renting meeting space. Hotel managers and businesses denied any specific ban on renting space to opposition groups; however, they said they cooperated with the Ministry of Interior and accommodated its requests when possible.

In March the Tunisian Association of Democratic Women (ATFD) reserved a hotel in Tunis to hold a seminar for International Women's Day. However, the day before the conference, hotel managers cancelled the reservation, citing ongoing work at the hotel facilities. Activists alleged that the government had instructed the hotel not to allow ATFD access to prevent it from holding the planned event.

The government used police and other state security forces to monitor, control, and sometimes disrupt demonstrations. The government broke up several unsanctioned demonstrations during the year. In general demonstrators and security forces did not resort to violence; however, there were some exceptions, such as scuffles ensuing from demonstrators' attempts to cross police lines barring access to a demonstration site or demonstrators not dispersing when ordered by police.

The government consistently blocked meetings by the LTDH, in its headquarters in Tunis and in regional offices throughout the country. On May 27, the LTDH attempted to hold a national congress at it headquarters in Tunis. Hundreds of police, a majority of whom were in civilian clothing, blocked access to the LTDH headquarters buildings by LTDH members and international observers. Police throughout the country reportedly prevented members from regional cities from traveling to Tunis to attend the congress. Plainclothes police beat some persons attempting to gain access to the site.

In July the government refused to allow several demonstrations to take place. Opposition groups, human rights NGOs, the Tunisian labor union and students had petitioned for permission for multiple demonstrations to protest Israeli actions in Lebanon. Police in Sfax, Gabes, and Kairouan reportedly used violence in breaking up unauthorized demonstrations held in protest against the conflict between Israel and Lebanon in July. Only one demonstration, sanctioned and led by the government, took place.

On October 3 and October 27, diplomatic officials attempted to visit the Bizerte regional branch of the LTDH. On both occasions, plainclothes police and security officials prevented the officials from entering the LTDH branch office and conducting a meeting. On October 31, the government sent a diplomatic note to all diplomatic missions in Tunis saying that the LTDH was subject to a 2001 court decision that "forbids all activity of the LTDH." The note said that the court had ruled that the LTDH could only prepare for its national congress. However, the LTDH had conducted widespread activity since 2001, although a September 2005 ruling reportedly prevented the LTDH from any activity involving the preparation of its national congress.

On September 8, the government blocked an international conference on labor and employment issues organized by the German Friedich Ebert Foundation, the Euro-Mediterranean Human Rights Network, the Euromed Trade Union Forum, and the Fundacion Paz y Solidaridad of the Spanish Comisioners Obreras trade union in liaison with the UGTT, ostensibly because the organizers had not given the government advance notification. However, officials reported privately that the government blocked the conference due to the participation of two local activists. On October 18, the European Commission released the complete text of a diplomatic protest expressing disappointment over the cancellation of the event after the Chargé d'Affaires at the country's Embassy in Brussels refused to accept the demarche in person.

In November 2005 organizers of the "Citizen's Summit on the Information Society," an unofficial parallel summit to the UN World Summit on the Information Society, reported that the Tunis hotel where they reserved space notified them that the hall was no longer available. Representatives of the organizations planning the citizen's summit also tried to meet at the Goethe Institute, but they were prevented from entering by several dozen plainclothes police. According to HRW representatives, the police, who did not identify themselves, "manhandled local and foreign activists, knocking down several individuals as they pushed them along the streets."

Freedom of Association

The law provides for freedom of association; however, the government generally did not respect this right in practice. The law requires that new NGOs apply to the government to gain recognition and to operate legally. According to the law, an NGO that has filed an application to register may operate freely while the government processes its application. If the government does not reject the application within 90 days, the NGO is automatically registered.

The government routinely blocked registration of new independent NGOs by refusing to provide receipts for their registration applications. Without such a receipt, NGOs were unable to counter the government's assertions that they had not applied to register and therefore were not allowed to operate. In such cases, NGOs could be shut down, their property seized, and their members prosecuted for "membership in an illegal organization."

During the year significant numbers of RCD members attempted to join independent NGOs, such as the LTDH and other civil society groups. Their apparent intent was to limit the NGOs' independence by gaining control through elections or disrupting their operations. In some cases RCD members used the NGOs' own bylaws, while in other cases they exploited a provision of the law on associations that requires "organizations of a general character" to grant membership to all who apply.

On May 27, a court again ruled that the LTDH could not hold its national congress because of a suit filed by seven members of the LTDH allegedly loyal to the RCD.

