# Exhibit F



# Tunisia

Country Reports on Human Rights Practices - 2004
Released by the Bureau of Democracy, Human Rights, and Labor
February 28, 2005

Tunisia is a constitutional republic dominated by a single political party, the Democratic Constitutional Rally (RCD). Zine El-Abidine Ben Ali has been the President since 1987. In the October 24 presidential and legislative elections, President Ben Ali ran against three opposition candidates and won 94.49 percent of the popular vote, with official turnout quoted as higher than 90 percent of registered voters, although there were indications that voter turnout figures were artificially inflated. By law, 20 percent of seats in the legislature (Chamber of Deputies) are reserved for opposition party candidates; as a result, 37 (out of 189) seats were divided between 5 of the 7 legal opposition parties in proportion to the number of votes they received. The RCD was allocated the remaining 152 seats. A coalition of three local independent nongovernmental organizations (NGOs) cited a lack of media access by opposition candidates during the campaign period and media bias in favor of the ruling party as serious problems. Opposition candidates and other observers cited voter intimidation and restrictions on disseminating campaign materials and organizing campaign events. The ruling party's domination of state institutions and political activity precluded credible and competitive electoral challenges from unsanctioned actors. A second legislative body, the Chamber of Advisors, was created in a 2002 referendum amending half the constitution, but has yet to be formed. President Ben Ali has said the chamber will open in the summer of 2005. The Constitution provides that the President appoint the Prime Minister, the Cabinet, and the 24 governors. The Constitution grants legislative power to the Chamber of Deputies and Chamber of Advisors; however, the President can also propose legislation. The Constitution provides for an independent judiciary; however, the executive branch and the President strongly influence judicial procedures, particularly in political cases.

The police share responsibility for internal security with the National Guard and other state security forces. The police operate in the capital and a few other cities. In outlying areas, their policing duties are shared with, or ceded to, the National Guard. The majority of internal security forces are under the control of the Minister of Interior. The civilian authorities maintained effective control of all security forces. Members of the security forces committed numerous, serious human rights abuses and acted with impunity.

The country has a population of approximately 10 million; the Government maintained that approximately 80 percent of citizens are in the middle class. Fewer than 5 percent fall below the poverty line. The economy is export-oriented, relatively diversified, and increasingly market based. During the year, the economy's growth rate was approximately 5 percent. Wages generally have kept pace with inflation.

The Government's human rights record remained poor, and the Government continued to commit serious abuses; however, the Government continued to demonstrate respect for the religious freedom of minorities, as well as the human rights of women and children. There were significant limitations on citizens' right to change their government. Members of the security forces tortured and physically abused prisoners and detainees. Security forces arbitrarily arrested and detained individuals. International observers were not allowed to inspect prisons, and lengthy pretrial and incommunicado detention remained a serious problem. The Government infringed on citizens' privacy rights. The Government continued to impose significant restrictions on freedom of speech and of the press. The Government restricted freedom of assembly and association. The Government remained intolerant of public criticism and used intimidation, criminal investigations, the court system, arbitrary arrests, residential restrictions, and travel controls (including denial of passports), to discourage criticism by human rights and opposition activists. Corruption was a problem.

**RESPECT FOR HUMAN RIGHTS**

Section 1 Respect for the Integrity of the Person, Including Freedom From:

a. Arbitrary or Unlawful Deprivation of Life

There were no reports of politically motivated killings by the Government or its agents; however, on February 27 the Tunisian Human Rights League (LTDH) reported that a 29-year-old male citizen, Badreddine Rekeii, died in police custody

between February 7 and 9. The police reportedly told Rekeii's family that he committed suicide; however, according to his family, his body showed "signs of violence" that led them to disbelieve the police report.

b. Disappearance

There were no reports of politically motivated disappearances; however, state authorities sought to limit contact between prisoners and outside contacts, including family, by moving them frequently to other locations.

Habib Ellouz, a former leader of the banned Islamist party, An-Nahdha (Arabic for "renaissance"), which the Government considers a terrorist organization, was transferred from the Borj El Amri prison in early in the year after he began a hunger strike. His family has said it has been unable to find out where he is being held (see Section 1.c.). A military tribunal gave Ellouz a life sentence in 1992 for his alleged involvement in a conspiracy to overthrow the Government.

c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

The Penal Code prohibits such practices; however, security forces reportedly tortured detainees to elicit confessions and political prisoners to discourage resistance. The forms of torture included: electric shock; confinement to tiny, unlit cells; submersion of the head in water; beatings with hands, sticks, and police batons; suspension from cell doors resulting in loss of consciousness; cigarette burns; and food and sleep deprivation. Police allegedly beat naked, manacled prisoners while they were suspended from a rod. According to Amnesty International (AI), police and prison officials used sexual assault and threats of sexual assault against the wives of Islamist prisoners to extract information, to intimidate, and to punish.

Charges of torture in specific cases were difficult to prove because authorities often denied victims access to medical care until evidence of abuse disappeared. The Government maintained that it investigated all complaints of torture and mistreatment filed with the prosecutor's office, and noted that alleged victims sometimes accused police of torture without filing a complaint, which is a prerequisite for an investigation.

According to defense attorneys, local human rights groups, and AI, police routinely refused to register complaints of torture. In addition, judges dismissed complaints without investigation, and accepted as evidence confessions extracted through torture. The Government may open an administrative investigation of allegations of torture or mistreatment of prisoners without a formal complaint; however, it is unlikely in those cases to make the results public, or available to the lawyers of affected prisoners.

There were more reports of torture committed in pretrial detention centers than in prisons. Political prisoners and Islamists allegedly received harsher treatment during their arrests and confinement than common criminal prisoners.

AI reported in 2003 that individuals (who became known as the "Zarzis Group") were tortured during their pretrial detention. The Government stated that the individuals did not file complaints of mistreatment nor request medical examinations. The judge did not investigate the allegations of torture. The international NGO Reporters Without Borders reported that nine members of the group were convicted on terrorism related charges in April (see Section 1.e.).

Security forces regularly used violence against Islamists, activists, and dissidents. Three individuals, alleged members of the security forces, assaulted journalist Sihem Ben Sedrine on January 5 (see Section 2.a.). On October 11, former political prisoner Hamma Hammami, whose party urged the boycott of the October 24 presidential elections, reported being assaulted.

According to the International Association for the Support of Political Prisoners (AISPP), Nabil El Ouaer, whom a military tribunal sentenced to 15 years of prison in the early 1990s, was beaten by the head of Borj Erroumi prison and put in solitary confinement, where four other prisoners raped him in June. Based on its timing and location, human rights activists believed prison officials sanctioned the incident. El Ouaer conducted a hunger strike and filed a complaint through a lawyer. When the case received international attention, President Ben Ali ordered the Higher Commission on Human Rights and Basic Freedoms (a state-appointed body) to conduct an inquiry into the case; however, the results were not publicized. El Ouaer's family told human rights activists that prison officials pressured him to withdraw his complaint.

On July 29, the LTDH reported that a police officer allegedly received only a suspended sentence of two years for raping an 8-year-old girl in October 2000 in the town of Sousse. According to reports, the officer had not been suspended from work following the incident. Human rights activists described this as an example of the security forces' lack of accountability.

Prison conditions ranged from spartan to poor, and generally did not meet international standards. Foreign diplomatic

observers who visited prisons described the conditions as "horrible." Overcrowding and limited medical care posed a significant threat to prisoners' health. Sources reported that 40 to 50 prisoners were typically confined to a single 194 square foot cell, and up to 140 prisoners shared a 323 square foot cell. Prisoners and former prisoners reported that inmates were forced to share a single water and toilet facility with more than 100 cellmates, which created serious sanitation problems.

On October 7, the LTDH released a 63-page report on the country's prisons entitled "The Walls of Silence," which stated that there were approximately 26,000 prisoners in 29 prisons and 7 juvenile detention centers. The report described a number of abuses, alleging that torture and humiliating ill treatment of prisoners were widespread within prisons.

Zouhair Yahiaoui, a formerly imprisoned journalist (see Section 2.a.), reported in 2003 that he had shared a cell that was 40 square meters (430 square feet) with 80 fellow prisoners, and that they only had access to water for 30 minutes a day. He conducted hunger strikes to protest his treatment.