Leaders of the AMT also alleged that the government used members loyal to the RCD to disrupt its meetings and operations. In 2005 AMT members allegedly under government and RCD control held new elections for AMT leadership after the AMT president proposed new judicial reform initiatives and supported a group of lawyers alleging improprieties in the trial of Mohamed Abbou (see section 1.c.). These RCD-loyal AMT members claimed that the president's communiqué was not representative of all AMT members. In 2005 the government evicted AMT leadership from the association's headquarters in Tunis. On August 30, the president who released the communiqué was transferred from Tunis to the coastal city of Mahdia. Previously, several other AMT board members were also transferred from Tunis to regional cities. Human rights organizations viewed these transfers as punishments and stated that the government removed the current AMT leadership due to its demonstrated independence. On September 10, the new AMT leadership, allegedly loyal to the RCD, drafted an internal regulation reducing the number of AMT members serving on the executive board and excluding members serving in regional cities from the board. Human rights activists reported that this was done to exclude independent-minded members who had been transferred from Tunis as punishment.

c. Freedom of Religion

The law provides for freedom of religion that does not disturb public order, and the government generally respected this right in practice, although there were some restrictions and abuses.

Islam is the state religion, and the law stipulates that the president must be a Muslim.

The government recognizes all Christian and Jewish religious organizations that were established before independence in 1956. Although it permitted other Christian denominations to operate, the government formally recognized only the Catholic church.

In March 2005 the government allowed the re-opening of a Catholic church in Djerba, but did not permit Christian groups to establish new churches.

While it was not illegal to change religions, government officials occasionally discriminated against converts from Islam to another religion using bureaucratic means to discourage conversion. Muslims who convert to another religion faced social ostracism. Customary law based on Shari'a forbids Muslim women from marrying outside their religion. The government required non-Muslim men to convert to Islam before marrying a Muslim woman. The government did not allow married couples to register their children with non-Muslim names. However, marriages of Muslim women to non-Muslim men abroad were generally recognized by the government. While judges generally ruled that marriages abroad were legal, on rare occasions judges have declared that a marriage abroad was void in the country.

While authorities did not deport foreigners suspected of proselytizing, the government did not renew the visas of suspected missionaries. During the year there were no reports of official action against persons suspected of proselytizing.

The government required Islamic religious education in public schools. The religious curriculum for secondary school students also included histories of Judaism and Christianity.

The government did not permit the establishment of political parties based on religion, and it used this prohibition to continue to outlaw the Islamist party An-Nahdha and to prosecute suspected An-Nahdha members for "membership in an illegal organization" (see section 1.e.). The government continued to maintain tight surveillance over Islamists and monitored activity in mosques.

The law provides that only persons appointed by the government may lead activities in mosques. The government required

that mosques remain closed except during prayers and other authorized religious ceremonies, such as marriages or funerals. According to human rights lawyers, the government regularly questioned individuals observed praying frequently in mosques. Authorities instructed imams to espouse governmental social and economic programs during prayer times in mosques. The government paid the salaries of imams.

The government sought to suppress certain outward signs of citizens' religious practice. For example, authorities characterized the hijab as a "garment of foreign origin having a partisan connotation." In September, according to news reports, the police intensified efforts to apply a 1981 decree prohibiting women from wearing the hijab in official buildings, schools and universities. In addition, some women were stopped in public places, detained, and told to remove their hijab. During an October 27 meeting of the government-loyal NGO National Union of Tunisian Women (UNFT), senior UNFT officials demanded that all women in the audience remove their veils, on occasion tugging at their veils and verbally abusing them to do so. In several cases school officials took disciplinary action to punish and deter hijab use by attempting to have women sign written oaths renouncing its use. There were reports that police sometimes detained and harassed men with what were termed "Islamic" beards, compelling them to shave. These reports increased in frequency after attacks by alleged Islamists on December 23 (see section 1.d.).

Religious publications were subject to the same restrictions on freedom of speech and the press as secular publications. Christian groups were generally allowed to distribute religious documents in English, but not in Arabic and not in public. Only sanctioned Muslim religious groups were allowed to distribute religious documents. In the government's view, distribution by other groups constituted an illegal "threat to public order" (see section 2.a.). The government determined which citizens could make the Hajj due to country quotas from the Saudi Arabian government on how many nationals from each country could participate in the Hajj.

Societal Abuses and Discrimination

Cartoons in some mainstream newspapers used derogatory images of historically stereotypical Jews to portray the state of Israel and Israeli interests. These cartoons were drawn by cartoonists outside of the country and reprinted locally.