After a commission of inquiry conducted an investigation of prison conditions in 2003, President Ben Ali decided to implement a number of reforms, many relating to improving medical care in prisons; however, the effects of this decision could not be determined. The Commission's report was not released to the public. An article from the magazine "Réalités" stated that there were 253 prisoners per 100,000 citizens, that prisoners were made to sleep on floors and under beds, and that some waited up to 7 months before moving from the floor to a bed shared with other prisoners.

On July 7, Human Rights Watch (HRW) released a report entitled "Long-Term Solitary Confinement of Political Prisoners" that documented how as many as 40 political prisoners, mostly An- Nahdha leaders, have been held in long-term isolation in prisons around the country. HRW claimed that many of these prisoners have been in isolation for periods ranging from months to years, and that the isolation policy has violated the country's law.

Men, women, and children were held separately in prisons. Prison conditions for women were generally better than those for men. According to "Réalités," there were four juvenile "reformatory centers." Conditions for detainees and convicts were reportedly the same. Pretrial detainees generally were kept separate from convicts.

There were reports from former prisoners, the relatives of current prisoners, and NGOs that prison conditions and rules were harsher for political prisoners and Islamists. Former political prisoners said their records and identity cards were marked to identify them to guards for "special treatment." These prisoners apparently were moved frequently and, upon arrival at a new prison, received a brutal beating.

International and local NGOs reported that political prisoners regularly were moved among jails throughout the country, thereby making it more difficult for their families to deliver food to them and to discourage their supporters or the press from inquiring about them (see Section 1.b.). The National Council for Liberties in Tunisia (CNLT) reported that other inmates were instructed to stay away from political prisoners and were punished severely for making contact with them.

The Government did not permit international organizations or the media to inspect or monitor prison conditions. During the year, the Government conducted talks with the International Committee of the Red Cross (ICRC) to allow ICRC access to the country's prisons; however, no access had been granted by year's end.

d. Arbitrary Arrest or Detention

The Constitution specifically prohibits arbitrary arrest and detention; however, these prohibitions were not always observed in practice.

The Ministry of Interior controls the majority of the security services. Within the ministry are several law enforcement organizations, including: the police, who have primary responsibility within the major cities; the National Guard, which has responsibility in smaller cities and the countryside; and state security forces tasked with monitoring groups and individuals the Government considers to be a dangerous threat, such as the media, Islamists, human rights activists, and opposition parties and leaders. The Ministry of Interior monitors the communications of those groups and individuals. There are a large number of plainclothes police throughout the country.

In general, law enforcement groups were disciplined, organized, and effective; however, there were episodes involving petty corruption, the solicitation of bribes by police at traffic stops, and police brutality against individuals whose behavior was deemed "provocative." Human rights activists reported that law enforcement organizations operated with impunity, and that the police committed attacks, sanctioned by high officials, on dissidents and oppositionists.

During the year, the Government stated that in 74 cases between 2000 and 2002, police and prison guards who committed

"infringements against detainees" had received sentences ranging from an $85 (100 dinars) fine to a 10-year imprisonment.

On March 17, the Minister of Interior announced the creation of the Higher Institute of Internal Security Forces and Customs, a new oversight body for law enforcement officers in the Ministries of Interior and Customs. The organization's stated mission was to reinforce human rights and improve law enforcement; however, no information was available about its subsequent operations.

The law provides that the police must have a warrant to arrest a suspect, unless the crime committed is a felony or in progress; however, authorities sometimes ignored this requirement and arbitrary arrests and detentions occurred. The Penal Code permits the detention of suspects for up to 6 days prior to arraignment, during which the Government may hold suspects incommunicado. Arresting officers are required to inform detainees of their rights, immediately inform detainees' families of the arrest, and make a complete record of the times and dates of such notifications; however, those rules were sometimes ignored. Detainees were allowed access to family members when they were not being held incommunicado; however, the Government did not always facilitate the efforts of family members to identify the whereabouts of their detained relatives.

Detainees have the right to know the grounds of their arrest before questioning, and may request a medical examination. They do not have a right to legal representation during the pre-arraignment detention. Attorneys, human rights monitors, and former detainees maintained that the authorities illegally extended detainment by falsifying arrest dates. Police reportedly extorted money from families of innocent detainees in exchange for dropping charges against them.

The law permits the release of accused persons on bail, which may be paid by a third party. Detainees have the right to be represented by counsel during arraignment. The Government provides legal representation for indigents. At arraignment, the examining magistrate may decide to release the accused or remand him to pretrial detention.

In cases involving crimes for which the sentence may exceed 5 years or that involve national security, pretrial detention may last an initial period of 6 months and may be extended by court order for two additional 4-month periods. For crimes in which the sentence may not exceed 5 years, the court may extend the initial 6-month pretrial detention by an additional 3 months only. During this pretrial stage, the court conducts an investigation, hears arguments, and accepts evidence and motions from both parties. Complaints of prolonged pretrial detention were common. Some defendants claimed that they were held in pretrial detention for years.

The Government denied detaining anyone for political crimes. The lack of public information on prisoners and detainees made it impossible to estimate how many political detainees there were. However, it is likely that the number of political detainees held without charge is low because criminal convictions of dissidents and Islamists are easy to secure under laws prohibiting membership in outlawed organizations, and "spreading false information aimed at disturbing of the public order."

Judges and the Government exercised their authority to release prisoners or suspend their sentences, often on conditional parole (see Section 1.e.). On November 3, the Government granted amnesty to prisoners in an annual ritual marking the anniversary of President Ben Ali's accession to power (see Section 3). The Government did not provide details on the numbers, types, or names of prisoners released. Estimates of the numbers released range from 26 to at least 80. According to AI, most of those released were members of the banned Islamist group An-Nadha.

e. Denial of Fair Public Trial

The Constitution provides for an independent judiciary; however, the executive branch and the President strongly influenced judicial decisions, particularly in political cases. The executive branch exercises an indirect authority over the judiciary through the appointment, assignment, tenure, and transfer of judges, which rendered the system susceptible to pressure in sensitive cases. In addition, the President is head of the Supreme Council of Judges. The law provides citizens legal recourse to an administrative tribunal to address grievances against government ministries; however, government officials rarely respected the tribunal's decisions, which were non-binding. Throughout the year, the Government permitted observers from diplomatic missions, members of the European Parliament, and foreign journalists to monitor trials. The Government did not permit observers to attend sessions of military tribunals.

The civil court system is composed of a four-tiered hierarchy. At the first level, there are 51 District Courts, in which a single judge hears each case. At the second level are the Courts of First Instance, which serve as the appellate courts for the District Courts, but also have original jurisdiction for more serious cases. There is a Court of First Instance in each region, and they are empowered to consider all commercial and civil cases. Each Court is composed of a three-judge panel. At the third level are three Appeals Courts. The Court of Cassation or Supreme Court serves as the final court of appeals. The Supreme Court only considers arguments pertaining to points of law. The organization of the criminal court

system is similar to that of the civil court system. In most cases, the presiding judge or panel of judges dominates a trial, and defense attorneys have little opportunity to participate substantively.

There are also military courts, which fall under the Ministry of Defense, and an administrative tribunal.

Trials in the regular courts of first instance and in the courts of appeal are open to the public. By law, the accused has the right to be present at trial, be represented by counsel, and question witnesses; however, judges do not always observe these rights in practice. The law permits the trial in absentia of fugitives from the law. Both the accused and the prosecutor may appeal decisions of the lower courts. In court, a woman's testimony is worth the same as a man's.

The Constitution provides that defendants are presumed innocent until proven guilty "following a procedure offering essential defense guarantees." However, that presumption was sometimes ignored in practice, especially in politically sensitive cases. Defendants may request a different judge if they believe the one assigned to them is not impartial; however, judges are not required to recuse themselves. The law allows judges to substitute community service for jail sentences of 6 months or less. There were no reports that this alternative was applied in political cases.

Although family and inheritance law is codified, civil law judges were known to apply Shari'a law in family cases (especially those involving child custody) if the two systems conflicted. For example, codified laws provided women with the legal right to custody over minor children; however, judges sometimes refused to grant women permission to leave the country with them, holding that Shari' a appoints the father as the head of the family who must grant children permission to travel. Some families avoided the application of Shari' a inheritance rules by executing sales contracts between parents and children to ensure that daughters received shares of property equal to that of sons.