Christians and Jews living in the country, including foreigners, constituted less than 1 percent of the population. According to church leaders, the practicing Christian population was approximately 2,000 and included a few hundred native-born citizens converted to Christianity. The government permitted Christians and Jews who did not proselytize to worship as they wished, and it allowed Jewish communities to operate private religious schools. Some Christians reported government harassment in the form of surveillance and interrogation. There were reports of Christian citizens being detained by police and government security officials and questioned about their conversion to Christianity. There was one report that a Christian from the country was told by a local security official that it was illegal to be a Christian and was threatened with imprisonment. There were reports that the process of renewing passports was inexplicably delayed for

some Christians, although passports were subsequently issued (see section 2.d.). Jewish children on the island of Djerba were permitted to divide their academic day between public secular schools and private religious schools.

Jewish community leaders reported that the government actively protected synagogues, particularly during Jewish holidays. The government allowed the Jewish community freedom of worship and paid the salary of the grand rabbi. The government partially subsidized restoration and maintenance costs for some synagogues. The Provisional Committee of the Jewish community met weekly and performed religious activities and charity work, although the government had not granted it permanent registration.

In March according to press reports and eyewitnesses, approximately 100 students shouted anti-Israel and anti-Jewish slogans during a demonstration at Manouba University near Tunis at a ceremony to mark the donation of books from the library of the late Jewish and citizen historian Paul Sebag. After the incident the Manouba Student Union, mainstream citizen journalists, and the Tunisian Human Rights League strongly denounced the demonstration's anti-Jewish character.

While Baha'is do not consider themselves Muslims, the government regarded the Baha'i faith as a heretical sect of Islam and permitted its adherents to practice their faith only in private.

For a more detailed discussion, see the *2006 International Religious Freedom Report*.

d. Freedom of Movement Within the Country, Foreign Travel, Emigration, and Repatriation

The law provides for these rights, and the government generally respected them in practice; however, the government refused to issue, renew, amend, or accept passports of some dissidents, Islamists, and their relatives. The government also may impose a five-year period of "administrative controls" at sentencing on certain former prisoners that constituted a type of internal exile.

The law authorizes the courts to cancel passports and contains broad provisions that both permit passport seizure on national security grounds and deny citizens the right either to present their case against seizure or to appeal the judges' decision. The Ministry of Interior is required to submit to the courts requests to seize or withhold a citizen's passport through the public prosecutor; however, the ministry routinely bypassed the public prosecutor with impunity.

According to the constitution, no citizen can be exiled from the country nor prevented from returning.

Many citizens reported difficulty applying for or renewing their passports and accused the government of blocking their applications solely on the basis of political opposition. Some Christian converts also reported unexplained delays in passport issuance or renewal.

Former Islamist leader Mohamed Sedki Labidi has been deprived of his passport for the last decade without a court decision.

Administrative control measures, which take effect upon a convict's release from prison, are similar to parole restrictions, except that they may be applied to prisoners even after they have completed their sentences. The government requires those individuals to reside in a place, chosen by the government, which may be anywhere in the country, and they are required to stay "in the area of their residence." They also may be required to report to a police station frequently each day, at times determined only the previous evening. At the police station, they may be forced to wait hours before they are allowed to sign in, making normal employment impossible. Numerous Islamists released from prison in recent years have been subjected to such continuing punishment.

By law administrative control measures may only be imposed at sentencing; however, a former high school teacher, Nouri Chniti, claimed that, although his sentence did not include administrative control, he has been subject to extrajudicial administrative control measures since 1991 when he received a suspended sentence for membership in An-Nahdha. Some political opponents in self-imposed exile abroad were prevented from obtaining or renewing their passports to return to the country. In 2005 a group of citizens abroad who had been refused passports formed an organization called "Tunisians Without Passports" and released communiqués calling on the government to allow all citizens to receive passports.

Protection of Refugees

The law provides for the granting of asylum or refugee status in accordance with the 1951 UN Convention relating to the Status of Refugees and its 1967 protocol. The government cooperated to a certain degree with the office of the UN High Commissioner for Refugees (UNHCR) and other humanitarian organizations in assisting approximately 100 refugees and asylum seekers primarily from sub-Saharan Africa. However, the government has not established a system for providing protection to refugees or foreign nationals who may not qualify as refugees under the 1951 Convention and 1967 protocol, but who still need some form of international protection. In practice, the government did not provide protection against *refoulement*, the return of persons to a country where they feared persecution.