Lengthy trial delays remained a problem (see Section 1.d.). Defendants do not have the right to a speedy trial, nor is there any limit to how much time a case can take. Defense lawyers claimed that judges sometimes refused to let them call witnesses on their clients' behalf or to question key government witnesses. Defense lawyers contended that the courts often failed to grant them adequate notice of trial dates, or to allow them time to prepare their cases. Some reported that judges restricted access to evidence and court records, and in some cases, required all the lawyers working on a case to examine documents together on a single date in judges' chambers, without allowing them to copy relevant documents.

Lawyers and human rights organizations reported that courts routinely failed to investigate allegations of torture and mistreatment and accepted as evidence confessions extracted through torture (see Section 1.c.). They noted that the summary nature of court sessions sometimes prevented reasoned deliberation. They also stated that erratic court schedules and procedures were designed to deter observers of political trials.

On April 6, eight defendants, known informally as the "Zarzis Group," were convicted of terrorism-related charges. Six sentences were later reduced on appeal from up to 26 years to 13 years. On April 16, a ninth member of the group received a 25-month sentence. Human rights groups criticized their trials, claiming the prosecution submitted very little evidence. The defendants, most in their late teens and early twenties, reportedly had searched the Internet for information about explosives and construction of a rocket launcher, and they had tried to contact an alleged member of Al Qaida in Europe. According to some human rights groups, the Zarzis members were arrested immediately after Government "cyber police" detected their illicit web surfing.

On November 4, Jalal Zoghlami, editor of the opposition magazine Kaws El-Karama, and his brother Nejib Zoghlami were sentenced to 8 months in prison for damaging property during a "disturbance" in a Tunis café. According to HRW, the brothers claimed that police agents had staged the event.

Military tribunals have the authority try cases involving military personnel and civilians accused of national security crimes. A military tribunal consists of a civilian judge and four military deputy judges. Defendants may appeal the military tribunal's verdict to the civilian Supreme Court, which considers arguments on points of law as opposed to the facts of a case. AI has claimed that citizens charged under the tribunals have been denied basic rights during the judicial process.

On June 29, Salem Zirda, a civilian and former refugee, faced a military court trial for "providing services to a terrorist organization operating abroad." Mr. Zirda was accused of having made contact with members of the banned Islamist party An-Nadha The court sentenced him to 7 years in prison.

The Government denied that it held any political prisoners, and there was no definitive information regarding the number of political prisoners. Nevertheless, early in the year, the AISPP published a list of 542 names of individuals whom it considered political prisoners. The AISPP stated that impediments to gathering information about prisoners made it very likely that the total number of political prisoners was higher. Nearly all of these prisoners were Islamists, but very few were convicted for acts of violence. Most of those who have been identified by international human rights groups as political

prisoners or prisoners of conscience were arrested for violating laws that prohibit membership in illegal organizations, and spreading false information aimed at undermining public order. Many were arrested for disseminating information produced by organizations such as An-Nahdha. Former political prisoners said their identity papers were marked in a way that resulted in their receiving harsher treatment (see Section 1.c.).

The Government released approximately 80 prisoners in early November. Two of the released prisoners were former An-Nahdha leaders Ali Laaridh and Zyed Daoulatli. The releases were part of the annual amnesty commemorating President Ben Ali's 1987 accession; however, observers noted that most of the released prisoners had served two-thirds of their sentences, which is the point when most convicts are granted parole.

f. Arbitrary Interference with Privacy, Family, Home, or Correspondence

The Constitution prohibits such actions "except in exceptional cases defined by law"; however, the Government generally did not respect these prohibitions in practice. Police sometimes ignored the requirement to have a warrant before conducting searches if authorities considered state security to be involved.

On June 14, state security forces reportedly attempted to search the office of Saida Akremi, a lawyer and the Secretary General of the AISPP. According to witnesses, Akremi was able to prevent the search from taking place, since the security forces reportedly did not have a search warrant.

On September 3, the opposition newspaper Al Mawkef reported that the house of journalist Slim Boukhedhir was broken into after he asked a question at a press conference implying that relatives of the President had pressured the judiciary to influence a legal case. Human rights activists speculated that security forces committed the break in (see Section 2.a.).

Authorities may invoke state security to justify telephone surveillance. There were numerous reports by NGOs, the news media, and diplomatic representatives that the Government intercepted faxes and emails. The law does not explicitly authorize these activities, but the Government stated that the Code of Criminal Procedure implicitly gives investigating magistrates such authority. Many political activists experienced frequent and sometimes extended interruptions of home and business telephone and fax service. Human rights activists accused the Government of using the Postal Code, with its broad but undefined prohibition against mail that threatens the public order, to interfere with their correspondence and interrupt the delivery of foreign publications. Security forces routinely monitored the activities, telephone, and Internet exchanges of opposition, Islamist, and human rights activists, as well as journalists, and also placed some under surveillance (see Section 2.a.).

Human rights activists claimed that the Government subjected family members of Islamist activists and human rights activists to arbitrary arrest, reportedly using charges of "association with criminal elements" to punish family members for crimes allegedly committed by the activists. Family members were reportedly denied jobs, business licenses, and the right to travel due to their relatives' activism. They also alleged that relatives of Islamist activists, who were in jail or living abroad, were subjected to police surveillance and mandatory visits to police stations for questioning about their activist relatives. The Government maintained that the non-activist relatives were themselves members or associates of the An Nahdha movement, and therefore were subject to legitimate laws prohibiting membership in or association with that organization.

On April 3, two Islamist former political prisoners, Abdellatif Makki and Jalel Ayes, suspended their 2-month hunger strike protesting their December 2003 dismissal from El Manar University. They had been banned from attending the university after their release from prison. Their case received the attention of local and international human rights NGOs; however, they were not reinstated.

According to human rights lawyer Radhia Nasraoui, the Government reportedly was no longer conducting obtrusive surveillance of her, her family, and her clients.

There were no indications that the Government had reissued any of the more than 10,000 national identity cards (confiscated in 2003) of former prisoners convicted of An-Nahdha membership, or of relatives of An-Nahdha members and their supporters. Confiscation of an identity card makes nearly every aspect of civil and administrative life difficult. An individual must have an identity card to receive healthcare, sign a lease, buy or drive a car, access bank accounts and pensions, and even to join a sports club. Police may stop anyone at any time and ask for their identity card. If individuals are unable to produce their cards, police may detain them until their identity can be established by a central fingerprint database.

Section 2 Respect for Civil Liberties, Including:

a. Freedom of Speech and Press

The Constitution provides for freedom of speech and of the press "exercised within the conditions defined by the law"; however, the Government generally did not respect these rights in practice. It limited press freedom and intimidated journalists, editors, and publishers into practicing self-censorship. Security forces closely monitored press activity.

There were a number of limits on freedom of speech. In particular, the Government did not tolerate criticism of its policies or officials in the mainstream press, and self-censorship in public over these issues was common throughout all levels of society.

On July 24, the Tunisian Chamber of Deputies adopted a law that criminalized the unauthorized publication of any other individual's personal information. The Government cited this as an example of improvement in the field of human rights, namely, citizens' right to privacy; however, journalists expressed concern that in practice the law would actually be used to limit freedom of speech and the press, particularly in politically sensitive cases. There were no reports of this law being enforced.

The law prohibits citizens from discussing national politics on foreign radio or television channels during the 2 weeks prior to national elections; however, there were no cases in which the law was invoked during the year.

Security forces often questioned citizens seen talking with foreign visitors or residents, particularly visiting international human rights monitors and journalists.

The Government stated there were 245 newspapers and magazines in the country, the "great majority" of which are "privately owned and freely decide on their own editorial line." It also noted "the press as a whole enjoys a great deal of indirect assistance in the form of customs exemptions for all materials involved in printing." However, of the eight mainstream dailies, two are government-owned, two are owned by the ruling party, and two, although nominally private, take editorial direction from senior government officials. All media are subject to significant governmental pressure over subject matter. There were three opposition party newspapers, which had small circulations but exercised editorial independence from the Government. Nevertheless, two of them, Ettariq El Jadid and Al Wahda, received Government subsidies under a law that provided government financing to papers representing opposition parties with seats in Parliament. The third, Al Mawqif, did not receive the subsidy since its party was not represented in Parliament.