AI reported that Adel Tebourski was forcibly returned to the country from France after his request for asylum was rejected. In May 2005 Tebourski was sentenced in France to six years' imprisonment for providing false identity documents to two alleged al-Qa'ida operatives involved in the killing of Commander Massoud, leader of the Northern Alliance coalition group in Afghanistan, on September 9, 2001. AI reported that Tebourski was at grave risk of torture and other serious human rights violations. On August 7, according to AI, Adel Tebourski was deported back to the country and released after brief questioning from the country's border police.

Section 3 Respect for Political Rights: The Right of Citizens to Change Their Government

The law provides that citizens shall directly elect the president and members of the Chamber of Deputies for five-year terms; however, there were significant limitations on citizens' right to change their government. Moreover, there were irregularities that routinely called into question the legitimacy of elections.

Elections and Political Participation

In the October 2004 national elections, President Ben Ali faced three candidates and officially received 94.9 percent of the popular vote to secure a fourth term. The third opposition candidate, Mohamed Halouani of the Et Tajdid party, cited government restrictions and other irregularities to explain why he received less than 1 percent of the official vote count. According to official election returns, more than 90 percent of registered voters went to the polls; however, independent NGOs estimated that the actual turnout was closer to 30 percent.

The polling was characterized by irregularities. A coalition of three local independent NGOs (LTDH, CNLT, and the

Tunisian Association of Democratic Women) cited as serious problems the opposition's lack of media access during the campaign and media bias in favor of the ruling party (see section 2.a.). Opposition candidates and other observers also cited voter intimidation, restrictions on disseminating campaign materials and organizing campaign events.

The Electoral Code significantly limits the number of individuals eligible to run for president. A candidate must be Muslim and must receive the endorsement of 30 sitting deputies or municipal council presidents to be eligible to run. By law 20 percent of the seats in one house of the legislature (Chamber of Deputies) are reserved for opposition party candidates. The ruling party's domination of state institutions and political activity precluded any credible and competitive electoral challenges.

In March 2005 the National Election Observatory, formed by the government in 2004 to monitor all stages of the 2004 elections, issued its report, concluding that the electoral process in general proceeded fairly and according to law. The report contained references to opposition and NGO criticism of the election, including the non-distribution of voting cards to opposition party members, the ruling party's media advantage, the lack of transparency of the actual balloting, and secret ballot counts. While the report refuted the claims, it also listed 12 specific recommendations to address problems. Independent human rights activists complained that the real purpose of the observatory was to deflect criticism of the lack of independent or international observers.

The ruling party has maintained power continuously since the country's independence in 1956. It dominates the cabinet, the legislature, and regional and local governments.

In July 2005 the government conducted elections for the 126-seat Chamber of Advisors, a second parliamentary chamber created by a 2002 constitutional amendment. The voters consisted of 4,555 officials, including municipal counselors, deputies, and mayors, plus the 189 members of the Chamber of Deputies. Of the 4,555 voters, only 305 belonged to opposition parties. The constitutional amendment creating the chamber specified that its 126 seats must be allocated among various regional and professional organizations, including 14 seats for the General Union of Tunisian Workers (UGTT), which refused to name candidates, citing a lack of independence and democracy in the candidate selection process. The president directly appointed 41 candidates. The elected members of the new chamber were overwhelmingly members or supporters of the ruling RCD party.

The president appoints the prime minister, the cabinet, and the 24 governors. The government and the party are closely integrated; current and former senior government officials constitute the top ranks of the RCD. The president of the country is also the president of the party, and the party's vice president and secretary general each hold the rank of minister. All members of the RCD politburo hold ministerial rank based on their current or former government service.

RCD membership conferred tangible advantages. For example, there were widespread reports that RCD members and their families were much more likely to receive educational and housing benefits, small business permits, and waivers on zoning restrictions.

To reduce the advantages wielded by the ruling party, the Electoral Code reserves 20 percent of seats in the Chamber of Deputies (37 of 189) for the seven officially recognized opposition parties, and distributes them on a proportional basis to those parties that won at least a single directly elected district seat. In the 2004 elections, five of the opposition parties gained seats under that provision. The RCD held the remaining 152 seats.

On March 3, authorities authorized the establishment of the Green Party for Progress (PVP), the first new political party created since 2002. Many critics alleged that the party was loyal to the RCD, particularly after its chairman told the media shortly after its authorization that it did not have a platform because it was still in the process of organizing. The government refused to recognize the environmentally based political party, Green Tunisia, despite a long-pending application.