Foreign publications that included articles critical of the country were generally not available for sale, although in some cases they were distributed after a few days' delay. The Government prevented local journalists from broadcasting reports on pan-Arab satellite channels during the Arab ministerial meetings in January and March. Government regulations required foreign correspondents to obtain written approval before videotaping any public area.

The Government tightly controlled broadcast media. It owned and operated the two television stations and all but one of the country's radio stations. Broadcast news reports were confined to international and uncontroversial national issues. On the other hand, the Government did not restrict possession of satellite dishes, which reportedly a majority of households used to gain access to foreign news channels. The country's sole private radio station, Radio Mosaique, continued to make extensive independent social commentary; however, its political reporting was similar to that of state-owned broadcast media.

The Government exercised tight control over the creation of new print and broadcast media organizations. It did not allow the creation of any new newspaper during the year, but did authorize the creation of the country's first independent television station, which reportedly will begin broadcasting in February 2005.

The Government was sensitive about local journalists who contributed to negative reporting about the country in the international press. On January 5, three men, alleged to be plainclothes members of the security forces, assaulted journalist Sihem Ben Sedrine. One struck her repeatedly in the face and chest. The assault coincided with an increase in Ben Sedrine's contacts with western media, NGOs, and governments, which observers believed to be the reason for the assault.

On January 13, security forces prevented Sihem Ben Sedrine, a journalist, publisher, and one of the founders of the CNLT, from registering her newspaper Kalima, whose website remains blocked within the country (see Section 2.b.) Ms. Ben Sedrine has said this was her third attempt to register the publication.

Members of the security forces regularly questioned journalists regarding press conferences and other public functions hosted by foreigners that the journalists attended.

On May 3, the Tunisian Journalism Association (AJT) published a list of 11 journalists who had not received permission, as requested, to publish new independent newspapers. The Government did not process applications for independent television and radio licenses, and applicants complained of a lack of transparency about the application process.

Harassment of journalists by the Government was common, and in rare cases, security forces used violence against them. At an August press conference, two men, alleged to be members of the security forces, reportedly assaulted journalist Slim Boukhedhir after he asked a question implying that relatives of the President had pressured the judiciary to influence a legal case. Subsequent to the incident, Boukhedhir reportedly received numerous threatening phone calls and his house was broken into (see Section 1.f.).

The Government withheld press credentials from, and delayed granting passports to, journalists with whom it was displeased, particularly those associated with the opposition. For example, Al Mowqif senior editor Mohamed Fourati was denied a passport for 8 months. On March 24, the Government accused Fourati in court of belonging to an unauthorized organization based on a series of articles that he published in Kalima, although the Government subsequently dropped the charges. On the other hand, Internet journalist and former political prisoner Zouhair Yahyaoui (conditionally released from prison in November 2003) was able to get a passport, despite the fact that he remained vocally critical of the Government, and resumed his work editing an online pro-democracy magazine that the Government blocked.

Unlike in previous years, there were no new reports of journalists being arrested. In March, a Court of Appeals confirmed the November 2003 conviction of Kalima editor and dissident journalist Neziha Rejiba (known as Om Zied). Rejiba was convicted of an arbitrarily enforced currency exchange restriction and received an 8-month suspended sentence and a $950 (1,200 dinars) fine. Observers believed that she was charged to punish her for the editorial line of the online journal.

On September 10, Abdullah Zouari, a journalist who once worked for Al-Fajr, the weekly newspaper of the An-Nahdha party, was released from prison. He conducted a hunger strike in early this year to protest the fact that his family was prohibited from visiting him. Zouari was convicted in August 2003 for violating the terms of his administrative control when he accompanied an HRW foreign worker to visit families of Islamist prisoners. Hamadi Jebali, a former editor of Al-Fajr, remained in prison to serve his 6-year sentence for insurrection and "membership in an illegal organization."

News media are subject to direct and indirect government control over content. However, the primary mechanisms that the Government used to censor publications were indirect. For example, The Press Code requires all newspapers to submit copies of each edition to the Government prior to distribution. This pro forma process, known as "dépôt legal", resulted in self-censorship among editors and journalists. Unlike the mainstream independent press, the Government required some opposition papers to await explicit approval of each edition before beginning its distribution. Even when the Government formally approved editions of opposition papers, it sometimes prevented their distribution. The staff of Al Mawqif reported that such was the case on several occasions during the year.

On March 9, 28 journalists employed by the government-owned daily newspapers, La Presse and As Sahafa, signed a letter to government officials decrying an increase in censorship and pressure from "the hierarchy." They specifically cited pressure to refrain from reporting on sensitive national issues such as the 2003 Tunis floods and a teacher's strike, as well as on international issues such as the number of coalition forces killed in Iraq and Israeli actions in Palestine. Thirteen later rescinded their signatures, allegedly due to pressure from their editors. On May 31, representatives of the Ministry of Interior convoked Rachid Khachana, the editor of Al Mawqif, to advise him to desist from publishing statements by "unrecognized entities" and from "criticizing the ruling party."

According to media editors, senior government officials routinely called news directors and editors to inform them which issues were taboo, and in some cases, to take issue with reports they had published or broadcast. The Tunisian Agency for External Communications (ATCE) enforced this policy and other informal censorship mechanisms by selectively withholding government-advertising funds from newspapers or magazines that published articles that the Government deemed offensive. In May, Réalités lost all government-funded advertising for two weeks after the publication of an editorial on freedom of the press in the country. In addition, private companies reportedly were consistently unwilling to advertise in newspapers no longer receiving government advertisements for fear of appearing to side with the media organization being punished.

The media practiced a high degree of self-censorship. Journalists in the mainstream press regularly refrained from investigative reporting on national issues. The tiny opposition press constituted the only newspapers to report regularly on controversial national issues.

Book publishing was subject to the pro forma approval of the Government, and the Government imposed the same restrictions on books as it did on other media.

The Government blocked access to a number of Internet websites, including nearly all sites belonging to domestic human

rights, opposition and Islamist groups, as well as many pornographic websites. However, in April, the Government allowed access to several foreign websites that previously had been blocked, including Hotmail, Al Jazeera, AI, and the French daily newspaper Liberation. Some foreign human rights websites remained blocked, including the website of the NGO Reporters Without Borders.

On May 3, the LTDH published the report, "Media Under Watch", that criticized the state of press freedom and discussed the means by which the Government monitored and blocked Internet usage. In July, a report on "cyber freedom", published by the Arab Information Network on Human Rights, ranked the country last among 11 Arab countries.

The Government limited academic freedom and sought to foster a culture of self-censorship in universities. The Government closely monitored administrators, teachers, and students to identify Islamic extremists. Police on university campuses, both in uniform and plainclothes, discouraged students from openly expressing dissent. Academic publications were subject to the pro forma process of submission to the Government before publication, and university libraries did not purchase foreign books or subscribe to foreign magazines deemed critical of the Government. Tight government control over academic research funds caused university administrators to not apply for grants on research topics (such as one on "voting methods") that they believed the Government would find objectionable. Professors avoided teaching classes on subjects considered sensitive, such as legal courses on political systems or classes on civil liberties.

b. Freedom of Peaceful Assembly and Association

The Constitution provides for freedom of assembly; however, the Government restricted this right in practice. Groups that wish to hold a public meeting, rally, or march must apply for and obtain a permit from the Ministry of Interior no later than 3 days before the proposed event, and they must submit a list of participants. According to diplomatic representatives, the authorities routinely approved such permits for groups that supported government positions, but consistently refused permission for groups that expressed dissenting views. In previous years, NGO leaders have reported difficulty in renting space to hold large meetings. They maintained that police pressured hotel and hall managers to prevent them from renting meeting space to the NGOs.

In March, according to human rights activists, the deputy governor of Gafsa refused to allow regional leaders of an opposition party to meet. The meeting's organizers were forced to cancel the event at the last minute.

According to opposition media, regional authorities pressured a Tozeur businessman to rescind his offer to rent a meeting hall to an opposition party in May, which he did. Other hotel managers and businessmen denied that there is a specific ban on renting space to opposition groups; however, they said they cooperated with the Ministry of Interior and accommodated its requests when possible.

On November 28, security forces prevented human rights activists from attending a meeting of the LTDH, in the town of Kairouan, by imposing road checkpoints and blocking entrance to the LTDH headquarters. On December 11, police surrounded the headquarters of the CNLT and blocked attendance at the organization's general assembly.