The government partially funded legal opposition parties. In November 2005 the president announced an increase in the level of support for opposition parties represented in the chamber. The government raised the public subsidy for operational costs of opposition parties to$56,300 (75,000 dinars) per year, raised the additional payment per deputy to $5,300 (7,500 dinars), and increased the level of government funding for opposition newspapers to $112,500 (150,000 dinars). Opposition party PDP newspaper *Al Mawqif* did not receive a subsidy since the PDP was not represented in the legislature (see section 2.a.).

By law the government prohibits the establishment of political parties on the basis of religion, language, race, or gender. The government used the prohibition to continue to outlaw the An-Nahdha party and to prosecute suspected members for "membership in an illegal organization" (see sections 2.b. and 2.c.).

On a number of occasions, the president expressed the desire to increase the level of representation of women in the government to 25 percent. In April 2004 he appointed the country's first female governor. There were 50 women in the 301-seat legislature, two women in the 25-seat cabinet, and five women among the 18 secretaries of state (regarded as junior cabinet members). Following municipal elections in May 2005, more than one-fourth of municipal council members elected were women. Three women served as presidents of chambers on the Supreme Court, and two women served on the 15-member Higher Council of the Magistracy.

Government Corruption and Transparency

There are 13 articles of the penal code addressing corruption, and there were a small number of corruption cases prosecuted throughout the year. On July 26, a newspaper reported that the National Guard arrested a regional tax control officer and prosecuted him on corruption charges after allegedly taking bribes from merchants. The officer, who was not named, was reportedly in detention, although he had not been sentenced at year's end. In March 2004 the Minister of Interior announced creation of the "Higher Institute of Security Forces and Customs," tasked not only with "reinforcing human rights and improving law enforcement," but also reducing corruption. There were no public reports of the organization's subsequent activities. There are no laws to provide government documents to citizens. According to Transparency International, human rights, and opposition groups, the public perception that serious corruption existed within the government increased. Frequent complaints by citizens and articles in international and unauthorized domestic media about corruption corroborated these reports.

Section 4 Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Violations of Human Rights

The Ministry of Justice and Human Rights has the lead on government policy on human rights issues in the country, although other ministries also had human rights offices. The ministry did not release any public reports of cases or investigations. A government-appointed and funded body, the Higher Commission on Human Rights and Basic Freedoms, received, addressed, and occasionally resolved human rights complaints in regard to prison conditions, requests for amnesty from families of prisoners, and other issues. The commission submitted confidential reports directly to the president. The government maintained several government-run news sites that included sections on human rights, but the sites were not identified as government-sponsored. However, the government continued to block access to the sites of domestic and international human rights organizations (see section 2.a.).

The government actively discouraged investigations of human rights abuses by domestic and international groups, who generally were able to investigate and publish their findings with difficulty. The government sought to monitor and control the activities of some foreign NGOs within the country. There were approximately one dozen domestic human rights NGOs, although only half were authorized. Some NGOs loyal to the government received government funding. The government met with registered domestic human rights NGOs and on occasion responded to their inquiries; however, it also harassed, targeted, and prosecuted some of them.

Citing a court ruling that stated the LTDH could not hold its National Congress, the government blocked its meetings and events throughout the year. The LTDH traditionally was one of the most active independent advocacy organizations, with 41 branches throughout the country, although the blockage of LTDH activities by the government limited its operational effectiveness. The organization received and investigated complaints and protested abuses, although the government rarely responded to LTDH communiqués. The government continued to block a European Union grant to the LTDH, citing a law on NGO financing that includes broad prohibitions on funding of NGOs without government approval. On October 31, the government sent an official communication to all diplomatic missions in Tunis saying that the LTDH was subject to a 2001 court decision that "forbids all activity of the LTDH." However, the LTDH had conducted widespread activity since 2001.

Other independent human rights NGOs included: the legally registered Arab Human Rights Institute; the Tunisian Association of Democratic Women (ATFD); the unregistered AISPP; and the ALTT.

Since 1998 the government has refused to authorize the CNLT's registration as an NGO. The CNLT issued statements sharply criticizing the government's human rights practices. Government officials have accused CNLT members of violating the pro forma submission requirements by publishing communiqués without prior government approval (see section 2.a.).

During the year significant numbers of ruling party RCD members joined and attempted to join independent NGOs such as the LTDH and other civil society groups with the apparent intent of eventually gaining control them (see section 2.b.).

Between April 18 and 22, the International Freedom of Expression Exchange-Tunisia Monitoring Group (IFEX-TMG), a coalition of international human rights and freedom of expression NGOs, conducted fact-finding missions. The IFEX-TMG

reported heavy police surveillance of their activities and government interference with their mission. Police prevented translators and private citizens traveling with the group from attending some meetings.