The Government used large numbers of police and other forces tasked with state security to monitor, control, and sometimes disrupt demonstrations. According to diplomatic representatives, the Government broke up several unsanctioned demonstrations during the year and, in many incidents, police outnumbered demonstrators. In general, demonstrators and security forces did not resort to violence; however, there were some exceptions, such as scuffles ensuing from demonstrators' attempts to cross police lines or demonstrators not dispersing when ordered by police. Security forces were prepared to respond vigorously to civil disorder.

On April 18, police convoked several NGO leaders who had organized a peaceful demonstration to protest the killing of a Palestinian leader. Some were asked to sign a written document promising not to participate in future demonstrations.

On April 23, college students in the northern town of Bizerte conducted a demonstration "in solidarity with Iraq and Palestine" that police violently dispersed. There were no reports of injuries or deaths. The official government news agency announced that the demonstration served no purpose since the Government position and that of the demonstrators were identical.

The Constitution provides for freedom of association; however, the Government generally did not respect this right in practice, particularly for groups deemed critical of its policies. The law requires that new NGOs submit an application to the Government in order to gain recognition, and to operate legally. According to the law, an NGO that has filed an application to register may operate freely, while the Government processes its application. If the Government does not reject the application within 90 days, the NGO is automatically registered.

The Government routinely and arbitrarily blocked the registration of new independent NGOs by refusing to provide receipts for their registration applications. Without such a receipt, NGOs were unable to counter the Government's assertions that they had not applied to register, and therefore were not allowed to operate. In such cases, NGOs could be shut down, their property seized, and their members prosecuted for "membership in an illegal organization."

On January 13, journalist and editor Sihem Ben Sedrine was similarly rebuffed when she attempted to register her online magazine, Kalima, despite the fact a member of the Chamber of Deputies accompanied her (see Section 2.a.).

On March 22, the Government solicited the application of the AISPP, which its president, Mohamed Nouri, duly submitted. When the Government gave him a receipt, many observers assumed that it would approve the NGO's application, since in all related cases in recent years it has refused to provide a receipt for the applications of human rights NGOs. Nevertheless, in June, the Government formally rejected its application without providing the grounds for refusal (see Section 4).

On April 26, the recently formed Tunisian Green Party submitted an application to register itself with the Government. After the party did not hear from the Government for 3 months, its president, Abdelkader Zitouni, believed that the application had been approved according to the law. Nevertheless, on July 26, the Ministry of Interior informed him that it had not received an official request for registration. Since Zitouni had not received a receipt, he was unable to prove to the Government's satisfaction that he had submitted an application (see Section 3).

On June 8, the human rights activist Radhia Nasraoui of the Tunisian Association for the Struggle against Torture (ALTT), accompanied by the NGO's vice-president, secretary general, and treasurer, attempted to submit an application to register their NGO. According to the ALTT, after government officials refused to accept their applications, the group conducted a 6-hour sit-in until police expelled them and supporters from the premises (see Section 1.f.).

c. Freedom of Religion

The Constitution provides for the freedom of religion that does not disturb public order, and the Government generally respected this right in practice, although there were some restrictions and abuses. The Government did not permit the establishment of political parties based on religion, prohibited proselytizing, and restricted the wearing of the hijab, or headscarf. Islam is the state religion, and the Constitution stipulates that the President must be a Muslim. The Government controlled and subsidized mosques, and also subsidized some synagogues. The Government paid the salaries of both Muslim prayer leaders and the country's Grand Rabbi.

The Government recognizes all Christian and Jewish religious organizations that were established before independence in 1956. Although it permits other Christian denominations to operate, the Government has only formally recognized the Catholic Church. The Government did not permit Christian groups to establish new churches. Authorities can deport foreigners suspected of proselytizing and not permit them to return; however, there were reports that the Government preferred to not renew the visas of suspected missionaries or to pressure their employers to not extend their contracts, rather than to deport them. There were no reported cases of official action against persons suspected of proselytizing during the year.

Since 1999, the Government has not permitted registration of a Jewish religious organization in Djerba; however, the group has been permitted to operate, and it performed religious activities and charitable work without restriction.

The Ministry of Religious Affairs hosted a Colloquium December 8-9 entitled "Dialogue of the Abrahamic Faiths for Tolerance and Peace", aimed at fostering mutual understanding. Representatives of the Muslim, Christian, and Jewish faiths participated.

Islamic religious education was mandatory in public schools; however, the religious curriculum for secondary school students also included histories of Judaism and Christianity.

The Government did not permit the establishment of political parties based on religion, and it used this prohibition to continue to outlaw the Islamist party An-Nahdha, and to prosecute suspected members for "membership in an illegal organization" (see Section 1.e.). In previous years, the Government revoked the identity cards of an estimated 10,000 to 15,000 Islamists and fundamentalists, which, among other consequences, prevented them from being legally employed (see Section 1.f.). Many of these individuals reportedly remained without identity cards throughout the year. The Government continued to maintain tight surveillance over Islamists.

The law provides that only persons appointed by the Government may lead activities in mosques, such as prayer or theological discussion groups. The Government required that mosques remain closed, except during prayer times and

other authorized religious ceremonies, such as marriages or funerals. According to human rights lawyers, the Government regularly questioned individuals observed praying frequently in mosques. Authorities instructed imams to espouse governmental social and economic programs during prayer times in mosques.

The Government sought to suppress certain outward signs of citizens' religious practice. For example, regulations forbade the wearing of the hijab in government offices, and there were reports of police requiring women to remove their hijab in offices, on the street, and at certain public gatherings. In several cases, school officials took disciplinary action to punish and deter hijab use, and there were reports that school and government officials detained women who wore the hijab, and attempted to make them sign written oaths renouncing it. The Government characterized the hijab as a "garment of foreign origin having a partisan connotation," and prohibited the hijab in public institutions in order to "observe impartiality required of officials in their professional relations with others." However, diplomatic representatives observed a few government employees wearing the hijab in their offices. There were reports that police sometimes detained men with "Islamic" style beards, harassed them, and compelled them to shave off their beards.

Religious publications are subject to the same restrictions on freedom of speech and the press as secular publications. Christian groups were generally allowed to distribute religious documents in English but not in Arabic. Moreover, only sanctioned religious groups were allowed to distribute religious documents. In the Government's view, distribution by other groups constituted an illegal "threat to public order" (see Section 2.a.).

Christians and Jews living in the country, including foreigners, constituted less than 1 percent of the population. The Government permitted Christians and Jews, who did not proselytize, to worship as they wished, and it allowed Jewish communities to operate private religious schools. Jewish children on the island of Djerba were permitted to divide their academic day between secular public schools and private religious schools. The Government also encouraged Jewish expatriates to return for the annual pilgrimage to the historic El-Ghriba Synagogue on the island.

The Government took a wide range of security measures to protect synagogues, particularly during Jewish holidays, and Jewish community leaders said that the level of protection that the Government provided them increased during the year. Government officials and private citizens alike often cited the country's tradition of religious tolerance as one of its strengths.

While Baha'is do not consider themselves Muslims, the Government regarded the Baha'i faith as a heretical sect of Islam, and permitted its adherents to only practice their faith in private. Ministry of Interior officials periodically met with prominent citizens of the Baha'i faith to discuss their activities, and Baha'i leaders asserted that, as a result, their community's relationship with the Government improved during the year.

Muslims who converted to another religion faced social ostracism. There were reports that the Government did not allow married couples to register the birth of their children, or receive birth certificates if the mother was Christian and the father was Muslim, and if the parents tried to give their children non-Muslim names.

For a more detailed discussion, see the 2004 International Religious Freedom Report.

d. Freedom of Movement Within the Country, Foreign Travel, Emigration, Repatriation, and Exile

The Constitution provides for these rights, and the Government generally respected them in practice; however, the Government refused to issue, renew, amend, or accept passports of some dissidents, Islamists, and their relatives. The Government also may impose a 5-year period of "administrative controls" at sentencing on certain former prisoners that constituted a type of internal exile.

The law provides that the courts can cancel passports and contains broad provisions that both permit passport seizure on national security grounds, and deny citizens the right either to present their case against seizure or to appeal the judges' decision. The Ministry of Interior is required to submit requests to seize or withhold a citizen's passport through the public prosecutor to the courts; however, the Ministry of Interior routinely bypassed the public prosecutor with impunity. The public prosecutor deferred to the Ministry of Interior on such requests.