On May 21, Yves Steiner, a visiting member of the Executive Committee of the Swiss Section of AI, was arrested and expelled from the country. According to AI, Steiner had delivered a speech on May 20 to members of AI's local chapter in which he condemned growing human rights abuses in the country, notably restrictions on freedom of expression and freedom of association. According to international media, a government source said that Steiner had posed a threat to public order.

In April 2005 following more than a year of negotiation, the ICRC signed an agreement with the government allowing the ICRC to conduct visits to all prisons and detention centers in the country. Throughout the year the ICRC conducted visits, including repeat visits to prisons and detention centers previously visited, and reported that access and cooperation with the government were good (see section 1.c.). ICRC submitted its first intermediary report to the Ministry of Justice in February.

There were credible reports that police prevented some family members of prisoners from visiting ICRC offices and monitored, occasionally harassing, families that visited ICRC offices.

Section 5 Discrimination, Societal Abuse, and Trafficking in Persons

The law provides that all citizens are equal before the law, and the government generally respected this provision, although in inheritance and family law, biased gender-based provisions in the civil code adversely affected women.

Women

Laws against domestic violence provide for fines and imprisonment for assaults committed by a spouse or family member that are double those for the same crimes committed by an unrelated individual, but enforcement was lax, as police and the courts generally regarded domestic violence as an internal family problem. Violence against women and spousal abuse occurred, but there were no statistics to measure its extent. The National Union of Tunisian Women (UNFT), a government-sponsored organization that ran a center to assist women and children in difficulty, sponsored national educational campaigns for women. The UNFT reported that its two shelters, in Tunis and Sousse, handled 1,000 cases during the year. The ATFD, active in debating and publicizing women's issues, operated a counseling center for female victims and reported that its shelter assisted approximately 100 women using the shelter for the first time during the year, in addition to a continuing caseload from previous years.

The penal code specifically prohibits rape, including spousal rape, and the government enforced the laws vigorously, giving significant press coverage to rape cases; however, there were no reports of prosecution for spousal rape. The penalty for rape with the use of violence or threat with a weapon is death. For all other rape cases, the penalty is life imprisonment.

The penal code prohibits prostitution, although individuals were rarely charged. There were government-sanctioned brothels, although under the penal code there is a penalty for prostitution of up to two years in prison. The law applies to both women and men and their accomplices. There were no reported cases of trafficking or forced prostitution involving women.

Sexual harassment was a problem, although there were no comprehensive data to measure its extent. In 2004 the legislature passed the country's first law making sexual harassment a criminal offense. Civil society groups vociferously criticized it for being too vague and susceptible to abuse.

Women enjoy the same legal status as men, and the government advanced those rights in the areas of divorce and property ownership. The law explicitly requires equal pay for equal work, and although there were no statistics comparing the average earnings of men and women, anecdotal evidence indicated that women and men performing the same work received the same wages. A slight majority of university students were women.

On July 18, the Chamber of Deputies adopted a law that allowed some female employees in the public sector to work part-time while still receiving two-thirds of their original salary. The government stated that the law was motivated by a desire to allow women to balance family and professional life. Women's rights activists, including the ATFD, said that treating women and men differently under the law was a major setback to women's rights in the workplace.

Women served in high levels of the government as cabinet ministers and secretaries of state, and President Ben Ali appointed the country's first female governor in 2004 (see section 3). Women constituted approximately 37 percent of the

civil service and 24 percent of the nation's jurists. However, women still faced societal and economic discrimination.

Codified civil law is based on the Napoleonic code, although judges often used Shari'a as a basis for customary law in family and inheritance. Most property acquired during marriage, including property acquired solely by the wife, was held in the name of the husband. Married couples may choose between joint or separate property systems when signing marriage contracts. Customary law based on Shari'a Muslim prohibits women from marrying outside their religion. Application of Shari'a inheritance lawcontinued to discriminate against women, and there was a double standard based on gender and religion: non-Muslim women and Muslim men who are married may not inherit from each other. The government considers all children from those marriages to be Muslim, and forbids those children from inheriting from their mothers. Female citizens can convey citizenship rights to their children regardless of the father's citizenship.

The Ministry for Women's Affairs, Family, Children, and Senior Citizens sponsored several national media campaigns to promote awareness of women's rights. Nearly two-thirds of its budget was devoted to ensuring the legal rights of women, while simultaneously improving their socioeconomic status. The government supported and funded the UNFT, the Center for Research, Documentation, and Information on Women (CREDIF), and women's professional associations. Several NGOs focused on women's advocacy and research in women's issues, and a number of attorneys represented women in domestic cases.