There were numerous reports of citizens experiencing difficulty applying for or renewing their passports. Many applicants accused the Government of not acting on their applications solely on the basis of their opposition to the ruling party or Government policies. Mokhtar Boubaker, a labor leader and former chief editor of the General Union of Tunisian Workers (UGTT) weekly, Esch-Chaab, reported that the Government has refused him a passport since 2001. He said the Ministry of Interior refused to tell him the reason for not processing his renewal application. In another case, former Islamist leader Dr. Mohamed Sedki Labidi allegedly has been deprived of his passport for the last decade without a court decision. In February, the Government allegedly refused to issue a passport for the 8-month-old daughter of a former political prisoner,

now living in Europe.

The Constitution prohibits forced exile; however, the Penal Code provides for the imposition of a form of internal exile (which the Government calls "administrative control") on convicts for up to five years. Administrative control measures, which take effect upon a convict's release from prison, are similar to parole restrictions, except that they may be applied to prisoners even after they have completed their sentences. The Government assigns those individuals a place to live, which may be anywhere in the country, and they are required to stay "in the area of their residence." They also may be required to report to a police station several times each day, and at times that are determined only the previous evening. At the police station, they reportedly may be forced to wait hours before they are allowed to sign in, which made employment impossible and childcare difficult. Numerous Islamists released from prison in recent years have been subjected to such requirements.

On September 10, the Government released former journalist Abdullah Zouari, who was originally sentenced to 9 months in prison in August 2003 for violating the terms of the administrative control measures imposed on him (see Section 2.a.).

By law, administrative control measures may only be imposed at sentencing; however, a former high school teacher, Nouri Chniti, claimed that, although his sentence did not include administrative control, he has been subject to extra-judicial administrative control measures since 1991, when he received a suspended sentence for membership in An-Nadha.

Some political opponents in self-imposed exile abroad were prevented from obtaining or renewing their passports in order to return to the country.

The Constitution provides for the granting of asylum or refugee status in accordance with the 1951 U.N. Convention Relating to the Status of Refugees and its 1967 Protocol. The country is a party to the 1951 Convention relating to the Status of Refugees, the 1967 Protocol Relating to the Status of Refugees, and the Convention Governing the Specific Aspects of Refugee Problems in Africa. However, in practice, the Government has instituted no measures to protect against refoulement, the return of persons to a country where they feared persecution, and has not granted refugee status and asylum. The Government cooperated to a certain degree with the office of the U.N. High Commissioner for Refugees (UNHCR) and other humanitarian organizations in assisting refugees and asylum seekers. The Government has not officially provided temporary protection to foreign nationals who did not qualify as refugees under the 1951 Convention and 1967 Protocol.

Section 3 Political Rights: Citizens' Right to Change Their Government

The Constitution provides that citizens shall directly elect the President and members of the Chamber of Deputies for 5-year terms; however, there were significant limitations on citizens' right to change their government. Moreover, irregularities that called into question the legitimacy of elections were routine. In the October 24 national elections, President Ben Ali faced three candidates, and received 94.49 percent of the popular vote to secure a fourth term in office. The third opposition candidate, Mohamed Halouani of the Et Tajdid party, cited a number of government restrictions and other irregularities to explain why he received less that 1 percent of the official vote count. According to official election returns, more than 90 percent of registered voters went to the polls; however, independent NGOs estimated that the actual turnout was closer to 30 percent.

The elections were characterized by notable irregularities, such as voter intimidation. A coalition of three local independent NGOs (LTDH, CNLT, and the Tunisian Association of Democratic Women) cited a lack of media access by opposition candidates during the campaign period, and media bias in favor of the ruling party as serious problems. Opposition candidates and other observers also cited voter intimidation, restrictions on disseminating campaign materials and organizing campaign events, the ruling party's domination of state institutions, and political activity which precluded credible and competitive electoral challenges from unsanctioned actors.

The Electoral Code significantly limits the number of individuals eligible to run for president. A candidate must be Muslim, and must receive the endorsement of 30 sitting deputies or municipal council presidents to be eligible to run.

On August 31, the Government formed a body called the National Election Observatory, whose members were to include "national figures known for their competence, experience, and independence." The Observatory was tasked with monitoring all stages of the October 24 elections, and was to report directly to President Ben Ali. However, independent human rights activists complained that the real purpose of the Observatory was to co-opt foreign observers, and reduce pressure to allow independent groups to monitor both the elections and their preparation.

The ruling party has maintained power continuously since the country gained its independence in 1956. It dominates the Cabinet, the Chamber of Deputies, and regional and local governments. The President appoints the Prime Minister, the

Cabinet, and the 24 governors. The Government and the party are closely integrated, and current and former senior government officials constitute the top ranks of the RCD. The President of the Republic is also the president of the party, and the party's vice president and secretary general each hold the rank of minister. All the members of the RCD politburo hold ministerial rank based on their current or former government service.

RCD membership conferred tangible advantages. For example, there were widespread reports that children of RCD members were much more likely to receive scholarships and housing preferences at school. RCD members also were much more likely to receive small business permits and waivers on zoning restrictions.

To mitigate the advantages wielded by the ruling party, the Electoral Code reserves 20 percent of seats in the Chamber of Deputies (37 of 189) for the 7 officially recognized opposition parties, and distributes them on a proportional basis to those parties that won at least a single directly elected district seat. Five of the opposition parties gained seats under that provision in the October 24 elections. The RCD continued to hold the remaining 152 seats. Since opposition parties have been unsuccessful in their attempts to raise money from private contributors, the Government partially funded their campaigns. For the elections, each party represented in the Chamber of Deputies received a public subsidy of approximately $42,000 (60,000 dinars), plus an additional payment of $3,500 (5,000 dinars) per deputy. Opposition newspapers had difficulty finding sources of advertising revenue, so the Government gave each one up to $105,000 (120,000 dinars). The Government provided 3 minutes of airtime for a representative of each legislative list, and 5 minutes of airtime for each presidential candidate, in addition to limited coverage of political party meetings following the main nightly news program; however, there were reports that the statements of opposition representative were not shown on TV at all. Opposition parties were allocated equal space on bulletin boards placed in most neighborhoods for the elections.

By law, the Government does not permit the establishment of political parties on the basis of religion, language, race, or gender. The government has used the prohibition to continue to outlaw the Islamist An-Nahdha party and to prosecute suspected members for "membership in an illegal organization" (see Sections 2.b. and 2.c.). The Government refused to recognize the creation of the Tunisian Green Party, which applied for registration with the Government on April 26 (see Section 2.b.).

Prior to the October 24 elections, several opposition leaders protested the country's 2002 referendum vote, which amended half of the Constitution, questioning the legitimacy of the amendments, including the provision that allowed President Ben Ali to run for an additional term of office. Others noted the inconsistent application of the amendments, such as the Government's failure to create the new upper house of the country's legislature, the Chamber of Advisors, even 2 years after the referendum. The Government stated that, "the spirit and import of the reforms cannot come down to some of its provisions, given their wide range and diversity." For example, it cited laudable provisions that in theory increased the power of the judiciary and legislative branch relative to the executive.

Corruption in the Government existed. On March 17, the Minister of Interior announced the creation of the "Higher Institute of Security Forces and Customs," tasked not only with "reinforcing human rights and improving law enforcement," but also reducing corruption. There were no public reports of the organization's subsequent activities. There also were episodes involving petty corruption with the security forces, in particular the solicitation of bribes by police at traffic stops (see Section 1.d.).

On a number of occasions, President Ben Ali expressed the desire to increase the level of representation of women in the Government to 25 percent. In April, he appointed Tunisia's first female governor. There were 43 women in the 189-seat legislature. Two of the 25 ministers, and 5 of the 20 secretaries of state were women. More than one-fifth of municipal council members were women. Three women served as presidents of chambers on the Supreme Court. Two women served on the 15-member Higher Council of the Magistracy. The September 7 by-elections in a governorate on the outskirts of Tunis were one of the first elections held in the country without gender segregation at polling stations.