Children

The government demonstrated a strong commitment to free and universal public education, which is compulsory from age six to 16 years. According to the UN Children's Fund (UNICEF), 95 percent of boys and 93 percent of girls were in primary school, and approximately 73 percent of boys and 76 percent of girls were in secondary school. The government reported the rate of school attendance was approximately 99 percent. During the year female students graduated from secondary school at a higher rate than males. There were schools for religious groups (see section 2.c.). The government sponsored an immunization program targeting preschool-age children and reported vaccinating more than 95 percent of children. Male and female students received equal access to medical care.

Convictions for abandonment and assault on minors carried severe penalties. There was no societal pattern of child abuse.

Child labor and child prostitution were not significant problems. There were two ministries responsible for rights of children: the Ministry of Women's Affairs, Family, and Childhood; and the Ministry of Youth, Sports, and Physical Training. Each had secretaries of state responsible for safeguarding the rights of children.

Trafficking in Persons

The law prohibits trafficking in persons, and there were no reports that persons were trafficked to, from, or within the country.

In 2004 the legislature approved amendments to the 1975 law on passports and travel documents. The law includes provisions for sentencing convicted traffickers to prison terms of three to 20 years and fines of $67,000 to $83,000 (80,000 to 100,000 dinars). The amendments supplement Tunisian ratification of the United Nations Protocol to Prevent, Supress, and Punish Trafficking in Persons. Traffickers may be prosecuted under laws prohibiting forced displacement of persons.

The Ministry of Interior and Local Development and the Ministry of Social Affairs, Solidarity, and Tunisians Abroad were the agencies responsible for antitrafficking efforts. There were no specific government campaigns to prevent trafficking, although the government worked closely with its European neighbors to interdict smuggling, some of which may include trafficking. The government does not, however, have measures to identify trafficking victims from among persons smuggled voluntarily.

Persons with Disabilities

The law prohibits discrimination against persons with physical or mental disabilities and mandates at least 1 percent of public and private sector jobs be reserved for persons with disabilities; however, leaders of NGOs dedicated to persons with disabilities reported that this law was not widely enforced, and many employers were unaware of its existence. There was little discrimination against persons with disabilities in employment, education, access to health care, or in the provision of other state services. All public buildings constructed since 1991 must be accessible to persons with physical disabilities, and this was enforced. The government issued special cards to persons with disabilities for benefits such as unrestricted parking, priority medical services, preferential seating on public transportation, and consumer discounts. The government provided tax incentives to companies to encourage the hiring of persons with physical disabilities, and the

government strongly supported NGOs working to help persons with disabilities.

Several active NGOs provided educational, vocational, and recreational assistance to children and young adults with mental disabilities. The government and international organizations funded several programs. The Ministry of Social Affairs and Solidarity and Tunisians Abroad was responsible for protecting the rights of persons with disabilities.

Section 6 Worker Rights

a. The Right of Association

The law provides workers the right to organize and form unions, and the government generally respected this right in practice. The UGTT was the country's only labor federation. There were some unauthorized, independent trade unions: the Democratic Confederation for Labor; and the Tunisian Journalists Syndicate. Approximately 30 percent of the work force belonged to the UGTT, including civil servants and employees of state-owned enterprises, and a considerably larger proportion of the work force was covered by union contracts. A union may be dissolved only by court order.

The UGTT and its member unions were legally independent of the government and the ruling party; however, they operated under regulations that limited their freedom of action. The UGTT membership included persons associated with all political tendencies. There were credible reports that the UGTT received substantial government subsidies to supplement union dues; however, UGTT leaders stated that their only funding came from modest union dues and revenue from an insurance company and a hotel owned by the union. Union members and their families received additional support from the National Social Security Fund (CNSS). The government provided the UGTT with land for its new headquarters and support for its construction. The central UGTT leadership generally cooperated with the government regarding its economic reform program. Throughout the year the UGTT board showed some independence regarding economic and social issues, and in support of greater democracy. In 2005 the UGTT refused to submit a list of candidates for 14 UGTT-designated seats for elections to the newly created Chamber of Advisors, citing a lack of independence and democracy in the selection process and an unfair distribution of seats (see section 3). The UGTT supported the LTDH and agreed to let LTDH regional chapters use UGTT facilities for conferences and meetings, although the LTDH was unable to hold any conferences during the year (see section 4).