Section 4 Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Violations of Human Rights

Domestic and international groups were able to investigate and publish their findings on human rights cases; however, the Government sought to discourage investigations of human rights abuses. According to the Government, there were more than 8,000 NGOs in the country. The vast majority was devoted exclusively to social and economic development issues. There were approximately one dozen domestic human rights NGOs, although only half were authorized. The Government met with registered domestic human rights NGOs, and responded to their inquiries; however, it also harassed, targeted, and prosecuted some of them. Human rights activists and lawyers complained of frequent interruptions of postal and telephone services (see Section 1.f.).

The LTDH was one of the most active independent advocacy organizations, with 41 branches throughout the country. The organization received and investigated complaints and protested abuses. According to diplomatic representatives, the

Government continued to block a European Union grant to the LTDH, citing a law on NGO financing that includes broad prohibitions on funding of NGOs without Government approval.

Other independent human rights NGOs included: the legally registered Arab Human Rights Institute; the Tunisian Association of Democratic Women (ATFD); the unregistered AISPP; and the ALTT.

Since 1998, the Government has refused to authorize the CNLT's registration as an NGO. The CNLT issued statements sharply criticizing the Government's human rights practices. Government officials accused CNLT members of violating the pro forma submission requirements by publishing communiqués without prior government approval (see Section 2.a.).

During the year, significant numbers of RCD members continued attempts to join independent NGOs, such as the LTDH and other civil society groups, with the apparent intent of eventually gaining control of the NGOs through elections. In some cases they used the NGOs' own bylaws, while in other cases they exploited a provision of the country's law on associations that requires "organizations of a general character" to grant membership to all who apply. This strategy brought mixed results, but it could achieve eventual success, especially since the number of independent NGOs was relatively low.

During the year, the Government deterred several foreign NGOs from visiting the country to work on election monitoring projects. The Government cited the country's October 24 elections as an especially sensitive time that precluded controversial visits. The Government also sought to control and monitor the activities of some foreign NGOs within the country.

The ICRC maintained a regional office in the country. During the year, the Government entered into discussions with ICRC representatives over granting the ICRC access to the country's prisons; however, no agreement was reached during the year (see Section 1.c).

The Ministry of Justice and Human Rights has the lead on government policy on human rights issues in the country. There were also human rights offices in other ministries. The Ministry did not release any public reports of cases or investigations. A government-appointed and funded body, the Higher Commission on Human Rights and Basic Freedoms, addressed, and sometimes resolved, human rights complaints. The Higher Commission submitted confidential reports directly to President Ben Ali. The Government maintained several human rights websites, which promoted the country's human rights record; however, it continued to block access to the sites of domestic human rights organizations (see Section 2.a.).

Section 5 Discrimination Based on Race, Sex, Disability, Language, or Social Status

The Constitution provides that all citizens are equal before the law, and the Government generally respected these rights. Legal discrimination was not pervasive; however, in some areas such as inheritance and family law, Based-based provisions in the civil code adversely affected women.

Women

Violence against women occurred, however, there were no comprehensive statistics to measure its extent. Police officers and the courts tended to regard domestic violence as a problem to be handled by the family. Nonetheless, there are stiff penalties for spousal abuse. Both the fine and imprisonment for battery or violence committed by a spouse or family member are double those for the same crimes committed by an unrelated individual. The National Union of Tunisian Women (UNFT) is a government-sponsored organization that ran a center to assist women and children in difficulty, and has undertaken national educational campaigns for women. The UNFT reported that their shelter handled 1,000 cases during the year. The Tunisian Democratic Women's Association (ATFD) was active in debating and publicizing women's issues, and also operated a counseling center for women who were victims of domestic violence. The ATFD reported that their shelter assisted approximately 1,000 women. The Center for Studies, Research, Documentation, and Information on Women (CREDIF), a government research organization, reports official information on women's issues.

The Penal Code specifically prohibits rape. There is no legal exception to this law for spousal rape; however, in part due to social stigma, there were no reports of spousal rape being prosecuted. The penalty for rape with the use of violence or threat with a weapon is the death sentence. For all other rape cases, the penalty is life imprisonment.

The Penal Code prohibits prostitution; however, charges against individuals were rare. Prostitution was not a problem. The penalty for prostitution is up to two years in prison. The law applies to both women and men and their accomplices. There were no reported cases of trafficking or forced prostitution involving women.

The 2003 razorblade attacks, in which the victims were women supposedly chosen because they dressed immodestly, stopped after the arrest of two alleged perpetrators in 2003. No information was available about the status of those arrested. If convicted, the Penal Code stipulates a penalty of up to 5 years in prison for violence and use of a knife or razorblade.

Sexual harassment occurred; however, there was no comprehensive data to measure its extent. On August 2, the Chamber of Deputies passed the country's first law making sexual harassment a criminal offense; however, the Government subsequently suspended the law after civil society groups vociferously criticized it. The law would have instituted sentences of 1 year in prison and a fine of $2,500 (3,000 dinars) for individuals convicted of "publicly insulting acceptable standards of good behavior by gesture or speech."

Women enjoy substantial rights, and the Government advanced those rights in the areas of property ownership practices and support to divorced women. Women comprised approximately 30 percent of the work force. The law explicitly requires equal pay for equal work, and although there were no statistics comparing the average earnings of men and women, anecdotal evidence indicated that women and men performing the same work received the same wages. In 2003, there were an estimated 2,000 businesses headed by women. A slight majority of university students were women. There was a marked difference in female literacy rates by age. According to UN statistics, the rate of female literacy for those between the ages of 6 and 30 was over 90 percent. Female literacy for those over 50 was 10 percent.

Women served in high levels of the Government as cabinet ministers and secretaries of state, comprising more than 13 percent of the total, and President Ben Ali appointed the country's first female governor in April (see Section 3). Women constituted 37 percent of the civil service and 24 percent of the nation's total jurists. However, women still faced societal and economic discrimination in certain categories of private sector employment.

Codified civil law is based on the Napoleonic code; however, judges often used Shari' a as a basis for customary law in family and inheritance. Most property acquired during marriage, including property acquired solely by the wife, is held in the name of the husband. Muslim women are not permitted to marry outside their religion. Marriages of Muslim women to non-Muslim men abroad are considered common-law, and are voided when the couple returns to the country. Application of inheritance law continued to discriminate against women, and there was a double standard based on gender and religion: Non-Muslim women and Muslim men who are married may not inherit from each other. The Government considers all children from those marriages to be Muslim, and forbids those children from inheriting anything from their mothers. Female citizens can convey citizenship rights to their children whether the father is a citizen or not.

In February, the Government launched a morality campaign invoking a 1940 law penalizing "immoral behavior" that observers said primarily affected women. There were reports that women were detained for wearing jeans that police judged too tight, for holding hands with men in public, and for driving with young men "without authorization." According to newspaper reports, hundreds of citizens (both men and women) were sentenced to prison terms varying from 4 to 12 months for "immoral behavior."

The Ministry for Women's Affairs, Family, Children and Senior Citizens, has undertaken several national media campaigns to promote awareness of women's rights. Nearly two-thirds of its budget is devoted to ensuring the legal rights of women, while simultaneously improving their socioeconomic status. The Government supported and funded the UNFT, the CREDIF, and women's professional associations. Several NGOs focused, in whole or in part, on women's advocacy and research in women's issues, and a number of attorneys represented women in domestic cases.

Children

The Government demonstrated a strong commitment to free and universal public education, which is compulsory from age 6 to 16 years. According to UNICEF, 95 percent of boys and 93 percent of girls were in primary school, and approximately 73 percent of boys and 76 percent of girls were in secondary school. During the year, female students graduated from secondary school at a higher rate than male counterparts. There were schools for religious groups (see Section 2.c.). The Government sponsored an immunization program targeting preschool-age children, and reported that more than 95 percent of children were vaccinated. Male and female students received equal access to medical care.

Penalties for convictions for abandonment and assault on minors were severe. There was no societal pattern of abuse of children.

There were two ministries responsible for rights of children: the Ministry of Women's Affairs, Family, and Childhood, and the Ministry of Culture, Youth, and Leisure. Each had secretaries of state responsible for safeguarding the rights of children.

Trafficking in Persons

The Law prohibits trafficking in persons, and there were no reports that persons were trafficked to, from, or within the country.