The law prohibits antiunion discrimination by employers, although the UGTT claimed that there was antiunion activity among private sector employers, such as firing union activists and using of temporary workers to avoid unionization. In certain industries, such as textiles, hotels, and construction, temporary workers accounted for a strong majority of the work force. The labor code protects temporary workers, but enforcement was more difficult than for permanent workers. A committee chaired by an officer from the Labor Division of the Office of the Inspector General approved all worker dismissals. The committee is composed of representatives from the Ministry of Social Affairs, Solidarity, and Tunisians Abroad, the UGTT, and the company dismissing the worker.

b. The Right to Organize and Bargain Collectively

The law protects the right to organize and bargain collectively, and the government protected this right in practice. Wages and working conditions are set in triennial negotiations between the UGTT member unions, the government and employers. Numerous collective bargaining agreements set standards for industries in the private sector and covered 80 percent of the total private sector workforce. During the year the triennial labor negotiations with the UGTT, the Union of Tunisian Employers (the private sector employer's association) and the government continued as the UGTT sought more favorable wage increases for employees.

Unions, including those representing civil servants, have the right to strike, provided that they give 10 days advance notice to the UGTT, and it grants approval. The ICFTU has characterized the requirement for prior UGTT approval of strikes as a violation of worker rights, but such advance approval rarely was sought in practice. There were numerous, short-lived strikes over failure by employers to fulfill contract provisions regarding pay and conditions and over efforts by employers to impede union activities. While the majority of the strikes technically were illegal, the government did not prosecute workers for illegal strike activity. The law prohibited retribution against strikers. Labor disputes were settled through conciliation panels in which labor and management were represented equally. Tripartite regional arbitration commissions settle industrial disputes when conciliation fails.

There are export-processing zones (EPZs) subject to domestic labor laws.

c. Prohibition of Forced or Compulsory Labor

The law prohibits forced and compulsory labor, including by children, and there were no reports that such practices

occurred. However, some parents of teenage girls placed their daughters as domestic servants and collected their wages (see section 6.d.).

d. Prohibition of Child Labor and Minimum Age for Employment

The law prohibits the employment of children under 18 in jobs whose nature and environment present a serious threat to their health, security, and morality, and the UGTT and CNSS conducted inspection tours of factories and industrial sites to ensure compliance with the law.

In April 2005 the government amended the Household Workers Law to prohibit the employment of children under the age of 16 years, which is consistent with the age for completing educational requirements, and inspectors of the Ministry of Social Affairs and Solidarity examined the records of employees to verify that employers complied with the minimum age law. However, there were no reports of sanctions against offending employers. Child labor also existed in the informal sector disguised as apprenticeship, particularly in the handicraft industry.

The minimum age for light work in the nonindustrial and agricultural sectors during nonschool hours was 13 years. Workers between the ages of 14 and 18 must have 12 hours of rest per day, which must include the hours between 10 p.m. and 6 a.m. In nonagricultural sectors children between the ages of 14 and 16 years may work no more than two hours per day. The total time that children spend in school and work may not exceed seven hours per day. Nonetheless, young children sometimes performed agricultural work in rural areas and worked as vendors in towns, primarily during their summer vacation from school.

e. Acceptable Conditions of Work

The labor code provides for a range of administratively determined minimum wages. In July the industrial minimum wage was raised to $175 (231 dinars) per month for a 48-hour workweek and to $151 (200 dinars) per month for a 40-hour workweek. The agricultural daily minimum wage was $5.74 (7.58 dinars) per day for specialized agricultural workers and $6.04 (7.98 dinars) per day for qualified agricultural workers. With the addition of transportation and family allowances, the minimum wage provided a decent standard of living for a worker and family, although that income was only enough to cover essential costs. More than 500,000 workers were employed in the informal sector, which was not covered by labor laws.

Regional labor inspectors enforced standards related to hourly wage regulations. They inspected most firms approximately once every two years. The government often had difficulty enforcing the minimum wage law, particularly in nonunionized sectors of the economy. The labor code sets a standard 48-hour workweek for most sectors and requires one 24-hour rest period per week.

Special government regulations governed employment in hazardous occupations like mining, petroleum engineering, and construction, and the Ministry of Social Affairs, Solidarity and Tunisians Abroad had responsibility for enforcing health and safety standards in the workplace. Working conditions and standards generally were better in export-oriented firms than in those firms producing exclusively for the domestic market. Workers were free to remove themselves from dangerous situations without jeopardizing their employment, and they could take legal action against employers who retaliated against them for exercising this right.

The few foreign workers in the country had the same protections as citizen workers.

 BACK TO TOP