On January 27, the legislature approved amendments to the 1975 law on passports and travel documents. The law includes provisions for sentencing convicted traffickers to prison terms of 3 to 20 years, and fines of $67,000 to $83,000 (80,000 to 100,000 dinars). The amendments brought national law into conformance with the international protocol agreement on trafficking of persons. The Government was also prepared to use provisions of the penal code to combat trafficking should the need arise. For example, traffickers could be prosecuted under laws prohibiting forced displacement of persons. Current law also prohibits slavery and bonded labor.

The Ministry of Interior and Local Development and the Ministry of Social Affairs, Solidarity and Tunisians Abroad were the agencies responsible for anti-trafficking efforts. Since trafficking was not a problem, there were no specific government campaigns to prevent trafficking.

Persons with Disabilities

There was little discrimination against persons with disabilities in employment, education, access to health care, or in the provision of other state services. The law prohibits such discrimination, and mandates that at least 1 percent of public and private sector jobs be reserved for persons with disabilities. The law also specifically prohibits discrimination against persons with mental disabilities. All public buildings constructed since 1991 must be accessible to persons with physical disabilities, and the Government generally enforced these provisions. The Government issued special cards to persons with disabilities for benefits such as unrestricted parking, priority medical services, preferential seating on public transportation, and consumer discounts. The Government provided tax incentives to companies to encourage the hiring of persons with physical disabilities. The Government strongly supported NGOs working to help persons with disabilities.

Several active NGOs provided educational, vocational, and recreational assistance to children and young adults with mental disabilities. The Government and international organizations funded several programs. The Ministry of Social Affairs, Solidarity and Tunisians Abroad was responsible for protecting the rights of persons with disabilities.

Section 6 Worker Rights

a. The Right of Association

The Constitution and the Labor Code provide workers the right to organize and form unions, and the Government generally respected this right in practice. The General Union of Tunisian Workers (UGTT) is the country's only labor federation. There are some unauthorized, independent trade unions: The Democratic Confederation for Labor and the Tunisian Journalists Syndicate. Approximately 30 percent of the work force belonged to the UGTT, including civil servants and employees of state-owned enterprises, and a considerably larger proportion of the work force was covered by union contracts. A union may be dissolved only by court order.

The UGTT and its member unions were legally independent of the Government and the ruling party; however, they operated under regulations that restricted their freedom of action. The UGTT membership included persons associated with all political tendencies. There were credible reports that the UGTT received substantial government subsidies to supplement modest union dues; however, UGTT leaders stated that their only funding came from modest union dues, and revenue from an insurance company and hotel owned by the union. Union members and their families received additional support from the National Social Security Account (CNSS). The Government has provided the UGTT with land for its new headquarters and support for its construction. The central UGTT leadership generally cooperated with the Government regarding its economic reform program. Throughout the year the UGTT board showed some independence regarding economic and social issues, and in support of greater democracy. The UGTT supported the LTDH, and allowed LTDH regional chapters to use UGTT facilities for conferences and meetings.

The law prohibits antiunion discrimination by employers; however, the UGTT claimed that there was antiunion activity among private sector employers, such as the firing of union activists and using temporary workers to avoid unionization. In certain industries, such as textiles, hotels, and construction, temporary workers accounted for a large majority of the work force. The Labor Code protects temporary workers, but enforcement was more difficult than in the case of permanent workers. A committee chaired by an officer from the Labor Inspectorate of the Office of the Inspector General approved all worker dismissals. The committee is composed of representatives from the Ministry of Social Affairs, Solidarity and Tunisians Abroad, the UGTT, and the company dismissing the worker.

b. The Right to Organize and Bargain Collectively

The law protects the right to organize and bargain collectively, and the Government protected this right in practice. Wages and working conditions are set in triennial negotiations between the UGTT member unions and employers. Forty-seven collective bargaining agreements set standards for industries in the private sector, and covered 80 percent of the total private sector workforce. The Government's role in private sector negotiations was minimal, consisting mainly of lending its good offices as a mediator if talks stalled; however, the Government must approve, but may not modify, all agreements. Once approved, the agreements are binding on both union and nonunion workers in the line of work that they cover. The UGTT also negotiated wages and work conditions of civil servants and employees of state-owned enterprises. The Government was the partner in such negotiations. The 2002-03 triennial labor negotiations with the UGTT and the Union of Tunisian Employers (UTICA), the private sector employer's association, resulted in a compromise of a 5 percent wage increase in most sectors.

Unions, including those representing civil servants, have the right to strike, provided that they give 10 days advance notice to the UGTT, and it grants approval. The ICFTU has characterized the requirement for prior UGTT approval of strikes as a violation of worker rights; however, such advance approval rarely was sought in practice. There were numerous short-lived strikes over failure by employers to fulfill contract provisions regarding pay and conditions, and over efforts by employers to impede union activities. While the majority of the strikes technically were illegal, the Government did not prosecute workers for illegal strike activity, and the strikes were reported objectively in the press. The law prohibited retribution against strikers. Labor disputes were settled through conciliation panels in which labor and management are represented equally. Tripartite regional arbitration commissions settle industrial disputes when conciliation fails.

There were export-processing zones (EPZs) in the country. Organization and collective bargaining rights were not denied by law or practice in EPZs, nor were there any special laws or exemptions of regular labor laws for these zones.

c. Prohibition of Forced or Compulsory Labor

The law prohibits forced and compulsory labor, including by children, and there were no reports that such practices occurred. However, some parents of teenage girls placed their daughters as domestic servants and collected their wages (see Section 6.d.).

d. Status of Child Labor Practices and Minimum Age for Employment

Child labor did not pose a significant problem. The minimum age for employment was 16 years, and was consistent with the age for completing educational requirement (see Section 5). The minimum age for light work in the non-industrial and agricultural sectors, during non-school hours, was 13 years. Workers between the ages of 14 and 18 must have 12 hours of rest per day, which must include the hours between 10 p.m. and 6 a.m. In nonagricultural sectors, children between the ages of 14 and 16 years may work no more than 2 hours per day. The total time that children spend in school and work may not exceed 7 hours per day. The minimum age for hazardous or manual labor is 18 years.

The Government adhered to the standards of International Labor Organization Convention 182, and enacted regulations concerning the "worst forms of child labor" and "hazardous" work. Inspectors of the Ministry of Social Affairs and Solidarity examined the records of employees to verify that employers complied with the minimum age law. Nonetheless, as in most agricultural economies, young children sometimes performed agricultural work in rural areas, and worked as vendors in towns, primarily during their summer vacation from school. There were no reports of sanctions against employers.

Child labor existed in the informal sector, disguised as apprenticeship, particularly in the handicraft industry, and in the cases of teenage girls whose families placed them as domestic servants. There was no reliable data on the extent of this phenomenon.

e. Acceptable Conditions of Work

The Labor Code provides for a range of administratively determined minimum wages, which are set by a commission of representatives from the Ministry of Finance, the Ministry of Social Affairs, Solidarity and Tunisians Abroad, and the Ministry of Development and International Cooperation, in consultation with the UGTT and the UTICA, and approved by the President. In July, the industrial minimum wage was raised to $173 (218 dinars) per month for a 48-hour workweek and to $151 (189 dinars) per month for a 40-hour workweek. The agricultural daily minimum wage is $5.66 (7 dinars) per day for "specialized" agricultural workers and $5.94 (7 dinars) per day for "qualified" agricultural workers. With the addition of transportation and family allowances, the minimum wage provided a decent standard of living for a worker and family; however, that income was only enough to cover essential costs. In addition, the more than 500,000 workers were employed in the informal sector, which was not covered by labor laws.

Regional labor inspectors were responsible for enforcing standards related to hourly wage regulations. They inspected most firms approximately once every 2 years. However, the Government often had difficulty enforcing the minimum wage law, particularly in non-unionized sectors of the economy.

The Labor Code sets a standard 48-hour workweek for most sectors and requires one 24-hour rest period per week.

The Ministry of Social Affairs, Solidarity and Tunisians Abroad had responsibility for enforcing health and safety standards in the workplace. There were special government regulations covering hazardous occupations like mining, petroleum engineering, and construction. Working conditions and standards tended to be better in firms that were export oriented than in those producing exclusively for the domestic market. Workers were free to remove themselves from dangerous situations without jeopardizing their employment, and they could take legal action against employers who retaliated against them for exercising this right.

The few foreign workers in the country had the same protections as citizen workers.

 BACK TO TOP